*SOLICITATION VERSION*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PES HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 18-10122 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**JOINT PREPACKAGED CHAPTER 11**
**PLAN OF REORGANIZATION OF PES HOLDINGS, LLC AND ITS DEBTOR AFFILIATES**

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Steven N. Serajeddini (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              steven.serajeddini@kirkland.com

- and -

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Matthew C. Fagen (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        edward.sassower@kirkland.com
              matthew.fagen@kirkland.com

Laura Davis Jones (DE Bar No. 2436)
Timothy Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 870
Wilmington, Delaware 19899
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              pkeane@pszjlaw.com

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PES Holdings, LLC (8157); North Yard Financing, LLC (6284); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Logistics GP, LLC (9202); PES Logistics Partners, L.P. (1288); PESRM Holdings, LLC (2107); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is:  1735 Market Street, Philadelphia, Pennsylvania 19103.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................................1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
     GOVERNING LAW, AND OTHER REFERENCES**................................................................1
    A.      Defined Terms ...............................................................................................................1
    B.      Rules of Interpretation ................................................................................................15
    C.      Computation of Time ..................................................................................................15
    D.      Governing Law ...........................................................................................................15
    E.      Reference to Monetary Figures ..................................................................................16
    F.      Reference to the Debtors or the Reorganized Debtors ...............................................16
    G.      Controlling Document.................................................................................................16

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS**................................................16
    A.      Administrative Claims ................................................................................................16
    B.      DIP Facility Claims ....................................................................................................16
    C.      Professional Fee Claims..............................................................................................17
    D.      Priority Tax Claims ....................................................................................................17
    E.      Statutory Fees.............................................................................................................17

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**...........17
    A.      Classification of Claims and Interests........................................................................17
    B.      Treatment of Classes of Claims and Interests ...........................................................18
    C.      Special Provision Governing Unimpaired Claims .....................................................22
    D.      Elimination of Vacant Classes ...................................................................................22
    E.      Voting Classes; Presumed Acceptance by Non-Voting Classes ...............................22
    F.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................22
    G.      Intercompany Interests ...............................................................................................22
    H.      Subordinated Claims and Interests .............................................................................22

**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN**.............................23
    A.      General Settlement of Claims, Interests, and Causes of Action................................23
    B.      Restructuring Transactions .........................................................................................23
    C.      Sources of Consideration for Plan Distributions........................................................24
    D.      New Intermediation Facility and New First Loss Facility ........................................25
    E.      Management Incentive Plan ........................................................................................26
    F.      Exemption from Registration Requirements...............................................................26
    G.      Vesting of Assets .......................................................................................................26
    H.      Cancelation of Instruments, Certificates, and Other Documents ..............................27
    I.      Corporate Action ........................................................................................................27
    J.      Corporate Existence ...................................................................................................27
    K.      New Organizational Documents .................................................................................28
    L.      Effectuating Documents; Further Transactions..........................................................28
    M.      Section 1146(a) Exemption ........................................................................................29
    N.      Directors and Officers ................................................................................................29
    O.      Employee Arrangements of the Reorganized Debtors ...............................................29
    P.      Restructuring Expenses...............................................................................................30
    Q.      Preservation of Causes of Action ..............................................................................30
    R.      Wind Down and Dissolution of the Debtors ..............................................................31

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .....................31
    A.      Assumption or Rejection of Executory Contracts and Unexpired Leases....................31

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..............................................................................................................................1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW, AND OTHER REFERENCES**...........................................................1
    A.     Defined Terms ..........................................................................................................1
    B.     Rules of Interpretation ...........................................................................................15
    C.     Computation of Time .............................................................................................15
    D.     Governing Law .......................................................................................................15
    E.     Reference to Monetary Figures ..............................................................................16
    F.     Reference to the Debtors or the Reorganized Debtors ..........................................16
    G.     Controlling Document.............................................................................................16

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS**...............................................16
    A.     Administrative Claims ............................................................................................16
    B.     DIP Facility Claims ...............................................................................................16
    C.     Professional Fee Claims.........................................................................................17
    D.     Priority Tax Claims ................................................................................................17
    E.     Statutory Fees.........................................................................................................17

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**...........17
    A.     Classification of Claims and Interests....................................................................17
    B.     Treatment of Classes of Claims and Interests .......................................................18
    C.     Special Provision Governing Unimpaired Claims .................................................22
    D.     Elimination of Vacant Classes ...............................................................................22
    E.     Voting Classes; Presumed Acceptance by Non-Voting Classes ...........................22
    F.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................22
    G.     Intercompany Interests ...........................................................................................22
    H.     Subordinated Claims and Interests.........................................................................22

**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN**..............................23
    A.     General Settlement of Claims, Interests, and Causes of Action............................23
    B.     Restructuring Transactions .....................................................................................23
    C.     Sources of Consideration for Plan Distributions ...................................................24
    D.     New Intermediation Facility and New First Loss Facility ....................................25
    E.     Management Incentive Plan ...................................................................................26
    F.     Exemption from Registration Requirements..........................................................26
    G.     Vesting of Assets ...................................................................................................26
    H.     Cancelation of Instruments, Certificates, and Other Documents ..........................27
    I.     Corporate Action....................................................................................................27
    J.     Corporate Existence ...............................................................................................27
    K.     New Organizational Documents ............................................................................28
    L.     Effectuating Documents; Further Transactions.....................................................28
    M.     Section 1146(a) Exemption ...................................................................................29
    N.     Directors and Officers ...........................................................................................29
    O.     Employee Arrangements of the Reorganized Debtors ..........................................29
    P.     Restructuring Expenses ..........................................................................................30
    Q.     Preservation of Causes of Action...........................................................................30
    R.     Wind Down and Dissolution of the Debtors ........................................................31

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .....................31
    A.     Assumption or Rejection of Executory Contracts and Unexpired Leases.............31

**TABLE OF CONTENTS (CONT'D)**

B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases......................32
C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases....................32
D.    Indemnification ...............................................................................................................33
E.    Insurance Policies ...........................................................................................................33
F.    Contracts and Leases After the Petition Date..................................................................33
G.    Reservation of Rights......................................................................................................33
H.    Nonoccurrence of Effective Date....................................................................................34

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................34**
A.    Distributions on Account of Claims and Interests Allowed as of the Effective Date ....34
B.    Rights and Powers of the Distribution Agent..................................................................34
C.    Special Rules for Distributions to Holders of Disputed Claims......................................34
D.    Delivery of Distributions ................................................................................................35
E.    Claims Paid or Payable by Third Parties ........................................................................36
F.    Setoffs .............................................................................................................................37
G.    Allocation Between Principal and Accrued Interest .......................................................37

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS......37**
A.    Disputed Claims Process.................................................................................................37
B.    Claims Administration Responsibilities..........................................................................38
C.    Adjustment to Claims Without Objection .......................................................................38
D.    Disallowance of Claims and Interests ............................................................................38

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN .........................................38**
A.    Discharge of Claims and Termination of Interests..........................................................38
B.    Releases by the Debtors...................................................................................................39
C.    Releases by Holders of Claims and Interests ..................................................................39
D.    Exculpation .....................................................................................................................40
E.    Injunction ........................................................................................................................40
F.    Protection Against Discriminatory Treatment ................................................................41
G.    Release of Liens ..............................................................................................................41
H.    Reimbursement or Contribution......................................................................................41
I.    Recoupment .....................................................................................................................41
J.    Subordination Rights.......................................................................................................41

**ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE............................42**
A.    Conditions Precedent to the Effective Date ....................................................................42
B.    Waiver of Conditions ......................................................................................................43
C.    Effect of Non-Occurrence of Conditions to Consummation ...........................................43
D.    Substantial Consummation..............................................................................................43

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN............43**
A.    Modification of Plan .......................................................................................................43
B.    Effect of Confirmation on Modifications........................................................................43
C.    Revocation or Withdrawal of Plan ..................................................................................44

**ARTICLE XI. RETENTION OF JURISDICTION ................................................................44**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................................45**
A.    Immediate Binding Effect...............................................................................................45
B.    Additional Documents.....................................................................................................45
C.    Dissolution of the Creditors' Committee ........................................................................46
D.    Payment of Statutory Fees ..............................................................................................46
E.    Reservation of Rights......................................................................................................46

## TABLE OF CONTENTS (CONT'D)

**Page**

F.    Successors and Assigns ................................................................................. 46
G.    Service of Documents .................................................................................. 46
H.    Term of Injunctions or Stays ....................................................................... 47
I.     Entire Agreement ........................................................................................ 48
J.     Plan Supplement ......................................................................................... 48
K.    Non-Severability ......................................................................................... 48
L.     Votes Solicited in Good Faith ..................................................................... 48
M.    Closing of Chapter 11 Cases ....................................................................... 48
N.    Waiver or Estoppel ..................................................................................... 48

**Annex I** ......................................................................................................................... **50**

**Annex II** ........................................................................................................................ **51**

**Annex III** ...................................................................................................................... **52**

**INTRODUCTION**

PES Holdings, LLC and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases jointly propose this chapter 11 plan of reorganization (the "Plan") pursuant to section 1121(a) of the Bankruptcy Code. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of PES Holdings, LLC and its Debtors Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.    *Defined Terms*

1.    "*Additional Financing*" means $75 million of additional liquidity, to be funded from the Additional Financing Facility Documents with the Additional Financing Lender pursuant to the Additional Financing Facility Documents.

2.    "*Additional Financing Facility*" means the $75 million loan provided by the Additional Financing Lender pursuant to the Additional Financing Facility Documents.

3.    "*Additional Financing Facility Commitment Letter*" means the commitment letter attached as **Annex III** to the Plan, including the term sheets attached thereto.

4.    "*Additional Financing Facility Documents*" means the credit agreement and all other documents to be entered into in connection with the financing of the Additional Financing, on terms materially consistent with the Additional Financing Facility Commitment Letter and otherwise reasonably acceptable to the Required Consenting Cash Flow Creditors and the Additional Financing Lender as set forth in the Restructuring Support Agreement.

5.    "*Additional Financing Lender*" means Sunoco Logistics Partners Operations L.P. (or an affiliate thereof).

6.    "*Admin*" means PES Administrative Services, LLC.

7.    "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code.

8.    "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

9.    "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b)

Unimpaired Claims shall be affirmatively determined to be Allowed Claims to the same extent such Claims would be allowed under applicable nonbankruptcy law.

10.    "*Assignee*" means PES Inc., the Reorganized Debtors, or any subsidiary thereof, as reasonably determined by the Debtors, the Parent, the Required Consenting Term Loan B Creditors, and, solely to the extent adversely affecting their rights, the Required Consenting NYL Creditors.

11.    "*Assumed Agreements and Permits*" means all of the rights, title and interest of Parent in, to and under the Parent Agreements and Parent Permits other than the Excluded Liabilities, Excluded Parent Cash, and Excluded Contracts.

12.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

13.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

14.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

15.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

16.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

17.    "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guarantees, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through and including 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

18.    "*Certificate*" means any instrument evidencing a Claim or an Interest.

19.    "*CFIUS*" means the Committee on Foreign Investment in the United States.

20.    "*CFIUS Approval*" means written notice from CFIUS stating that: (a) the Restructuring Transactions are not "covered transactions" and are not subject to review under the Defense Production Act of 1950, as amended and codified at 50 U.S.C. 4565 (the "DPA"); (b) the review of the Restructuring Transactions under Section 721 of the DPA, including any subsequent investigation, has been concluded, and there are no unresolved national security concerns with respect to the Restructuring Transactions; or (c) CFIUS has sent a report to the President of the United States requesting the President's decision on the CFIUS notice submitted by any of Parent, the Debtors and the Consenting Creditors and either (i) the period under the DPA during which the President may announce his decision to take action to suspend, prohibit or place any limitations on the Restructuring Transactions has expired without any such action being threatened, announced or taken or (ii) the President has announced a decision not to take any action to suspend, prohibit or place any limitations on the Restructuring Transactions.

21.     "*CFIUS Filing*" means a joint voluntary notice by any of the Parent, the Debtors and the Consenting Creditors contemplated under 31 C.F.R. § 800.402 with respect to the Restructuring Transactions.

22.     "*CFIUS Investigation*" means prior to the Effective Date, CFIUS has initiated or prompted Parent, any of the Debtors or Consenting Creditors to initiate and has not closed a review or investigation under section 721 of the DPA of the Restructuring Transactions.

23.     "*Chapter 11 Cases*" means the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code and shall exclude, for the avoidance of doubt, a RIN Liability.

25.     "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

26.     "*Collective Bargaining Agreement*" means the Collective Bargaining Agreement, dated as of June 29, 2015 (as amended from time to time), between PESRM and the Unions.

27.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

28.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

29.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

30.     "*Confirmation Order*" means an order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

31.     "*Consenting Creditors*" means each Term Loan Lender, DIP Commitment Party, Additional Financing Lender, and Intermediation Lender (if applicable) that executes a signature page, or is otherwise a party, to the Restructuring Support Agreement.

32.     "*Consenting NYL Creditors*" means, collectively, the Term Loan A Lenders that are parties to the Restructuring Support Agreement.

33.     "*Consenting Term Loan B Creditors*" means, collectively, the Term Loan B Lenders that are parties to the Restructuring Support Agreement.

34.     "*Consummation*" means the occurrence of the Effective Date.

35.     "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

36.     "*Creditors' Committee*" means the official committee of unsecured creditors, if any, appointed in the Chapter 11 Cases.

37.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

38.     "*CSAM*" means Credit Suisse Asset Management, LLC, on behalf of, as the investment advisor to, or manager of, certain investment vehicles.

39.     "*D&O Liability Insurance Policies*" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', officers', and employees' liability.

40.     "*Debtors*" means, collectively, PES Holdings, PESRM Holdings, LLC, PES Logistics GP, LLC, PESRM, PES Logistics Partners, L.P., Admin, NYGP, NYL, and North Yard Financing, LLC.

41.     "*DIP Commitment*" means the commitment of the DIP Commitment Parties to backstop the funding of the DIP Facility.

42.     "*DIP Commitment Fee*" means 5.0% of the New Equity in the form of shares of New Class A Common Stock, subject to dilution by the Management Incentive Plan.

43.     "*DIP Commitment Parties*" means CSAM and Halcyon.

44.     "*DIP Credit Agreement*" means that certain Credit Agreement, by and among PESRM, Admin, the DIP Facility Lenders, and the DIP Facility Agent, as may be amended, restated, supplemented, or otherwise modified from time to time.

45.     "*DIP Election Date*" has the meaning set forth in the Restructuring Support Agreement.

46.     "*DIP Election Joinder*" means a joinder to the Restructuring Support Agreement pursuant to which a Consenting Term Loan B Creditor may, prior to the DIP Election Date, commit to, among other things, (a) fund its ratable share of the DIP Facility, (b) support the Plan, and (c) timely fulfill such commitments.

47.     "*DIP Facility*" means that certain $120,000,000.00 senior secured term loan debtor in possession credit facility under the DIP Credit Agreement.

48.     "*DIP Facility Agent*" means Cortland Capital Markets Services LLC, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, or its successor thereunder.

49.     "*DIP Facility Amount*" means $120,000,000.

50.     "*DIP Facility Claims*" means any and all Claims derived from, based upon, or secured by, the DIP Facility Loan Documents.

51.     "*DIP Facility Lenders*" means, collectively, the lenders party from time to time to the DIP Credit Agreement, which initially, shall be the DIP Commitment Parties and the Electing DIP Facility Lenders.

52.     "*DIP Facility Loan Documents*" means the DIP Credit Agreement and any amendments, modifications, supplements thereto, as well as any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the DIP Credit Agreement.

53.     "*DIP Facility Orders*" means, collectively, the interim and final orders entered by the Bankruptcy Court (a) authorizing certain Debtors to enter into the DIP Credit Agreement and incur postpetition obligations thereunder, (b) granting certain Debtors the authority to use cash collateral and prepetition collateral and (c) granting adequate protection to the Holders of certain Secured Claims.

54.     "*Disallowed*" means any claim that is not Allowed.

55.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

56.    "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

57.    "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select, in consultation with the Required Consenting Term Loan B Creditors, to make or to facilitate distributions in accordance with the Plan.

58.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

59.    "*Effective Date*" means the date that is the first business day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and the Plan is deemed effective by the Debtors.

60.    "*Electing DIP Facility Lenders*" means the Consenting Term Loan B Creditors who executed a DIP Election Joinder prior to the DIP Election Date.

61.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

62.    "*Estate*" means the estate of any Debtor created under section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

63.    "*Exculpated Parties*" means collectively, and in each case in its capacity as such:  (a) the Debtors and Reorganized Debtors; (b) to the maximum extent permitted under law, (i) the Consenting NYL Creditors, (ii) the Consenting Term Loan B Creditors, (iii) the Term Loan A Agent, (iv) the Term Loan B Agent, (v) the Refining ABL Lenders, (vi) the Refining ABL Agent, (vii) the Parent Parties, (viii) the DIP Facility Lenders, (ix) the DIP Agent, (x) the DIP Commitment Parties, (xi) the Additional Financing Lender, (xii) the Purchaser, and (xiii) the Intermediation Lenders; (c) with respect to each of the foregoing entities in clauses (a) and, to the extent applicable, (b), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; and (d) with respect to each of the foregoing Entities in clauses (a) and, to the extent applicable, (b) and (c), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (c), each solely in their capacity as such).

64.    "*Excluded Contracts*" means the Parent equity agreements, subscription agreements, and related agreements.

65.    "*Excluded Parent Cash*" means any Cash of the Parent other than the Parent Cash Contribution.

66.    "*Excluded Entities*" means PESRM, PES Holdings, and PES Admin under the Sale Transaction.

67.    "*Excluded Liabilities*" means any and all Liabilities arising from or incurred under (i) the PES Advisory Agreement, the PES Registration Rights Agreement or the Parent LLC Agreement; and (ii) any other Parent Agreements, Parent Permits, or Liabilities of Parent in each case under this clause (ii) based on the reasonable agreement of the Debtors and the Required Consenting Term Loan B Creditors, Parent, and, solely to the extent adversely affecting their rights or obligations under the Plan, the Required Consenting NYL Creditors, other than the PES Refining Contribution Agreement and the Parent Employment Agreements and any rights, title, interest and Liabilities thereunder, which are agreed to not be Excluded Liabilities.

68.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.     "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

70.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court.

71.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

72.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

73.     "*First Loss Claim*" means any Claim held by a First Loss Lender arising under, derived from, or based on the First Loss Facility.

74.     "*First Loss Facility*" means that certain schedule to the 2002 Master Agreement, dated as of October 7, 2014, between Merrill Lynch Commodities, Inc. and PES Inventory Company, LLC and the related ancillary agreements.

75.     "*First Loss Lender*" means BTO Commodities L.P.

76.     "*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Professional Fee Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Refining ABL Claim, a Term Loan Claim, an NGL Facility Claim, an Intermediation Claim, a First Loss Claim, or a DIP Facility Claim.

77.     "*Governance Term Sheet*" means the term sheet attached as **Annex I** to the Plan.

78.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

79.     "*Halcyon*" means Halcyon Capital Management LP and its subsidiary management companies on behalf of, as the investment advisors to, or managers of, certain investment vehicles.

80.     "*Holder*" means an Entity holding a Claim or Interest, as applicable.

81.     "*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as may be amended from time to time.

82.     "*HSR Approval*" means the waiting period (and any extension thereof) applicable to the consummation of the Restructuring Transactions under the HSR Act shall have expired or early termination thereof shall have been granted.

83.     "*HSR Filing*" means an appropriate filing of a Notification and Report Form pursuant to the HSR Act with respect to the Restructuring Transactions.

84.     "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

85.     "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors,

officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

86.     "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

87.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

88.     "*Intercompany Interest*" means, other than an Interest in PES Holdings, an Interest in a Debtor held by a Debtor.

89.     "*Interest*" means the membership interest, common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

90.     "*Intermediation Claim*" means any Claim held by an Intermediation Lender, in its capacity as such, arising under, derived from, or based on the Intermediation Facility.

91.     "*Intermediation Facility*" means that certain Amended and Restated Supply and Offtake Agreement, dated as of October 7, 2014, by and among PESRM, Admin, and Merrill Lynch Commodities, Inc. and the related ancillary agreements (in each case, as amended from time to time).

92.     "*Intermediation Lenders*" means Merrill Lynch Commodities, Inc. and PES Inventory Company, LLC.

93.     "*Liabilities*" means any and all liabilities, obligations, commitments, undertakings, fines, indemnities, fees, debts, payments, Liens, Claims, charges or other encumbrances.

94.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

95.     "*Liquidator*" means such Entity as may be designated by the Debtors as liquidator to effectuate the Wind Down.

96.     "*Management Incentive Plan*" means the Reorganized Debtors' management incentive plan.

97.     "*New Board*" means the Board of Directors of PES Inc.

98.     "*New Class A Common Stock*" means new shares of Class A common stock of PES Inc.

99.     "*New Class B Common Stock*" means new shares of Class B common stock of PES Inc.

100.     "*New Common Stock*" means the New Class A Common Stock and the New Class B Common Stock.

101.     "*New Equity*" means (i) the shares of the New Class A Common Stock and (ii) the New Membership Interests with paired shares of New Class B Common Stock.  For purposes of calculating a percentage amount of New Equity to be issued to any one or more persons, such percentage shall be calculated as a fraction with:  (a) the numerator representing such number of shares of New Class A Common Stock (with an equal number of New Membership Interests to be issued to PES Inc.) or such number of New Membership Interests (with an equal number of shares of New Class B Common Stock to be issued to such persons) to be issued, as applicable, and (b) the denominator representing all New Membership Interests to be outstanding on the Effective Date immediately upon consummation of the Restructuring Transactions, subject to dilution by the Management Incentive Plan.

102.    "*New First Lien Facility Administrative Agent*" means Cortland Capital Markets Services LLC, in its capacity as administrative agent under the New First Lien Term Loan Credit Agreement, and any successor thereto.

103.    "*New First Lien Term Loan*" means that certain term loan facility, consisting of Tranche A, Tranche B and Tranche C, that PES Holdings will incur on the Effective Date, on terms consistent with the New First Lien Term Loan Term Sheet and reasonably acceptable to the Required Consenting Cash Flow Creditors as set forth in the Restructuring Support Agreement.

104.    "*New First Lien Term Loan Credit Agreement*" means the credit agreement evidencing the New First Lien Term Loan and reasonably acceptable to the Required Consenting Cash Flow Creditors as set forth in the Restructuring Support Agreement.

105.    "*New First Lien Term Loan Documents*" means the New First Lien Term Loan Credit Agreement, and any guarantee, security agreement, deed of trust, mortgage, and other relevant documentation entered into in connection therewith that shall be reasonably acceptable to the Required Consenting Cash Flow Creditors as set forth in the Restructuring Support Agreement.

106.    "*New First Lien Term Loan Term Sheet*" means the term sheet attached as **Annex II** to the Plan.

107.    "*New First Loss Facility*" means that certain first loss facility (if any) reasonably acceptable to the Required Consenting Cash Flow Creditors as set forth in the Restructuring Support Agreement.

108.    "*New Intermediation Facility*" means that certain intermediation facility reasonably acceptable to the Required Consenting Cash Flow Creditors as set forth in the Restructuring Support Agreement.

109.    "*New LLC Agreement*" means the amended and restated limited liability company agreement of the Reorganized Partnership, which shall be consistent in all material respects with the Governance Term Sheet and reasonably acceptable to the Required Consenting Term Loan B Creditors and Parent as set forth in the Restructuring Support Agreement.

110.    "*New Membership Interests*" means the new membership interests in the Reorganized Partnership to be issued and distributed under the Plan.

111.    "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each of the Reorganized Partnership, the Reorganized Debtors and PES Inc., including the New LLC Agreement and the New Stockholders Agreement, which shall be consistent in all material respects with the Governance Term Sheet and reasonably acceptable to the Required Consenting Term Loan B Creditors and Parent as set forth in the Restructuring Support Agreement.

112.    "*New Stockholders Agreement*" means a stockholders agreement, to become effective on the Effective Date, by and among PES Inc., the Reorganized Partnership, and all recipients of New Equity under the Plan, which shall be consistent in all material respects with the Governance Term Sheet and reasonably acceptable to the Required Consenting Term Loan B Creditors and Parent as set forth in the Restructuring Support Agreement.

113.    "*NGL*" means NGL Energy Partners LP, a Delaware master limited partnership.

114.    "*NGL Facility*" means the Installment Sale and Purchase Agreement, dated as of May 7, 2014 (as amended from time to time), by and among PESRM, as the purchaser, and NGL, as the seller.

115.    "*NGL Facility Claim*" means any Claim held by NGL, arising under, derived from, or based on the NGL Facility.

116.    "*NYGP*" means North Yard GP, LLC.

117.    "*NYL*" means North Yard Logistics, L.P.

118.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

119.    "*Other Secured Claim*" means any Secured Claim against any of the Debtors, other than a Refining ABL Claim, DIP Facility Claim, NGL Facility Claim, First Loss Claim, Intermediation Claim, Term Loan A Claim, or Term Loan B Claim.

120.    "*Parent*" means Philadelphia Energy Solutions LLC.

121.    "*Parent Agreements*" means agreements or contracts to which Parent is a party or a beneficiary and has rights or interests exclusive of the rights and interest of the Debtors, including the PES Advisory Agreement, PES Registration Rights Agreement, PES Refining Contribution Agreement, the Parent Employment Agreements, and the Parent LLC Agreement.

122.    "*Parent Cash Contribution*" means the $65.0 million in Cash, payable by the Parent to the Debtors on the Effective Date, in accordance with the Plan.

123.    "*Parent Employment Agreements*" means the Severance Program.

124.    "*Parent LLC Agreement*" means that certain Amended and Restated Limited Liability Company Agreement of Parent, dated as of September 8, 2012, and as amended from time to time.

125.    "*Parent Parties*" shall have the meaning set forth in the Restructuring Support Agreement.

126.    "*Parent Permits*" means licenses, franchises, permits, certificates, approvals or other similar authorizations of the Parent.

127.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

128.    "*PES Holdings*" means PES Holdings, LLC, a Delaware limited liability company, the parent of PESRM Holdings, LLC, PES Logistics GP, LLC, PESRM, PES Logistics Partners, L.P., Admin, NYGP, NYL, and North Yard Financing, LLC.

129.    "*PES Inc.*" means a newly formed Delaware corporation to be the new top level parent entity of the Reorganized Debtors.

130.    "*PESRM*" means Philadelphia Energy Solutions Refining and Marketing LLC.

131.    "*PES Advisory Agreement*" means that certain Advisory Agreement, dated as of September 8, 2012, by and among Parent and the other parties thereto.

132.    "*PES Advisory Agreement Liabilities*" means any and all Liabilities arising from or incurred under the PES Advisory Agreement, which, for the avoidance of doubt, are to be released by the Parent Parties pursuant to Article VIII.C of the Plan.

133.    "*PES Refining Contribution Agreement*" means that certain Refining Contribution Agreement, dated as of July 2, 2012 and amended as of September 8, 2012, by and among Parent, PESRM and the other parties thereto.

134.    "*PES Registration Rights Agreement*" means that certain Registration Rights Agreement, dated as of September 8, 2012, by and among Parent and the other parties thereto.

135.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

136.    "*Plan*" means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules and supplements hereto (including any appendices, exhibits, schedules and supplements to the Plan that are contained in the Plan Supplement), as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof.

137.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules), to be Filed by the Debtors no later than 7 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents or amendments to previously Filed documents, Filed before the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) the New First Lien Term Loan Credit Agreement; (c) the New First Loss Facility (if any); (d) the New Intermediation Facility; (e) the Additional Financing Facility Documents; (f) a list of retained Causes of Action; (g) a disclosure of the members of the New Board; (h) the Purchase Agreement; (i) the Schedule of Rejected Executory Contracts and Unexpired Leases; and (j) the Restructuring Transactions Exhibit.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

138.    "*PNC Fee*" has the meaning set forth in Restructuring Support Agreement.

139.    "*Prepetition Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of April 4, 2013, by and among the Refining ABL Agent and the Term Loan B Agent, and acknowledged and agreed to by the Debtors.

140.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

141.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claims or Allowed Interests under the Plan.

142.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

143.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C of the Plan.

144.    "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been previously paid.

145.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount as set forth in Article II.C of the Plan.

146.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

147.    "*Purchase Agreement*" means that certain asset purchase agreement between the Debtors and the Purchaser, to be included in the Plan Supplement, and which shall be in form and substance reasonably acceptable to

the Parent, the Required Consenting Term Loan B Creditors, and, solely to the extent adversely affecting their rights or obligations under the Plan, the Required Consenting NYL Creditors.

148.    "*Purchaser*" shall have the meaning set forth in the Purchase Agreement.

149.    "*Rail Terminaling Services Agreement*" means the Rail Terminaling Services Agreement, dated as of January 1, 2015 (as amended from time to time), by and between PESRM and NYL, and related agreements including the services and secondment and easement agreements.

150.    "*Rail Terminaling Services Agreement Liabilities*" means any and all liabilities, obligations, commitments, undertakings, fines, indemnities, fees, debts, or payments arising from or incurred under the Rail Terminaling Services Agreement, which, for the avoidance of doubt, are to be canceled and released pursuant to Article III.B.10 and Article V.A of the Plan.

151.    "*Refining ABL Agent*" means Bank of America, N.A., in its capacity as administrative agent for the Refining ABL Lenders.

152.    "*Refining ABL Claims*" means any Claim held by the Refining ABL Lenders, in their capacity as such, arising under, derived from, or based on the Refining ABL Credit Agreement.

153.    "*Refining ABL Credit Agreement*" means the Amended and Restated Revolving Credit and Guaranty Agreement, dated as of October 7, 2014 (as amended from time to time), by and among PESRM, as the borrower, Admin, as guarantor, the Refining ABL Agent, and the Refining ABL Lenders.

154.    "*Refining ABL Facility*" means the Revolving Credit Loans, as defined in the Refining ABL Credit Agreement.

155.    "*Refining ABL Lenders*" means any Revolving Lender, as defined in the Refining ABL Credit Agreement.

156.    "*Reinstate,*" "*Reinstated,*" or "*Reinstatement*" means, with respect to Claims or Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

157.    "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Parent Parties; (c) the Term Loan A Lenders; (d) the Term Loan B Lenders; (e) the Term Loan A Agent; (f) the Term Loan B Agent; (g) the Intermediation Lenders; (h) the First Loss Lenders; (i) the Refining ABL Lenders; (j) the Refining ABL Agent; (k) the DIP Facility Lenders; (l) the DIP Facility Agent; (m) the DIP Commitment Parties; (n) the Additional Financing Lender; (o) the Purchaser; (p) with respect to each of the foregoing entities in clauses (a) through (o), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; and (q) with respect to each of the foregoing Entities in clauses (a) through (p), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (p), each solely in their capacity as such); *provided, however*, that any Holder of a Claim or Interest that (i) votes to reject the Plan and (ii) objects to the releases in the Plan shall not be a "Released Party."

158.    "*Releasing Parties*" means collectively, and in each case solely in its capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Parent Parties; (c) the Term Loan A Lenders; (d) the Term Loan B Lenders; (e) the Term Loan A Agent; (f) the Term Loan B Agent; (g) the Intermediation Lenders; (h) the First Loss Lenders; (i) the Refining ABL Lenders; (j) the Refining ABL Agent; (k) the DIP Facility Lenders; (l) the DIP Facility Agent; (m) the DIP Commitment Parties; (n) the Additional Financing Lender; (o) the Purchaser; (p) with respect to each of the foregoing entities in clauses (a) through (o), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; (q) with respect to each of the foregoing Entities

in clauses (a) through (p), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (p), each solely in their capacity as such); and (r) all Holders of Claims and Interests not described in the foregoing clauses (a) through (q); *provided, however*, that any Holder of a Claim or Interest that (i) votes to reject the Plan and (ii) objects to the releases in the Plan shall not be a "Releasing Party."

159.    "*Reorganization Transaction*" means the form of Restructuring Transaction under which the Debtors' assets shall vest in the Reorganized Debtors in accordance with the Plan.

160.    "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Plan or any successor thereto and the Purchaser.

161.    "*Reorganized Partnership*" means (i) in the event of a Sale Transaction, Purchaser, or (ii) in the event of a Reorganization Transaction, Reorganized PES Holdings or Parent.

162.    "*Reorganized PES Holdings*" means PES Holdings, as reorganized pursuant to and under the Plan or any successor thereto.

163.    "*Required Consenting Cash Flow Creditors*" has the meaning assigned to such term in the Restructuring Support Agreement.

164.    "*Required Consenting Creditors*" has the meaning ascribed to such term in the Restructuring Support Agreement.

165.    "*Required Consenting NYL Creditors*" has the meaning ascribed to such term in the Restructuring Support Agreement.

166.    "*Required Consenting Term Loan B Creditors*" has the meaning ascribed to such term in the Restructuring Support Agreement.

167.    "*Restructuring Expenses*" means all fees, expenses and disbursements of the DIP Facility Agent, the DIP Commitment Parties, the DIP Facility Lenders, the Additional Financing Lender, the Term Loan Agents, and the Restructuring Support Parties that are required to be paid under or pursuant to the DIP Credit Agreement, the DIP Facility Orders, the Term Loan B Credit Agreement, the Term Loan A Credit Agreement, or the Restructuring Support Agreement.

168.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of January 12, 2018 by and among the Debtors and the Restructuring Support Parties, including all exhibits and schedules attached thereto, as such agreement may be amended from time to time in accordance with the terms thereof, which shall be attached as **Exhibit B** to the Disclosure Statement.

169.    "*Restructuring Support Parties*" means, collectively, the Consenting Creditors, and the Parent Parties, in each case, that are party to the Restructuring Support Agreement.

170.    "*Restructuring Transactions*" mean those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions, that the Debtors reasonably determine, with the consent of the Required Consenting Term Loan B Creditors, Parent, and, solely to the extent adversely affecting their rights or obligations under the Plan, the Required Consenting NYL Creditors (in each case, such consent not to be unreasonably withheld), to be necessary to implement the Plan.

171.    "*Restructuring Transactions Exhibit*" means an exhibit, which may be included, as needed, in the Plan Supplement, and which sets forth the Restructuring Transactions the Debtors shall implement on the Effective Date.

172.    "*RFS Program*" means the Clean Air Act's renewable fuel standard program at 42 U.S.C. § 7545(o), including regulations promulgated thereunder, which is administered by the U.S. Environmental Protection Agency.

173.    "*RIN*" means renewable identification numbers under the RFS Program, as defined in 40 C.F.R. § 80.1401.

174.    "*RIN Liabilities*" means any liabilities or obligations of the Debtors or Reorganized Debtors under the Clean Air Act, including regulations promulgated thereunder, including any obligation to generate, acquire or otherwise obtain or retire RINs, and any commitments, undertakings, fines, or Liabilities of the Debtors or Reorganized Debtors relating to the RFS Program, that accrue or arise prior to the Effective Date.

175.    "*RIN Sale Proceeds*" means $27.5 million of proceeds from the Debtors' sale of RINs.

176.    "*Sale Transaction*" means the form of Restructuring Transactions under the Plan consummated between the Debtors and the Purchaser in accordance with the Plan, the Purchase Agreement, and the Restructuring Transactions Exhibit which shall be on terms reasonably acceptable to the Required Consenting Term Loan B Creditors and the Parent and, solely to the extent adversely affecting their rights or obligations under the Plan, the Required Consenting NYL Creditors.

177.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time before the Confirmation Date.

178.    "*SEC*" means the Securities and Exchange Commission.

179.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property of any Estate, which lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

180.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

181.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

182.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act. "*Securities*" shall have a correlative meaning.

183.    "*Servicer*" means an agent or other authorized representative of holders of Claims or Interests.

184.    "*Severance Program*" means that certain severance program by and between the Debtors and certain current executive and senior management employees, in effect as of the date hereof, including any letters, contracts, agreements, or obligations with respect thereto.

185.    "*Solicitation Agent*" means Rust Consulting/Omni Bankruptcy, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

186.    "*Solicitation Commencement Date*" means the date of distribution of the Solicitation Materials to holders of Claims in Impaired Classes.

187.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to the Plan.

188. "*Term Loan A Agent*" means PNC Bank, National Association, in its capacity as administrative agent under the Term Loan A Credit Agreement, and any successor thereto.

189. "*Term Loan A Claims*" means any Claims of the Term Loan A Lenders derived from or based upon the Term Loan A Credit Agreement.

190. "*Term Loan A Credit Agreement*" means that certain Credit Agreement, dated as of November 24, 2015 (as amended from time to time), by and among NYL, as borrower, NYGP, as guarantor, the Term Loan A Agent, and the Term Loan A Lenders.

191. "*Term Loan A Lenders*" means the lending institutions party from time to time to the Term Loan A Credit Agreement

192. "*Term Loan A Loan Documents*" means, collectively, the Term Loan A Credit Agreement, and any security documents, including the letter of credit documentation, and any other collateral and ancillary documents, including any applicable forbearance agreement, executed in connection with the Term Loan A Credit Agreement.

193. "*Term Loan Agents*" means the Term Loan A Agent and the Term Loan B Agent.

194. "*Term Loan B Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Term Loan B Credit Agreement, and any successor thereto.

195. "*Term Loan B Claims*" means any Claims of the Term Loan B Lenders derived from or based upon the Term Loan B Credit Agreement.

196. "*Term Loan B Credit Agreement*" means that certain Term Loan Agreement, dated as of April 4, 2013 (as amended from time to time), by and among PESRM, as borrower, the Term Loan B Agent, and the Term Loan B Lenders.

197. "*Term Loan B Lenders*" means the lending institutions party from time to time to the Term Loan B Credit Agreement.

198. "*Term Loan B Loan Documents*" means, collectively, the Term Loan B Credit Agreement, and any security documents, including the Prepetition Intercreditor Agreement, the letter of credit documentation, and any other collateral and ancillary documents, including any applicable forbearance agreement, executed in connection with the Term Loan B Credit Agreement.

199. "*Term Loan Claims*" means any Claim derived from or based upon the Term Loan Credit Agreements.

200. "*Term Loan Credit Agreements*" means the Term Loan A Credit Agreement and the Term Loan B Credit Agreement.

201. "*Term Loan Lenders*" means the Term Loan A Lenders and the Term Loan B Lenders.

202. "*Third-Party Release*" means the releases set forth in Article VIII.C of the Plan.

203. "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

204. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

205.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

206.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not impaired within the meaning of section 1124 of the Bankruptcy Code.

207.    "*Unions*" means United Steel, Paper and Forestry Rubber, Manufacturing, Energy Allied Industrial and Service Workers International Union, AFL-CIO-CLC and its Philadelphia Local 10-1.

208.    "*Wind Down*" means, in the event of a Sale Transaction, the wind down, dissolution, and liquidation after the Effective Date of the Excluded Entities.

B.    *Rules of Interpretation*

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10)  references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like as applicable; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D.    *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F.    *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.    *Controlling Document*

In the event of an inconsistency between the Plan, the Restructuring Support Agreement, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the Plan shall control.  In the event of an inconsistency between the Confirmation Order and any of the Plan, the Restructuring Support Agreement, or the Disclosure Statement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.    *Administrative Claims*

Except to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.    *DIP Facility Claims*

As of the Effective Date, the DIP Facility Claims shall be deemed to be Allowed in the full amount due and owing under the DIP Credit Agreement.

On the Effective Date, in full and final satisfaction of and in exchange for each Allowed DIP Facility Claim, each Holder of an Allowed DIP Facility Claim shall receive its Pro Rata share of:  (1) Tranche A of the New First Lien Term Loan; and (2) 2.5% of the New Equity in the form of New Class A Common Stock, subject to dilution by the Management Incentive Plan.  In addition, each DIP Commitment Party shall receive its Pro Rata share of the DIP Commitment Fee in accordance with the DIP Facility Orders.

C.      *Professional Fee Claims*

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than three (3) business days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of holders of Professional Fee Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid shall be turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

The Plan constitutes a separate plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code. Except for the Claims addressed in <u>Article II</u> of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, as applicable;

provided that any Class that does not contain any Allowed Claims or Allowed Interests with respect to a particular Debtor will be treated in accordance with Article III.D below.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | Refining ABL Claims | Unimpaired | Presumed to Accept |
| 4 | NGL Facility Claims | Unimpaired | Presumed to Accept |
| 5 | Intermediation Claims | Unimpaired | Presumed to Accept |
| 6 | First Loss Claims | Unimpaired | Presumed to Accept |
| 7 | Term Loan A Claims | Impaired | Entitled to Vote |
| 8 | Term Loan B Claims | Impaired | Entitled to Vote |
| 9 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 10 | Intercompany Claims | Unimpaired, or Impaired | Presumed to Accept or Presumed to Reject |
| 11 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 12 | Interests in PES Holdings | Impaired | Presumed to Reject |

B.    *Treatment of Classes of Claims and Interests*

Except to the extent that the Debtors and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, each such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.    Class 1 — Other Secured Claims

a.    *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

b.    *Treatment*:  Each holder of an Allowed Other Secured Claim shall receive, as the Debtors or the Reorganized Debtors (as applicable) determine, either:

i.    payment in full, in Cash, of the unpaid portion of its Allowed Other Secured Claim, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code (or if payment is not then due, in accordance with the terms of such Allowed Other Secured Claim) on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Secured Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Other Secured Claim is Allowed; and (c) the date such Allowed Other Secured Claim becomes due and payable, or as soon thereafter as is reasonably practicable;

      ii.      the collateral securing its Allowed Other Secured Claim, plus any interest thereon required to be paid under section 506(b) of the Bankruptcy Code;

      iii.      Reinstatement of such Other Secured Claim; or

      iv.      such other treatment rendering such Claim Unimpaired.

c.      *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 — Other Priority Claims</u>

a.      *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

b.      *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the latest of:  (i) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Priority Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Other Priority Claim is Allowed; and (iii) the date such Allowed Other Priority Claim becomes due and payable, or as soon thereafter as is reasonably practicable.

c.      *Voting*:  Class 2 is Unimpaired.  Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3.      <u>Class 3 — Refining ABL Claims</u>

a.      *Classification*:  Class 3 consists of all Refining ABL Claims against any Debtor.

b.      *Treatment*:  In full satisfaction of each Refining ABL Claim, each holder of an Allowed Refining ABL Claim shall receive payment in full in Cash.

c.      *Voting*:  Class 3 is Unimpaired.  Holders of Allowed Refining ABL Claims in Class 3 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Refining ABL Claims in Class 3 are not entitled to vote to accept or reject the Plan.

4.      <u>Class 4 — NGL Facility Claims</u>

a.      *Classification*:  Class 4 consists of all NGL Facility Claims against any Debtor.

b.      *Treatment*:  In full and final satisfaction of each NGL Facility Claim, all NGL Facility Claims shall be Reinstated.

c.      *Voting*:  Class 4 is Unimpaired.  Holders of Allowed NGL Facility Claims in Class 4 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed NGL Facility Claims in Class 4 are not entitled to vote to accept or reject the Plan.

5.      Class 5 — Intermediation Claims

      a.      *Classification*:  Class 5 consists of all Intermediation Claims against any Debtor.

      b.      *Treatment*:  In full and final satisfaction of each Allowed Intermediation Claim, each Holder of an Allowed Intermediation Claim shall receive payment in full either (i) in Cash from the proceeds of the New Intermediation Facility or (ii) in accordance with the terms of the New Intermediation Facility.

      c.      *Voting*:  Class 5 is Unimpaired.  Holders of Allowed Intermediation Claims in Class 5 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Intermediation Claims in Class 5 are not entitled to vote to accept or reject the Plan.

6.      Class 6 — First Loss Claims

      a.      *Classification*:  Class 6 consists of all First Loss Claims against any Debtor.

      b.      *Treatment*:  In full and final satisfaction of each Allowed First Loss Claim, each Holder of an Allowed First Loss Claim shall receive payment in full either (i) in Cash from the proceeds of the New First Loss Facility or New Intermediation Facility; or (ii) in accordance with the terms of the New First Loss Facility.

      c.      *Voting*:  Class 6 is Unimpaired.  Holders of Allowed First Loss Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed First Loss Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7.      Class 7 — Term Loan A Claims

      a.      *Classification*:  Class 7 consists of all Term Loan A Claims against any Debtor.

      b.      *Allowance*:  The Term Loan A Claims shall be Allowed in the aggregate principal amount of $97,500,000 plus any accrued but unpaid interest thereon payable as of the Petition Date, and any accrued but unpaid fees and expenses payable in accordance with the Term Loan A Documents.

      c.      *Treatment*:  Each holder of an Allowed Term Loan A Claim shall receive its Pro Rata share of:  (i) $15,000,000 of Cash; (ii) Tranche B of the New First Lien Term Loan Facility; and (iii) Cash in the amount of any accrued but unpaid interest on the Term Loan A Claims measured through the Effective Date.

      d.      *Voting*:  Class 7 is Impaired.  Holders of Allowed Term Loan A Claims in Class 7 are entitled to vote to accept or reject the Plan.

8.      Class 8 — Term Loan B Claims

      a.      *Classification*:  Class 8 consists of all Term Loan B Claims against any Debtor.

      b.      Allowance:  The Term Loan B Claims shall be Allowed in the aggregate principal amount of $523,875,000 plus any accrued but unpaid interest thereon payable as of the Petition Date, and any accrued but unpaid fees and expenses payable in accordance with the Term Loan B Documents.

     c.     *Treatment*:  On the Effective Date, each holder of an Allowed Term Loan B Claim shall receive on account of such Claim its Pro Rata share of:  (i) 100% of the New Equity in the form of New Class A Common Stock, less the percentage of the New Equity distributed to (x) holders of Allowed DIP Facility Claims and the DIP Commitment Parties pursuant to <u>Article II.B</u> of the Plan and (y) Parent pursuant to <u>Article IV.B.1</u>, subject to dilution by the Management Incentive Plan; and (ii) Tranche C of the New First Lien Term Loan Facility.

     d.     *Voting*:  Class 8 is Impaired.  Holders of Allowed Term Loan B Claims in Class 8 are entitled to vote to accept or reject the Plan.

9.     <u>Class 9 — General Unsecured Claims</u>

     a.     *Classification*:  Class 9 consists of any General Unsecured Claims against any Debtor.

     b.     *Treatment*:  In full and final satisfaction of each Allowed General Unsecured Claim, each Holder thereof shall receive Cash in an amount equal to such Allowed General Unsecured Claim on the later of:  (i) the Effective Date; or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured Claim.

     c.     *Voting*:  Class 9 is Unimpaired.  Holders of Allowed General Unsecured Claims in Class 9 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed General Unsecured Claims in Class 9 are not entitled to vote to accept or reject the Plan.

10.     <u>Class 10 — Intercompany Claims</u>

     a.     *Classification*:  Class 10 consists of any Intercompany Claims against any Debtor.

     b.     *Treatment*:  Each Allowed Intercompany Claim shall be Reinstated or canceled and released, at the Debtors' or the Reorganized Debtors' option; *provided, however*, that any Intercompany Claims held by or against the Excluded Entities shall be canceled.  No distribution shall be made on account of any Allowed Intercompany Claim.

     c.     *Voting*:  Class 10 is either Unimpaired, in which case the holders of Allowed Intercompany Claims in Class 10 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and not receiving any distribution under the Plan, in which case the holders of such Allowed Intercompany Claims in Class 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of an Allowed Intercompany Claim in Class 9 will not be entitled to vote to accept or reject the Plan.

11.     <u>Class 11 — Intercompany Interests</u>

     a.     *Classification*:  Class 11 consists of any Intercompany Interests in any Debtor.

     b.     *Treatment*:  In full and final satisfaction of each Allowed Intercompany Interest, each Intercompany Interest shall be Reinstated solely to maintain the Debtors' corporate structure; *provided, however*, that any Intercompany Interests in the Excluded Entities shall be canceled and not entitled to any recovery or distribution under the Plan.

     c.     *Voting*:  Class 11 is Unimpaired.  Holders of Allowed Intercompany Interests in Class 11 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Intercompany Interests in Class 11 are not entitled to vote to accept or reject the Plan.

12. <u>Class 12 — Interests in PES Holdings</u>

      a.     *Classification*:  Class 12 consists of all Interests in PES Holdings.

      b.     *Treatment*:  In full and final satisfaction of each Interest in PES Holdings, each Allowed Interest in PES Holdings shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in PES Holdings shall be entitled to any recovery or distribution under the Plan on account of such Interests.

      c.     *Voting*:  Class 12 is Impaired.  Holders of Interests in Class 12 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

      Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

D.     *Elimination of Vacant Classes*

      Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

      If a Class contains Claims or Interests eligible to vote and no holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class.

F.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

      Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with <u>Article X</u> of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.     *Intercompany Interests*

      To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of the New Equity, and shall receive no recovery or distribution.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

H.     *Subordinated Claims and Interests*

      The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating

thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, including the Parent Cash Contribution, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any Causes of Action assertable against the Parent Parties.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

B.    *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, including the Purchaser, shall take all actions reasonably acceptable to the Parent and the Required Consenting Term Loan B Creditors and, solely to the extent adversely affecting their rights or obligations under the Plan, the Required Consenting NYL Creditors, as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) the execution, delivery, and filing, if applicable, of the New First Lien Term Loan Documents, the New Intermediation Facility, the New First Loss Facility (if any), and the Additional Financing Facility; (5) the formation of PES Inc. and, as applicable, the Reorganized Debtors; (6) the issuance and distribution of the New Membership Interests and New Common Stock; (7) any action to effectuate the termination of the Rail Terminaling Services Agreement in accordance with Article V.A hereof; (8) any action to effectuate the termination of the PES Advisory Agreement and PES Registration Rights Agreement; (9) any action to effectuate any necessary assignment of the PES Refining Contribution Agreement to PES Inc. or any direct or indirect subsidiary thereof, if required; and (10) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

1.    <u>Corporate Structure</u>

On the Effective Date, PES Inc. and the Reorganized Partnership will be reorganized into a structure in which PES Inc. will hold one New Membership Interest for each issued share of New Class A Common Stock.

On the Effective Date, (1) the Reorganized Partnership shall cancel its existing membership interests and distribute 25.0% of the New Equity in the form of New Membership Interests to the Parent or the holders of existing membership interests in Parent, in accordance with the Restructuring Transactions, and Parent or the holders of existing membership interests in Parent shall subscribe for shares of New Class B Common Stock pursuant to <u>Article IV.C.2</u> of the Plan, in accordance with the Restructuring Transactions, with the Reorganized Partnership being treated as a partnership continuation of Parent for U.S. federal and applicable state and local income tax purposes, and

(2) each Holder of an Allowed Term Loan B Claim shall contribute such Term Loan B Claim to PES Inc. in exchange for New Class A Common Stock and PES Inc. shall exchange such Term Loan B Claims for 100% of the New Membership Interests, less the percentage of New Equity distributed to (x) holders of Allowed DIP Facility Claims and the DIP Commitment Parties pursuant to Article II.B of the Plan and (y) Parent pursuant to clause (1). If the Required Consenting Term Loan B Creditors decide, each Holder of an Allowed Term Loan B Claim may instead exchange such claim for Membership Interests and then contribute such Membership Interests to PES Inc. for New Class A Common Stock. The Reorganized Partnership shall issue 7.5% of the New Membership Interests to PES Inc. in respect of the shares of New Class A Common Stock to be issued for the treatment of the DIP Commitment Fee and the Allowed DIP Facility Claims pursuant to Article II.B of the Plan.

    2.    Sale Transaction

    On the Effective Date, the Debtors shall consummate the Sale Transaction and, among other things, all of the Debtors' and Parent's assets other than the Excluded Liabilities and the Excluded Parent Cash shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances including the Excluded Liabilities and, unless otherwise ordered by the Bankruptcy Court by Final Order, the RIN Liabilities, pursuant to the terms of the Purchase Agreement. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Neither the Purchaser nor any of its Affiliates shall be deemed to be a successor of the Debtors.

    On or before the Effective Date, the Debtors shall have the authority to terminate the Sale Transaction and pursue instead the Reorganization Transaction. If the Debtors consummate the Sale Transaction, the Debtors shall not consummate the Reorganization Transaction.

C.    *Sources of Consideration for Plan Distributions*

    The Reorganized Debtors shall fund distributions under the Plan from the following sources:

    1.    Cash on Hand

    The Reorganized Debtors shall use Cash on hand to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan.

    2.    Issuance of the New Membership Interests and New Class B Common Stock

    On the Effective Date, the Reorganized Partnership shall cancel all of its existing membership interests and, in accordance with the Restructuring Transactions, issue and distribute the New Membership Interests to Parent or the holders of Parent's existing membership interests in accordance with Article IV.B of the Plan. Parent or holders of Parent's existing membership interests shall subscribe for New Class B Common Stock from PES Inc., in accordance with the Restructuring Transactions. Any party that is to receive New Membership Interests and shares of New Class B Common Stock shall be a party to the New LLC Agreement and the New Stockholders Agreement and deemed to be bound to the terms of the New LLC Agreement and New Stockholders Agreement from and after the Effective Date, even if not a signatory thereto. The issuance of the New Membership Interests and New Class B Common Stock under the Plan (as well as equity awards, if any), reserved under the Management Incentive Plan, is duly authorized without the need for further corporate action and without any further action by the Debtors, the Reorganized Debtors, the Purchaser, or the Holders of Claims. The New LLC Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and the Reorganized Partnership, PES Inc., and each holder of New Membership Interests shall be bound thereby.

    3.    Issuance and Distribution of the New Class A Common Stock

    On the Effective Date, PES Inc. shall issue and distribute certain of the New Common Stock to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan. Any party that is to

receive shares of New Class A Common Stock shall be a party to the New Stockholders Agreement and deemed to be bound to the terms of the New Stockholders Agreement from and after the Effective Date, even if not a signatory thereto.  The issuance of New Class A Common Stock under the Plan, as well as options, or other equity awards, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, the Purchaser, or the Holders of Claims and the holders of New Common Stock shall be deemed to have accepted the terms of the New Stockholders Agreement (solely in their capacity as holders of New Equity) and to be parties thereto without further action or signature.  The New Stockholders Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and PES Inc., the Reorganized Partnership, and each holder of New Common Stock shall be bound thereby.

      4.    <u>New First Lien Term Loan</u>

On the Effective Date the Reorganized Debtors shall enter into the New First Lien Term Loan, the terms of which will be set forth in the New First Lien Term Loan Credit Agreement.  Confirmation of the Plan shall be deemed approval of the New First Lien Term Loan Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors, in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute New First Lien Term Loan Documents and such other documents as may be required to effectuate the treatment afforded by the New First Lien Term Loan.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the New First Lien Term Loan Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New First Lien Term Loan Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New First Lien Term Loan Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

      5.    <u>Parent Cash Contribution</u>

On the Effective Date, as part of the General Settlement of Claims, Interests and Causes of Action described in <u>Article IV.A</u>, including a settlement of any Claims, Interests and Causes of Action that may be asserted against the Parent Parties and other related Released Parties, and in consideration of the releases set forth in <u>Article VIII.B and VIII.C</u> of the Plan, the Parent shall make the Parent Cash Contribution and consummate the other transactions set forth herein.  In return, on the Effective Date, the Parent or holders of existing membership interests in Parent shall receive 25.0% of the New Equity, in accordance with the Restructuring Transactions, subject to dilution by the Management Incentive Plan, in the form of New Class B Common Stock and New Membership Interests.

      6.    <u>Additional Financing Facility</u>

On the Effective Date, the Reorganized Debtors shall enter into the Additional Financing Facility with the Additional Financing Lender.  The Additional Financing Facility shall include terms in form and substance consistent with the Additional Financing Facility Commitment Letter, attached hereto as **<u>Annex III</u>**.

D.    *New Intermediation Facility and New First Loss Facility*

On the Effective Date, the Reorganized Debtors shall enter into the New Intermediation Facility and New First Loss Facility (if any).  On the Effective Date, the Intermediation Lenders shall return the RIN Sale Proceeds and any conditional collateral that may be pledged to the Intermediation Lenders to the Reorganized Debtors.

E.    *Management Incentive Plan*

The New Board will be authorized to implement the Management Incentive Plan.  The Management Incentive Plan shall provide for the issuance of options and/or equity based compensation, or other profit sharing arrangements, to certain members of management of PES Inc. or the Reorganized Partnership, as applicable.  New Equity may be reserved for issuance in connection with the Management Incentive Plan.   The participants in the Management Incentive Plan, the allocation of Management Incentive Plan compensation to participants (including the amounts allocated, the timing of grants, and the form of options and/or equity compensation allocated) and the terms and conditions of such options and equity compensation (including performance, time based vesting, exercise price, base values, hurdles, forfeiture, repurchase rights and transferability) shall either be (1) as reasonably acceptable to the Debtors and the Required Consenting Term Loan B Creditors, or (2) if no such terms are reached, be determined by the New Board in its sole discretion, it being understood and agreed that the Management Incentive Plan shall dilute all of the New Equity equally.

F.    *Exemption from Registration Requirements*

The offering, issuance, and distribution of any Securities, including the New Equity, pursuant to the Plan will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code.  Pursuant to section 1145 of the Bankruptcy Code, the New Equity issued under the Plan may be sold without registration under the Securities Act by the recipients thereof, subject to:  (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) any other applicable regulatory approval; and (3) the transfer restrictions set forth in the New Organizational Documents.

G.    *Vesting of Assets*

The Assignee shall have all of the rights, title and interest in all of the Assumed Agreements and Permits free and clear of all Liens, Claims, charges, or other encumbrances, including the Excluded Liabilities, under the Plan. The Assignee will be deemed to be the successor-in-interest of Parent for all of the Assumed Agreements and Permits as of the Effective Date.  The Assignee shall assume only the Assumed Agreements and Permits and shall not assume any other liability or obligation of Parent (or any predecessor of Parent or any prior owner of all or part of its business and assets) of whatever nature, whether presently in existence or arising hereafter.

1.    <u>Under the Sale Transaction</u>

Under the Sale Transaction, except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action (including Avoidance Actions), and any property acquired by any of the Debtors under the Plan, except for the Interests in the Excluded Entities, shall vest in the Reorganized Debtors, including the Purchaser, free and clear of all Liens, Claims, charges, or other encumbrances, including the Excluded Liabilities, and neither the Purchaser nor any of its Affiliates shall have any liability for any such Liens, Claims, charges, or other encumbrances, including the Excluded Liabilities and, unless otherwise determined by the Bankruptcy Court by Final Order, the RIN Liabilities. On and after the Effective Date, except as otherwise provided herein, the Reorganized Debtors, including the Purchaser, may operate the business of each Debtor or Reorganized Debtor, other than the Excluded Entities, as applicable, and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

2.    <u>Under the Reorganization Transaction</u>

Under the Reorganization Transaction, except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action (including Avoidance Actions), and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances, including

the Excluded Liabilities and, unless otherwise determined by the Bankruptcy Court by Final Order or the Debtors, the RIN Liabilities. On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.    *Cancelation of Instruments, Certificates, and Other Documents*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including the DIP Credit Agreement, the Term Loan B Documents, the Term Loan A Documents, the Refining ABL Facility, the First Loss Facility, the Intermediation Facility, and the intercompany note, dated as of December 27, 2016, between North Yard Financing, LLC and the Parent, and any other credit agreements and indentures, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged; *provided,* that nothing in the Plan shall release any rights of the (x) Term Loan B Agent against the Term Loan B Lenders under the Term Loan B Loan Documents or (y) Term Loan A Agent against the Term Loan A Lenders under the Term Loan A Loan Documents.

I.    *Corporate Action*

On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the adoption, execution, and/or filing of the New Organizational Documents; (2) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the New Board; (3) the authorization, issuance, and distribution of New Membership Interests and New Equity; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (5) the entry into the New First Lien Term Loan, the New Intermediation Facility, the New First Loss Facility (if any), and the Additional Financing Facility and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (6) the formation of PES Inc.; (7) the implementation of the Restructuring Transactions; (8) the adoption of the Management Incentive Plan by the New Board; and (9) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Debtors, and any corporate, partnership, limited liability company or other governance action required by the Debtors or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, members, directors, or officers of the Debtors or Reorganized Debtors, or the Purchaser, as applicable.

On or, as applicable, before, the Effective Date, the appropriate directors and officers of the Debtors, PES Inc., the Reorganized Partnership, or the other Reorganized Debtors shall be (or shall be deemed to have been) authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of PES Inc., the Reorganized Partnership and the other Reorganized Debtors, including the New First Lien Term Loan Documents, the New Organizational Documents and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.    *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is

deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law). Notwithstanding the foregoing, the Debtors reserve the right to modify the Debtors' corporate structure as of the Effective Date, including by merger or liquidation of any Reorganized Debtor or otherwise.

K.    *New Organizational Documents*

On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors', the Reorganized Partnership's and PES Inc.'s respective certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended as may be required to be consistent with the provisions of the Plan, the Governance Term Sheet, the New LLC Agreement, the New Stockholders Agreement, the other New Organizational Documents, the New First Lien Term Loan Documents, as applicable, and the Bankruptcy Code. The New Organizational Documents shall, among other things: (1) authorize the issuance of the New Membership Interests and the New Common Stock; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities. After the Effective Date, each Reorganized Debtor, the Reorganized Partnership and PES Inc. may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New LLC Agreement, the New Stockholders Agreement and the other New Organizational Documents.

The New Organizational Documents shall provide that each share of the New Class A Common Stock and New Class B Common Stock will have one vote on all matters and vote together as a single class, including irrespective of Section 242(b)(2) of the Delaware General Corporation Law, unless otherwise required by applicable law. To the maximum extent permitted under applicable law, at the option of the holders of any New Equity, such holder may convert all or any portion of its New Equity into non-voting New Equity and, subject to any required approvals of a governmental entity, may convert any such non-voting New Equity back to voting New Equity. Any non-voting New Equity shall be deemed not to be outstanding for the purposes of any vote, approval or consent provided under the New Organizational Documents. Each share of New Class B Common Stock will be paired with one New Membership Interest and the New Class B Common Stock shall only be transferable with an equal number of New Membership Interests. In addition, transfers of the New Common Stock and New Membership Interests shall be subject to the transfer restrictions set forth in the Governance Term Sheet. Each share of New Class B Common Stock, together with a corresponding New Membership Interest, may be transferred by its holder to the Reorganized Partnership in exchange for one share of New Class A Common Stock, pursuant to terms and conditions to be set forth in the New Organizational Documents. Any dividends or distributions or proceeds upon dissolution, liquidation or winding up of the Reorganized Partnership will be shared pro rata among the holders of the New Membership Interests and to the extent distributed to PES Inc., to the holders of the New Class A Common Stock pro rata. The New Class B Common Stock will not have any economic rights. Dividends, other distributions and any proceeds from the dissolution, liquidation or winding up of the Reorganized Partnership or PES Inc. shall not be declared or paid to the holders of shares of the New Class B Common Stock. PES Inc. will be the managing member of the Reorganized Partnership and will have the sole, absolute and exclusive power to manage the Reorganized Partnership and its subsidiaries. Unless otherwise required by law, no other holder of New Membership Interests shall have the authority to vote, approve or consent to any action involving the Reorganized Partnership and such holder of New Membership Interests will be deemed to have approved any decision of the managing member. The New LLC Agreement will eliminate fiduciary duties to the furthest extent permitted under the Delaware Limited Liability Company Act, other than the implied covenant of good faith and fair dealing.

L.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the Purchaser, as applicable, and the officers and members of the boards of directors and managers thereof, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New First Lien Term Loan Documents, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

M.     *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions and, if applicable, the Sale Transaction) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral as security for any or all of the New First Lien Term Loan, as applicable; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.     *Directors and Officers*

The New Board shall consist of: (1) two persons to be selected by CSAM, which shall be U.S. citizens; (2) two persons to be selected by Halcyon; (3) one person to be selected by the Parent; (4) one person to be selected by a majority-in-interest of the Consenting Term Loan B Creditors; and (5) the Chief Executive Officer of PES Inc.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Boards, as well as those Persons that will serve as officers of the Reorganized Debtors or the Purchaser, as applicable. Such initial officers of the Reorganized Debtors shall be reasonably acceptable to the Required Consenting Term Loan B Creditors as required under the Restructuring Support Agreement. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the New Boards will be disclosed in the New Organizational Documents.

O.     *Employee Arrangements of the Reorganized Debtors*

On the Effective Date, the Debtors shall have (i) assumed each of the contracts, agreements, policies, programs and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors (but excluding any severance agreements with any of Debtors' former employees) that are not set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases; or (ii) entered into a new employee agreement on terms acceptable to the respective employee and the Reorganized Debtors, and reasonably acceptable to the Required Consenting Term Loan B Creditors; *provided,* that the Severance Program and employment agreements will be assumed as modified so as to clarify that the Restructuring Transactions will not constitute a "good reason" event for the purposes of the Severance Program or any employment agreement; *provided, further*, that it is agreed and understood that any employment agreements or arrangements that constitute a component of at will employment arrangements, are provided or determined in the Debtors' discretion, or are subject to modification or termination by the Debtors in accordance with applicable law will remain as such with respect to the Reorganized Debtors. Except to the extent provided by <u>Article</u>

VIII of the Plan, nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such employment agreements.

Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Additionally, the Debtors shall assume all of their obligations under the Collective Bargaining Agreement. Such obligations shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive unimpaired and unaffected, irrespective of when such obligations arose.

After the Confirmation Date, the Debtors shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court.

P.      *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases on the dates on which such amounts would be required to be paid under the agreements giving rise to such Restructuring Expenses) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval other than as required in the documents giving rise to such Restructuring Expenses.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) days before the anticipated Effective Date; *provided*, that such estimates shall not be considered to be admissions or limitations with respect to such Restructuring Expenses.  On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors, which invoices shall be consistent with the requirements in the documents or orders giving rise to the Restructuring Expenses.

In addition, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, continue to pay in Cash all post-Effective Date fees, expenses, and disbursements related to implementation, Consummation, and defense of the Plan incurred by the Restructuring Support Parties, DIP Facility Agent, Term Loan A Agent, Term Loan B Agent, or Consenting Creditors as set forth in the documents giving rise to any such Restructuring Expenses or the Plan.

Q.      *Preservation of Causes of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan, the DIP Facility Orders, or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan, the DIP Facility Orders, or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.P include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article IV.P that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or be transferred pursuant to the Sale Transactions. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

R.      *Wind Down and Dissolution of the Debtors*

Under the Sale Transaction on and after the Effective Date, the Liquidator will implement any provision of the Plan and any applicable orders of the Bankruptcy Court, and the Liquidator shall have the power and authority to take any action necessary to wind down and dissolve the Excluded Entities. After the Effective Date, the Excluded Entities shall remain in existence for the sole purpose of dissolving. As soon as practicable after the Effective Date, the Liquidator shall: (1) cause the Excluded Entities to comply with, and abide by, the terms of the Purchase Agreement; (2) file for each of the Excluded Entities a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Excluded Entities under the applicable laws of their state of incorporation or formation (as applicable); (3) complete and file all final or otherwise required federal, state, and local tax returns for each of the Excluded Entities, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (4) take such other actions as the Liquidator may determine to be necessary or desirable to carry out the purposes of the Plan. The filing by the Liquidator of any Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of each such Debtor.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless listed on the Schedule of Rejected Executory Contracts and Unexpired Leases; *provided, however,* that (i) the Rail Terminaling Services Agreement, and (ii) the PES Advisory Agreement, the PES Registration Rights Agreement and any other Parent Agreement or Parent Permit which is an Excluded Liability shall each be canceled or terminated on the Effective Date, and no rejection damages or other Claims (including any Liabilities arising from or incurred thereunder) shall arise on account of such cancelation; *provided, further,* that the Debtors shall assume all Executory Contracts and Unexpired Leases between the Debtors and, Sunoco Partners Marketing & Terminals L.P. or Sunoco Pipeline, L.P. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates or the Purchaser in a Sale Transaction. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors, (with the consent of the Required Consenting Term Loan B Creditors (such consent not to be unreasonably withheld) and in consultation with the Required Consenting NYL Creditors) and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

        Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement.  Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of the order of the Bankruptcy Court approving such rejection.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Purchaser, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.  Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

        The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 15 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before the Confirmation Hearing.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

        If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.

        Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.B shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.B, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.    *Indemnification*

On and as of the Effective Date, the Indemnification Provisions will be assumed, irrevocable with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date, and will survive the effectiveness of the Plan, and the New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' directors, officers, employees, or agents that were employed by, or serving on the board of directors (or similar governing body) of, any of the Debtors as of the Petition Date, to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and, notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date.

E.    *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, including agreements of the Parent, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be filed, and shall survive the Effective Date.

On or before the Effective Date, the Debtors shall purchase and maintain tail coverage under the D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the existing D&O Liability Insurance Policies, subject to the reasonable acceptance of the Required Consenting Term Loan B Creditors. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

F.    *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

G.    *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims and Interests Allowed as of the Effective Date*

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in accordance with Article III.B.2 and Article III.B.1, respectively. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. A Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

B.      *Rights and Powers of the Distribution Agent*

1.      Powers of Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

C.      *Special Rules for Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims or Interests in such Class.

D.      *Delivery of Distributions*

      1.      <u>Record Date for Distributions</u>

      Three business days before the Effective Date, the various transfer registers for each class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

      2.      <u>Distribution Process</u>

      The Distribution Agent shall make all distributions required under the Plan, except that with respect to distributions to holders of Allowed Claims governed by a separate agreement other than the Term Loan B Credit Agreement, which shall include the DIP Facility, the Term Loan A Credit Agreement, the Intermediation Facility, and the First Loss Facility and administered by a Servicer, including the DIP Administrative Agent, the Term Loan A Agent, the Distribution Agent, the Debtor, the applicable Servicer, as applicable, shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the governing agreement. For the avoidance of doubt, in no event shall the (x) Term Loan B Agent be responsible in any respect for distributions to the Term Loan B Lenders or on account of the Term Loan B Claims and (y) Term Loan A Agent be responsible in any respect for distributions to the Term Loan A Lenders or on account of the Term Loan A Claims. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to holders of record or their respective designees as of three business days before the Effective Date: (a) to the address of such holder or designee as set forth in the applicable register (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is 10 days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register, no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 days before the Effective Date. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

      3.      <u>Compliance Matters</u>

      In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

      4.      <u>Foreign Currency Exchange Rate</u>

      Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the

exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

      5.      <u>Fractional, Undeliverable, and Unclaimed Distributions</u>

          a.      *Fractional Distributions*.  Whenever any distribution of fractional shares of New Membership Interests or New Common Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest interest or share, as applicable, (up or down), with half interests or shares or less being rounded down.

          b.      *Undeliverable Distributions*.  If any distribution to a holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until the Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to <u>Article VI.D.5.c</u> below, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

          c.      *Reversion*.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is comprised of New Membership Interests and/or New Common Stock, each shall be deemed canceled.  Upon such revesting, the Claim of the holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

      6.      <u>Surrender of Canceled Instruments or Securities</u>

On the Effective Date, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer).  Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing paragraph, this <u>Article VI.D.6</u> shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E.      *Claims Paid or Payable by Third Parties*

      1.      <u>Claims Paid by Third Parties</u>

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor; <u>provided</u> that the Debtors shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such

distribution shall result in the holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2.        Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; provided that the Debtors shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3.        Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F.        *Setoffs*

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any holder of Claims be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G.        *Allocation Between Principal and Accrued Interest*

Except as otherwise provided herein, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to interest, if any, on such Allowed Claim accrued through the Effective Date.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**

A.        *Disputed Claims Process*

Except as otherwise provided herein, if a party files a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless

Allowed or disallowed by a Final Order or as otherwise set forth in this <u>Article VII</u> of the Plan. For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan. Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to <u>Article IV</u> of the Plan.

C.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

Unless otherwise specifically provided for herein, or by any other order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

D.      *Disallowance of Claims and Interests*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**ARTICLE VIII.**
**EFFECT OF CONFIRMATION OF THE PLAN**

A.      *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the**

Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.      *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.      the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;

2.      any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;

3.      the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

4.      any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

C.      *Releases by Holders of Claims and Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1.      the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;

2.        **any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;**

3.        **the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or**

4.        **any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

D.      *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

E.      *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and**

**(5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

F.    *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with <u>Article VI</u> of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

G.    *Release of Liens*

Except as otherwise specifically provided in the Plan, the New First Lien Term Loan Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the New First Lien Term Loan Documents), the New Intermediation Facility, the New First Loss Facility (if any), the Additional Financing Facility, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other holder of a Secured Claim.  In addition, at the sole expense of the Debtors or the Reorganized Debtors, the holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent(s) for the New First Lien Term Loan Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

H.    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

I.    *Recoupment*

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

J.    *Subordination Rights*

Any distributions under the Plan to holders of Claims or Interests shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights.  On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable

subordination rights to property distributed under the Plan, in each case other than as provided in the Plan; *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      The Debtors shall not be in default under the DIP Facility or the DIP Facility Orders (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the DIP Facility Lenders or cured by the Debtors in a manner consistent with the DIP Facility and the DIP Facility Orders);

2.      All conditions precedent to the effectiveness of the New First Lien Term Loan, the New Intermediation Facility, the New First Loss Facility (if any), and the Additional Financing Facility shall have been satisfied or duly waived;

3.      The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed and shall be in form and substance reasonably acceptable to the Required Consenting Cash Flow Creditors and the Parent as set forth in the Restructuring Support Agreement;

4.      The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount;

5.      The Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Plan;

6.      The New First Lien Term Loan Documents, the New Intermediation Facility, the New First Loss Facility (if any), and the Additional Financing Facility shall have been executed and delivered by all of the Entities that are parties thereto, as applicable, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New First Lien Term Loan, the New Intermediation Facility, the New First Loss Facility (if any), and the Additional Financing Facility, as applicable, shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New First Lien Term Loan, the New Intermediation Facility, the New First Loss Facility (if any), and the Additional Financing Facility shall each be deemed to occur concurrently with the occurrence of the Effective Date;

7.      All governmental and material third party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the Restructuring Transactions, in the Debtors' discretion with the consent of the Required Consenting Cash Flow Creditors as set forth in the Restructuring Support Agreement (such consent not to be unreasonably withheld), shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

8.      If in accordance with the Restructuring Support Agreement, an HSR Filing is required under applicable law in connection with the consummation of the Restructuring, then HSR Approval shall have been obtained;

9.      If in accordance with the Restructuring Support Agreement either (1) there is a CFIUS Investigation or (2) CFIUS requests that Parent, any of the Debtors, or the Consenting Creditors make a CFIUS Filing, then CFIUS Approval shall have been obtained;

10.    All Restructuring Expenses, to the extent not otherwise paid, shall have been paid in Cash and in accordance with the documents giving rise to such Restructuring Expenses;

11.    The Effective Date Milestone set forth in Section 4.01(f) of the Restructuring Support Agreement, as extended or waived in accordance with the terms thereof, shall have been met; and

12.    The Assignee shall have all of the rights, title and interest in all of the Assumed Agreements and Permits and be deemed to be the successor-in-interest of Parent for all of the Assumed Agreements and Permits, and the Assignee shall not have assumed any other liability or obligation of Parent (or any predecessor of Parent or any prior owner of all or part of its business and assets) of whatever nature, whether presently in existence or arising hereafter other than the Assumed Agreements and Permits, and such other liabilities and obligations shall be retained by, and remain liabilities and obligations of, Parent from and after the Effective Date, and the Bankruptcy Court shall have found that Debtors have provided adequate notice under the Bankruptcy Code to all parties to the Assumed Agreements and Permits.

B.    *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this <u>Article IX</u> may be waived only by the consent of the Debtors, the Parent Parties (to the extent set forth in the Restructuring Support Agreement), and the Required Consenting Cash Flow Creditors, as applicable, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.    *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity; *provided*, that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

# ARTICLE X.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification of Plan*

Effective as of the date hereof and subject to the terms of the Restructuring Support Agreement:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.    enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.    grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to <u>Article VI.E.1</u> of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in <u>Article VIII</u> of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.      enforce all orders previously entered by the Bankruptcy Court;

16.      hear and determine all disputes regarding the Debtors', Reorganized Debtors', or Purchaser's RIN Liabilities that accrue or arise prior to the Effective Date;

17.      hear and determine disputes involving all matters the implementation of the Plan, including the New First Lien Term Loan, the New Intermediation Agreement, the New First Loss Facility (if any), and the Additional Financing Facility, to the extent required to adjudicate the foregoing, *provided*, *however*, that upon the closing of the relevant facilities and execution of the New Organizational Documents, disputes with respect to the New First Lien Term Loan, the New Intermediation Agreement, the New First Loss Facility (if any), the Additional Financing Facility, and the New Organizational Documents that are not related to the Plan shall otherwise be governed by the jurisdictional, forum selection or dispute resolution clause contained in such document; and

18.      hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to <u>Article IX.A</u> hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or

documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of the Creditors' Committee*

On the Confirmation Date, the Creditors' Committee, if any is appointed, shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals. The Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Confirmation Date.

D.      *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

E.      *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**                    **PES Holdings, LLC**
                                           1735 Market Street, 11th Floor
                                           Philadelphia, Pennsylvania 19103
                                           Attn:    John B. McShane

                                           with copies to:

**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Attn:   James H.M. Sprayregen, P.C.
        Steven Serajeddini

**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
601 Lexington Avenue
New York, New York 10022
Attn:   Edward O. Sassower, P.C.
        Matthew Fagen

**Pachulski Stang Ziehl & Jones LLP**
919 North Market Street # 1700
Wilmington, Delaware 19801
Attn:   Laura Davis Jones
        Timothy Cairns

**The Parent Parties** — **Philadelphia Energy Solutions LLC**
1735 Market Street, 11th Floor
Philadelphia, Pennsylvania 19103
Attn:   General Counsel

With copies to:

**Latham & Watkins LLP**
885 Third Avenue
New York, New York 10022
Attn:   Keith A. Simon
        Paul F. Sheridan, Jr.
and

**Akerman LLP**
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Attn:   John Mitchell

**Counsel to the Consenting NYL Creditors** — **Cahill Gordon & Reindel LLP**
80 Pine Street
New York, New York 10005
Attn:   Susanna M. Suh
        Joel H. Levitin
        Darren Silver

**Counsel to the Consenting Term Loan B Creditors** — **Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, New York 10017
Attn:   Damian S. Schaible
        Aryeh E. Falk

H.    *Term of Injunctions or Stays*

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy

**Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I.      *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement*

After any of such documents included in the Plan Supplement are filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Solicitation Agent's website at www.omnimgt.com/PhiladelphiaEnergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K.      *Non-Severability*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, or the Required Consenting Creditors; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of the Restructuring Support Parties and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if

such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  January 17, 2018

PES HOLDINGS, LLC
on behalf of itself and each of its Debtor affiliates

_/s/  Gregory G. Gatta_
Name: Gregory G. Gatta
Title: CEO

**<u>Annex I</u>**

**GOVERNANCE TERM SHEET**

*Execution Version*

# ANNEX I TO THE PLAN OF REORGANIZATION
## GOVERNANCE TERM SHEET

This non-binding indicative term sheet (the "**Governance Term Sheet**") sets forth the principal terms of governance to be implemented by the filing of cases under chapter 11 (the "**Chapter 11 Cases**") of title 11 of the United States Code (the "**Bankruptcy Code**").

This Governance Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protections of Federal Rule of Evidence 408 and any other applicable statutes or doctrines protecting the disclosure of confidential information and information exchanged in the context of settlement discussions. Any capitalized term used herein without definition shall have the meaning set forth for such term in the Plan to which this Governance Term Sheet is attached.

| Governance Term Sheet | |
|---|---|
| **Transfers** | The New Class B Common Stock shall only be transferable together with an equal number of New Membership Interests. Shares of New Class B Common Stock, together with an equal number of New Membership Interests, may be transferred by its holder at any time to the Reorganized Partnership in exchange for a number of shares of New Class A Common Stock at the applicable exchange rate which shall initially be one (1) share of New Class A Common Stock for each New Membership Interest and share of New Class B Common Stock (the "**Exchange Rate**").[1]<br><br>The following transfer restrictions shall apply to the New Common Stock and the New Membership Interests:<br><br>• the number of holders of record shall not exceed the number that would trigger the requirements for PES Inc. to become required to file with the Securities and Exchange Commission (the "**SEC**") under the Exchange Act of 1934, as amended (the "**Exchange Act**");<br><br>• no transfers that do not comply with U.S. federal or state securities laws or other applicable securities law;<br><br>• no transfers shall be permitted to entities that directly and |

---

[1]    The Consenting Term Loan B Creditors agree to consider in good faith any request of a Parent Party to permit the contribution (the "**Contribution**") to PES Inc. of 100% of the equity interests in those certain holding entities controlled by such Parent Party (classified as corporations for United States federal income tax purposes) that own no assets other than cash and/or direct or indirect interests in the Reorganized Partnership (such entities, the "**Blocker Corporations**") in exchange for New Class A Common Stock as part of the Restructuring Transactions so long as (i) the Blocker Corporations, at the time of such Contribution, own interests in the Reorganized Partnership directly and own no other assets (other than cash or prepaid taxes), (ii) such Parent Party makes representations to PES Inc. reasonably satisfactory to PES Inc. to the effect that the Blocker Corporations have no liabilities (other than tax liabilities) and (iii) such Parent Party provides PES Inc. with indemnification on terms reasonably satisfactory to PES Inc. for any inaccuracy of the representation described in (ii) and for any tax liability of the Blocker Corporations arising in a tax period (or portion thereof) ending on or before the closing (for the avoidance of doubt, taking into account the Restructuring Transactions) in excess of the cash held by such Blocker Corporations.

| | |
|---|---|
| | materially compete with PES Inc., the Reorganized Partnership or any of their respective material subsidiaries, as reasonably determined by the New Board, provided that this provision shall not restrict a transfer to any financial investment firm or collective investment vehicle solely by virtue of its ownership (and/or its affiliates' ownership) of an equity interest in any competitor held for investment purposes; and<br><br>• all transferees of the New Equity must sign a joinder to the Stockholders Agreement.<br><br>Subject to the right of a holder of a share of New Class B Common Stock to transfer such share at any time together with a corresponding New Membership Interest for one share of New Class A Common Stock, no transfer of the New Class B Common Stock or New Membership Interests will be permitted if it would cause the Reorganized Partnership to become a "publicly traded partnership." All transferees of the New Membership Interests must sign a joinder to the New LLC Agreement.<br><br>The New Common Stock and New Membership Interests shall be held electronically on the books and records of the transfer agent only and shall not be in certificated form unless authorized by the New Board. Each share or certificate shall bear a legend stating that such securities are subject to transfer restrictions set forth in the New Organizational Documents. |
| **Additional New Board Provisions** | After the Effective Date, (i) CSAM, (ii) Halcyon and (iii) Carlyle PES, L.L.C. ("**TCG**") shall have continuing rights to nominate and elect directors to the New Board consistent with the initial designation rights set forth in Article IV.N of the Plan (in the case of TCG, such rights refers to the rights provided to the Parent), provided that (x) from the time each of CSAM or Halcyon ceases to have an Ownership Percentage[2] of at least 20% but still has an Ownership Percentage of at least 10%, it will be entitled to designate one director; and (y) from the time each of CSAM, Halcyon or TCG ceases to have an Ownership Percentage of at least 10%, such party shall not have any further designation rights. The CEO shall also be entitled to be a director. The Stockholders Agreement shall provide that all holders of the New Common Stock shall be required to vote in favor of the election of (i) any directors designated by CSAM, Halcyon or TCG and (ii) the CEO. Any directors not subject to the foregoing continuing rights shall be elected by holders of a majority of the outstanding New Common Stock.<br><br>Until each of CSAM, TCG or Halcyon cease to have an Ownership Percentage of at least 10%, each may designate an observer to the New Board (a "**Board Observer**") and may require PES Inc. to enter into a customary management rights letter with it. All expenses incurred for a Board Observer to attend a meeting shall be paid for Board Observers on |

---

[2] "**Ownership Percentage**" means, with respect to any holder of New Common Stock at any particular time, the percentage resulting from a fraction, (i) the numerator of which is the number of outstanding shares of New Common Stock beneficially owned by such holder, collectively with its affiliates, funds managed by it or its affiliates, and on an institutional basis, as of such time and (ii) the denominator of which is the number of outstanding shares of New Common Stock immediately outstanding on the Effective Date (giving effect to the Restructuring Transactions).

| | |
|---|---|
| | the same terms as directors, and Board Observers shall be entitled to attend all meetings of the Board and of its committees and receive all materials delivered in connection therewith, subject to entering into a customary confidentiality agreement and redaction and recusal for the purposes of protecting the attorney-client privilege or any intellectual property (including trade secrets) or preventing a conflict of interest or violation of applicable law. The identity of each Board Observer, if any, designated by any of CSAM, Halcyon or TCG is subject to the prior written consent of the New Board, such consent not to be unreasonably withheld; *provided* that in the event such consent is not given for a Board Observer designated by CSAM, Halcyon or TCG, such party may designate a different person as the Board Observer, subject to the prior written consent of the New Board, such consent not to be unreasonably withheld.<br><br>Any person with a Board designation right or Board Observer right shall be permitted to assign such rights so long as the transferee shall have the requisite Ownership Percentage applicable to such transferor after giving effect to such transfer and the transferor elects to make such assignment in its sole discretion.<br><br>Board members will have customary indemnification protections, and PES Inc., the Reorganized Partnership and their respective subsidiaries will waive corporate opportunities on customary terms and conditions with respect to each of CSAM, Halcyon, TCG and any non-employee directors.<br><br>Any person with director designation or Board Observer rights may suspend such rights either in connection with a conversion of voting New Common Stock to non-voting New Common Stock or otherwise. Any such suspension or conversion may be canceled by such person at any time subject to any required approvals of an applicable governmental entity. |
| **New Common Stock Consent Rights** | The approval of the holders of a majority of the outstanding New Common Stock shall be required for PES Inc., the Reorganized Partnership or any of their respective subsidiaries to conduct any of the following actions, directly or indirectly, from and after the Effective Date:<br><br>• a Deemed Liquidation Event (as defined below), voluntary liquidation, dissolution, winding up, commencement of or consent to bankruptcy, insolvency, liquidation or similar proceedings of PES Inc. or the Reorganized Partnership;<br><br>• issue or sell any new capital stock of PES Inc., equity interest in the Reorganized Partnership, or any security of their respective subsidiaries, or any right, option or warrant (including convertible debt), convertible into or exercisable or exchangeable for such capital stock, equity interest or other security other than: (w) in connection with an Excess Tax Distribution Contribution (as defined below); (x) capital stock issued as part of a bona fide acquisition; (y) employee equity awards or capital stock issued upon the exercise, conversion or exchange of outstanding securities; and (z) any SEC-registered public offering following a Qualified IPO (collectively, the "**Excluded Issuances**");<br><br>• incur indebtedness in excess of $50 million in principal amount in the aggregate unless in the ordinary course of business; |

| | |
|---|---|
| | • enter into or amend any agreement or series of related agreements to which PES Inc., the Reorganized Partnership or any of their respective subsidiaries are expected to receive or make aggregate payments in excess of $50 million unless in the ordinary course of business;<br><br>• consummate any acquisition of assets or another person (including by a merger or consolidation) for consideration in excess of $50 million in fair market value unless in the ordinary course of business;<br><br>• any sale or other transfer (including an exclusive license) of assets with a fair market value in excess of $50 million unless in the ordinary course of business;<br><br>• any voluntary registration of the New Common Stock under the Exchange Act;<br><br>• any listing of the New Common Stock on a national securities exchange or over-the-counter market;<br><br>• amend any of the New Organizational Documents;<br><br>• consummate a public offering pursuant to a registration statement filed with the SEC, including a Qualified IPO; or<br><br>• enter into any agreement or other binding obligation to do any of the foregoing. |
| **New Class A Common Stock Consent Rights** | The approval of the holders of a majority of the outstanding New Class A Common Stock shall be required for PES Inc., the Reorganized Partnership or any of their respective subsidiaries to conduct any of the following actions, directly or indirectly, from and after the Effective Date:<br><br>• amend, alter, waive or repeal any of the New Organizational Documents to materially adversely and disproportionately affect the powers, preferences or rights of the outstanding New Class A Common Stock; or<br><br>• enter into any agreement or other binding obligation to do any of the foregoing. |
| **New Class B Common Stock Consent Rights** | The approval of the holders of a majority of the outstanding New Class B Common Stock shall be required for PES Inc., the Reorganized Partnership or any of their respective subsidiaries to conduct any of the following actions, directly or indirectly, from and after the Effective Date:<br><br>• amend, alter, waive or repeal any of the New Organizational Documents to materially adversely and disproportionately affect the powers, preferences or rights of the outstanding New Class B Common Stock;<br><br>• engage in any business activity other than the direct or indirect management and ownership of the Reorganized Partnership or any of its subsidiaries other than any action, including issuing equity or incurring its own indebtedness, if the New Board determines in good faith that such actions are in the best interest |

4

| | of the holders of the New Membership Interests and the Reorganized Partnership;[3] or<br><br>• enter into any agreement or other binding obligation to do any of the foregoing. |
|---|---|
| **Related Party Agreements** | PES Inc. and the Reorganized Partnership shall not, and shall not permit any of their respective subsidiaries to, enter into, amend or renew an agreement with (a) an affiliate of PES Inc. or the Reorganized Partnership, or (b) an owner of New Common Stock or of a New Membership Interest, or an affiliate of such owner, if such agreement or the performance of such agreement would materially and adversely impact the holders of the New Class A Common Stock, of the New Class B Common Stock or of the New Membership Interests, unless such agreement, amendment or renewal: (i) is entered into on an arm's-length basis no less favorable than those available from an unaffiliated third party; (ii) is, or is pursuant to, a compensation and benefits agreement with a director, officer or other employee of PES Inc., the Reorganized Partnership and any of its subsidiaries entered into in the ordinary course of business (and other similar, customary exclusions for intra-company matters); or (iii) is approved with the prior written consent of each of CSAM, Halcyon, TCG and Energy Transfer Partners, so long as such party has an Ownership Percentage of at least 5.0%. |
| **Existing Agreements** | For the avoidance of doubt, the consent rights set forth above under "New Common Stock Consent Rights," "New Class A Common Stock Consent Rights," "New Class B Common Stock Consent Rights" and "Related Party Agreements" shall not apply in respect of actions taken from and after the Effective Date pursuant to any agreement during its term, so long as it is not materially amended, to which PES Inc., the Reorganized Partnership or any of their respective subsidiaries is bound and was entered into prior to the Effective Date, including the Intermediation Facility or a replacement therefor. In addition, any direct or indirect sale, other transfer (including an exclusive license) or purchase of, or investment in, a company or other corporate entity or a business or substantially all of the assets thereof, whether by merger, consolidation or otherwise, shall not be considered to be in the "ordinary course of business." |
| **Other Provisions** | The New Organizational Documents will contain certain provisions, including, among other things:<br><br>• (i) Key Holders[4] will have tag-along rights for a transfer or series of related transfers for more than 25% of any of the outstanding New |

---

[3] To protect the principle that the holders of the New Class B Common Stock receive their economics through their New Membership Interests, the New Organizational Documents shall contain appropriate provisions generally (i) to provide for economic parity between a share of New Class A Common Stock and a New Membership Interest, subject to adjustments to the Exchange Rate as provided in footnote 6 herein; and (ii) to ensure that no business activity is taken at sister or parent entities of the Reorganized Partnership.

[4] "**Key Holder**" means (i) a holder (when combined with its affiliates and funds managed by it and its affiliates) of New Common Stock with an Ownership Percentage of at least 1.0% that is a party to the Stockholders

5

Equity, and (ii) Management Holders will also have tag-along rights for a transfer or series of related transfers for more than 5% of any of the outstanding New Equity ((i) and (ii) collectively, the "**tag-along rights**"); *provided* such tag-along rights shall not apply to (w) any transfer that is required by law or a governmental entity with jurisdiction over either PES Inc., the Reorganized Partnership or the transferor; (x) a transfer as part of an underwritten public offering pursuant to an SEC registration statement for which piggyback registration rights apply; (y) a transfer to any affiliate of the transferor, including any fund managed by the transferor or an affiliate thereof or (z) pursuant to the drag-along rights; and provided that each such holder will be provided the opportunity at its discretion to transfer its shares of New Class B Common Stock with a corresponding amount of New Membership Interests to the Reorganized Partnership for shares of New Class A Common Stock based on the Exchange Rate prior to any such transfer.

- If requested by holders of at least a majority of the outstanding New Common Stock (the "**Dragging Holders**") in connection with a Sale Event[5], all holders of the New Equity shall be required to sell their New Equity on the same terms and the same per-interest consideration as the Dragging Holders and, if a stockholder vote is required, vote in favor of such transaction and waive all appraisal or dissenter rights in connection therewith (the "**drag-along rights**"); *provided* if the acquiring person or group includes one or more affiliate stockholders of PES Inc., including any person which, together with its affiliates and on an institutional basis, beneficially owns 10% or more of the outstanding New Common Stock (an "**Affiliated Buyer**"), the drag-along rights shall only apply if such transaction is approved by (x) a majority of disinterested directors (even if less than a quorum) or (y) a majority of the outstanding New Common Stock not held by an Affiliated Buyer; *provided further* that each such holder will be provided the opportunity at its discretion to transfer its shares of New Class B Common Stock with a corresponding amount of New

---

Agreement and (ii) each member of management (former or current) of Parent and its affiliates who is receiving New Equity on the Effective Date pursuant to the Restructuring Transactions (and exclusive of the new Management Incentive Plan), such number of members of management not to exceed twenty (20) persons (a "**Management Holder**"); *provided* that if any Management Holder transfers 50% or more of its initial ownership of New Equity following the Restructuring and has an Ownership Percentage of less than 1.0% after giving effect to such transfer, such Management Holder shall no longer be a Key Holder except that such Management Holder shall still be eligible to exercise the tag-along rights and shelf registration rights provided hereunder; *provided further* that any Management Holder with an Ownership Percentage less than 1.0% shall not have any preemptive rights; *provided further* that no direct, material competitor, as reasonably determined by the New Board, may be a Key Holder.

[5]    "**Sale Event**" means: (i) A merger or consolidation (other than one in which holders of the voting power of PES Inc. own a majority by voting power of the outstanding shares of the surviving or acquiring corporation); (ii) a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of PES Inc. or the Reorganized Partnership; ((i) or (ii), a "**Deemed Liquidation Event**"); or (iii) a transaction or series of related transactions in which a person, or a group of related persons, acquires from stockholders of PES Inc. shares of capital stock representing more than fifty percent (50%) of the outstanding voting power of PES Inc.

Membership Interests to the Reorganized Partnership for shares of New Class A Common Stock based on the Exchange Rate prior to any such transfer;

- Key Holders will have customary information rights providing for at least the same information as provided under Section 5.1 of the Term Loan B Credit Agreement;

- So long as PES Inc. is not required to file public reports with the SEC, PES Inc. shall use commercially reasonable efforts to assist any Key Holder with a transfer of its New Equity by (i) providing reasonable access to PES Inc.'s and its subsidiaries' books and records, financial and operating data and any other information reasonably appropriate for a proposed transferee to conduct a reasonable and customary due diligence review and (ii) providing any reasonably requested legal opinions in connection with such a transfer upon the receipt of reasonable evidence and certifications that there is an applicable exemption from registration under the Securities Act (the "**sale support rights**").

- Each Key Holder will, collectively with its affiliates (including any funds managed by such Key Holder or its affiliates), have the right to participate on a *pro rata* basis in any issuance by PES Inc. or the Reorganized Partnership of any capital stock or securities exchangeable or exercisable for or convertible into its capital stock (the "**preemptive rights**"), except for (x) Excluded Issuances, *provided* that an issuance in connection with an Excess Tax Distribution Contribution shall not be considered an Excluded Issuance for purposes of the preemptive rights; or (y) in connection with any bona fide, arm's-length restructuring of outstanding debt of PES Inc., the Reorganized Partnership or any subsidiary (for the avoidance of doubt, a Key Holder may allocate its aggregate preemptive rights among its affiliates, including any funds managed by such Key Holder or its affiliates, in its sole discretion);

- All holders of the New Equity shall be party to the Stockholders Agreement as a precondition to receiving any of the New Equity and shall also grant a power of attorney and voting proxy to the New Board with respect to the Board designation and nomination rights and the drag-along rights; *provided* that any amendment to such rights shall require the prior written consent of each of CSAM, Halcyon and TCG so long as such party has an Ownership Percentage of at least 10.0%;

- To the extent that a tax distribution to PES Inc. by the Reorganized Partnership exceeds the amount of any taxes required to be paid by PES Inc. in respect of its ownership of the Reorganized Partnership for the applicable fiscal year, PES Inc. may use all or a portion of such excess cash to make a capital contribution to the Reorganized Partnership in return for a number of New Membership Interests based on the fair market value thereof (an "**Excess Tax Distribution Contribution**");[6] and

---

[6] In the event of an Excess Tax Distribution Contribution or any other purchase of New Membership Interests by PES Inc., the Exchange Rate shall be adjusted immediately following such purchase (and prior to any related

| | |
|---|---|
| | • Other reasonable provisions in the discretion of the Required Consenting Term Loan B Lenders acting in good faith and after consulting with the Parent Parties. |
| | If PES Inc. consummates an underwritten, SEC-registered initial public offering with gross primary proceeds of at least $75 million (a "**Qualified IPO**"), the consent rights, tag-along rights, drag-along rights, preemptive rights, information rights and sale support rights shall automatically terminate. |
| **Registration Rights** | From the earlier of (i) the date of consummation of a Qualified IPO or (ii) the date on which PES Inc. becomes obligated to publicly file SEC reports under the Exchange Act, the following registration rights will apply: <br><br> • *Shelf Registration Rights*: PES Inc. will use commercially reasonable efforts to file a shelf registration statement on Form S-1 (or Form S-3, if PES Inc. is eligible to use such form, it being understood that the obligation to file a shelf registration statement pursuant to this provision shall not be dependent on such eligibility), or any other applicable form, to cause such shelf registration statement to be declared effective by the earlier of (1) the 60th day following the date on which PES Inc. becomes obligated to publicly file SEC reports under the Exchange Act or (2) the 181st day following the pricing of a Qualified IPO and keep it effective to register the resale of any shares of New Class A Common Stock received in the Restructuring Transactions or thereafter acquired held by Key Holders, unless the resale of such New Class A Common Stock does not require registration to be resold without any holding period, volume or manner of sale restrictions in the reasonable opinion of the Board; *provided* that any Key Holder or Management Holder (i) with an Ownership Percentage of at least 10%, (ii) who is, or has an employee who is, an officer of PES Inc. or member of the New Board or (iii) that otherwise reasonably concludes based on advice of counsel that it may be considered an "affiliate" of PES Inc. will be deemed eligible to include its New Class A Common Stock in such shelf registration statement. |

transfer or exchange of New Membership Interests and New Class B Common Stock for New Class A Common Stock) to equal the quotient of (x) the aggregate number of shares of New Class A Common Stock outstanding immediately following such purchase of additional New Membership Interests divided by (y) the aggregate number of New Membership Interests held by PES Inc. immediately following such purchase. For example, if there are initially 100 outstanding shares of New Class A Common Stock and PES Inc. holds 100 New Membership Interests, the Exchange Rate will be one (1). If PES Inc. subsequently acquires 25 New Membership Interests (whether or not holders of New Membership Interests exercise any preemptive rights) without issuing any additional New Class A Common Stock, the Exchange Rate will be adjusted to equal 0.8, so each New Membership Interest together with a share of New Class B Common Stock will be exchangeable for 0.8 shares of New Class A Common Stock. The Exchange Rate will be similarly adjusted if PES Inc. repurchases or redeems any outstanding shares of New Class A Common Stock and there is no corresponding repurchase or redemption of New Membership Interests by the Reorganized Partnership. Furthermore, the Exchange Rate will also be adjusted if there is any subdivision or combination (whether by split, dividend, distribution, reclassification, recapitalization or otherwise) of either the New Class A Common Stock or the New Class B Common Stock and the New Membership Interests without a substantively identical subdivision or combination to provide for equal treatment of the New Class A Common Stock and New Class B Common Stock and New Membership Interests.

| | |
|---|---|
| | • *Demand Registration Rights*: Beginning on the date that is 180 days following the pricing of a Qualified IPO (or such earlier date on which the underwriters in such offering have agreed for the lock-up restrictions relating thereto to terminate), if one or more Key Holders with an aggregate Ownership Percentage of least 10% request it, PES Inc. will use commercially reasonable efforts to file a registration statement for the sale of such shares of New Class A Common Stock and such demanding Key Holders may require, in connection with any such demand registration, that PES Inc. conduct a firm commitment underwritten offering; *provided* such registration must cover the sale of at least 5% of the outstanding New Class A Common Stock and such demand may only be made once every six months.<br><br>• *Piggyback Registration Rights*: All Key Holders will have customary piggyback rights for any public offering of the New Class A Common Stock pursuant to an effective SEC registration statement, whether initiated by other Key Holders, PES Inc. or otherwise, with priority given to securities issued by PES Inc. in the case of an offering initiated by PES Inc. and otherwise with priority given to the initiating and other Key Holders on a pro rata basis.<br><br>• PES Inc. will pay all registration expenses including reasonable expenses of one counsel to the holders plus any necessary local counsel, except for the underwriting discounts and commissions of any Key Holders selling in any offering. |
| **Lockup;**<br>**Market Standoff** | In connection with a Qualified IPO and if required by the New Board, all directors and officers of PES Inc. and all holders of the New Equity will agree to not transfer any New Equity (and any securities exercisable or exchange for, or convertible into, New Equity) from the time a preliminary prospectus with a price range is publicly filed for up to 180 days following the date of a final prospectus. For any SEC-registered public offering following a Qualified IPO, if the New Board requires it, all directors and officers and all holders participating in such offering shall agree to the same terms as described above except such lock-up agreement shall not last for more than 90 days following the date of any final prospectus for such offering.<br><br>All directors and officers of PES Inc. and the relevant holders of New Equity referred to in the preceding paragraph will agree to execute a customary lock-up agreement with the underwriters consistent with these provisions and any waiver of such provisions granted by the underwriters to (i) any person or entity that beneficially owns 1% or more of the outstanding New Equity or (ii) any director or officer, in each case shall also apply to the same extent to all holders of New Equity for the same amount of New Equity waived for such other person (the "**MFN Release**") except if such waiver is in connection with an underwritten offering pursuant to an effective SEC registration statement, all Key Holders shall be eligible to participate in such offering and the MFN Release shall only apply with respect to such holder's sales in such offering. |

| | |
|---|---|
| **Rule 144 Cooperation** | During any period in which PES Inc. is subject to reporting under the Exchange Act, PES Inc. will use its commercially reasonable efforts to:<br><br>(a)     make and keep public information regarding PES Inc. available, as those terms are understood and defined in Rule 144 under the Securities Act (or any similar provision then in effect), at all times during such period;<br><br>(b)     file with the SEC in a timely manner all reports and other documents required of PES Inc. under the Securities Act and the Exchange Act at all times during such period; and<br><br>(c)     so long as a Key Holder owns any New Common Stock subject to registration rights, furnish (i) upon request, a written statement of PES Inc. that it has complied with the reporting requirements of Rule 144 under the Securities Act (or any similar provision then in effect), to the extent accurate and (ii) unless otherwise available via the SEC's EDGAR filing system, to furnish such Key Holder upon request a copy of the most recent annual or quarterly report of PES Inc., and such other reports and documents so filed as such Key Holder may reasonably request in availing itself of any rule or regulation of the SEC allowing such Key Holder to sell any such securities without registration. |

**Annex II**

**NEW FIRST LIEN TERM LOAN TERM SHEET**

## ANNEX II TO THE PLAN OF REORGANIZATION
## NEW FIRST LIEN FACILITY TERM SHEET

This term sheet (the "**New First Lien Facility Term Sheet**") is Annex II to the Plan of Reorganization (the "**Plan**") attached as Exhibit A to the Restructuring Support Agreement (the "**Restructuring Support Agreement**").  Capitalized terms used without definition have the meanings given to them in the Plan or the Restructuring Support Agreement.

This New First Lien Facility Term Sheet sets forth the principal terms of a potential first lien term loan facility (the "**New First Lien Facility**"; the credit agreement evidencing the New First Lien Facility, the "**New First Lien Credit Agreement**" and, together with the other definitive documents governing the New First Lien Facility, the Plan and the Final Orders, the "**New First Lien Facility Documents**," each of which shall be in form and substance acceptable to the New First Lien Facility Agent and the New First Lien Facility Lenders (each as defined herein)) to be entered into with the Loan Parties (as defined herein) in the event of the filing of the Chapter 11 Cases. The New First Lien Facility will be subject to (a) the approval of the Bankruptcy Court and (b) emergence from the Chapter 11 Cases, in accordance with (i) the Plan and Final Orders of the Bankruptcy Court authorizing the Loan Parties to enter into the New First Lien Facility, each of which shall be in form and substance acceptable to the New First Lien Facility Agent and the New First Lien Facility Lenders, and (ii) the New First Lien Facility Documents to be executed by the Loan Parties, the New First Lien Facility Agent and the New First Lien Facility Lenders.

| NEW FIRST LIEN FACILITY TERM SHEET | |
|---|---|
| **Borrower** | PES Holdings, LLC, as borrower (the "**Borrower**") |
| **Guarantors** | All subsidiaries of the Borrower (the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**"). |
| **New First Lien Facility Agent** | Cortland Capital Markets Services LLC, as administrative agent and collateral agent (the "**New First Lien Facility Agent**") |
| **New First Lien Facility Lenders** | Upon consummation of the Plan and the emergence (the "**Emergence**") of the Borrower and those of its affiliates for which cases were filed under Chapter 11 of the United States Bankruptcy Code from the Chapter 11 Cases, the DIP Facility will convert to Tranche A loans under the New First Lien Facility, subject to the terms and conditions of this New First Lien Facility Term Sheet and the New First Lien Facility Documents. |
| **Amount & Type (Tranches A, B and C of the New First Lien Facility)** | Upon Emergence:<br><br>• the DIP Facility will convert to Tranche A of the New First Lien Facility, such Tranche A having a principal amount of $120 million;<br><br>• as described in and in accordance with the Plan, each Holder of an Allowed Term Loan A Claim will receive its Pro Rata share of (i) Tranche B of the New First Lien Facility, such Tranche B having a principal amount of $82.5 million (for the avoidance of doubt, $82.5 million after giving effect to the cash repayment described in (ii)) and (ii) a permanent cash repayment in an aggregate principal amount of $15 million in respect of loans under the NYL Credit Agreement, plus all accrued and unpaid interest under the NYL Credit Agreement; and<br><br>• as described in and in accordance with the Plan, each Holder of an Allowed Term Loan B Claim will received its Pro Rata share of Tranche C of the New First Lien Facility, such Tranche C having a principal amount of $417 million,<br><br>in each case subject to the terms and conditions of this New First Lien Facility |

| | |
|---|---|
| | Term Sheet and the New First Lien Facility Documents.<br><br>The holders of the Tranche A loans are referred to as the "**Tranche A Lenders**," the holders of the Tranche B loans are referred to as the "**Tranche B Lenders**" and the holders of the Tranche C loans are referred to as the "**Tranche C Lenders**." |
| **Maturity Date** | December 31, 2022 |
| **Tranche A Interest Rate** | Cash pay interest of LIBOR + 625 bps |
| **Tranche B Interest Rate** | Cash pay interest of LIBOR + 450 bps |
| **Tranche C Interest Rate** | (A) From Emergence to the business day falling two years and six months after Emergence (such business day, the "**Hinge Date**"), cash pay interest of LIBOR + 350 bps and payment-in-kind interest of 300 bps and (B) from and after the Hinge Date, cash pay interest of LIBOR + 400 bps and payment-in-kind interest of 250 bps. |
| **LIBOR/Base Rate floor** | 100/200 bps |
| **Tranche A Amortization** | None. |
| **Tranche B Amortization** | $2,500,000.00 in 2018; $5,000,000.00 in 2019; $7,500,000.00 in 2020; and $10,000,000.00 each year thereafter, payable in equal quarterly installments. |
| **Tranche C Amortization** | None. |
| **Tranche C PIK Toggle** | If at any time up to and including the Hinge Date, the projected liquidity of the Loan Parties, on a consolidated basis (as defined in a manner to be agreed) over a prospective twelve month period is equal to or less than $115 million, the Borrower may elect to decrease the amount of the cash pay interest of the Tranche C Interest Rate by 300 bps by increasing the amount of the payment-in-kind interest by 400 bps up to an aggregate cap of $15 million in aggregate principal of such proposed in lieu payment-in-kind interest over the life of the New First Lien Facility. |
| **Collateral** | Subject to the below, substantially all of the assets of the Borrower and its subsidiaries, subject to customary carveouts and thresholds to be mutually agreed provided that the Excluded Collateral (as defined below) shall be excluded from the collateral securing the New First Lien Facility. Certain immaterial buildings identified by the Term Loan A Agent prior to the execution of the Restructuring Support Agreement will not secure the Tranche B (the "**Specified Tranche B Excluded Buildings**"). Prior to Emergence, the Borrower shall deliver evidence of flood insurance coverage to satisfy FEMA's flood insurance requirements on all existing properties (other than Specified Tranche B Excluded Buildings) of the Borrower and its subsidiaries that are located in a flood zone, as specified to the Borrower by the Term Loan A Agent or any Term Loan A Lender prior to the execution of the Restructuring Support Agreement. Notwithstanding anything to the contrary herein or in any New First Lien Facility Document, no building (as defined under the flood laws) acquired by the Borrower or any of its subsidiaries after Emergence shall secure the Tranche B if a Tranche B Lender notifies the New First Lien Facility Agent that such building (i) is located in a flood zone (unless otherwise not subject to the flood insurance requirements of the Federal Emergency Management Agency (FEMA)), and (ii) evidence of sufficient flood insurance coverage to satisfy FEMA's flood insurance |

|  | requirements has not been received (any such additional building that does not secure the Tranche B but secures the Tranche A and Tranche C by operation of this sentence, an "**Additional Tranche B Excluded Building**," and together with the Specified Tranche B Excluded Buildings, the "**Tranche B Excluded Buildings**"); it being understood that the Borrower shall be obligated to obtain flood insurance acceptable to each Tranche B Lender with respect to each building unless the Tranche B Lenders, in their discretion, determine to exclude any building from the mortgage requirement. |
|---|---|
| **Excluded Collateral** | The New First Lien Facility will not be secured by the MLC Separate Assets and Collateral (as defined in the Amended and Restated Intercreditor Agreement, dated as of October 7, 2014, among the Borrower, the other grantors party thereto, Bank of America, N.A., as revolving collateral agent and Merrill Lynch Commodities, Inc., as SOA collateral agent and as MLC, as in effect on the Petition Date) and all catalyst assets and catalyst inventory, precious metals assets and precious metals inventory and all additions, accessions and all rights and privileges related thereto. The New First Lien Facility will not be secured by the Collateral (as defined in Annex III Plan) for the Additional Financing Facility. |
| **Application of Proceeds** | All repayments after acceleration, an exercise of remedies or an Event of Default of the New First Lien Facility (i) from proceeds of Collateral will be applied (a) first, to the pro rata repayment of the loans and related obligations under Tranche A until such obligations have been paid in full and (b) second, to the pro rata repayment of the loans and related obligations under Tranche B and Tranche C (treated, for purposes of this paragraph, as a single tranche) until such obligations have been paid in full and (ii) if other than from proceeds of Collateral, to the pro rata repayment of the loans and related obligations under Tranche A, Tranche B and Tranche C until such obligations have been paid in full.  If proceeds from any Tranche B Excluded Buildings are received before or at the same time as proceeds from other collateral, the proceeds from the Tranche B Excluded Buildings shall be applied toward the Tranche A and, subject to the waterfall in the preceding sentence, the Tranche C, and, subject to the waterfall in the preceding sentence, the Tranche B shall receive an equivalent amount from proceeds of collateral other than the Tranche B Excluded Buildings. |
| **Prepayments** | Prepayments of Tranche B and Tranche C will be made on a no less than ratable basis with respect to Tranche A, and prepayments of Tranche B will be made on a basis that is no less than ratable with respect to the Tranche C. |
|  | All prepayments of Tranche B loans shall be applied to the amortization payments on the Tranche B loans in direct order of maturity. |
| **Events of Default** | Customary and appropriate for similar facilities, including, without limitation, payment default, breaches of loan documents, cross default and cross acceleration to material debt, undischarged judgments, ERISA events, change of control,  breach of reps and warranties, bankruptcy related defaults, lien related defaults, invalidity of New First Lien Facility Documents and suspension or termination of intermediation agreement or refinery operations (in each case subject to baskets, thresholds and carveouts to be agreed). |
| **Covenants** | Affirmative and negative covenants customary and appropriate for similar first lien term loans, together with such additions and modifications as determined by the New First Lien Facility Lenders and the Borrower; *provided* that such |

<table>
<tr><td></td><td>negative covenants shall include (in certain cases, subject to customary exceptions, carveouts and thresholds):
<ul>
<li>a prohibition on dividends, distributions, share buybacks or shareholder loans until the complete repayment of all Tranche B loans (the "<b>Tranche B Dividend Block</b>");</li>
<li>a prohibition on incurring any additional debt (including any additional Tranche A loans) that has priority of payment or priority in proceeds of Collateral over the Tranche B; provided that, subject to receipt of a budget reasonably satisfactory to the Required Tranche B Lenders demonstrating the need for a use for such additional borrowing within the two quarters on and following the time of such additional borrowings for ordinary working capital purposes, the Borrower may borrow for cash up to an additional $15 million in aggregate principal amount of the Tranche A (provided that the Tranche B Lenders shall be afforded the opportunity to participate in such increase on a ratable basis) (the "<b>Anti-Layering Covenant</b>");</li>
<li>a restriction on modifications to the terms of the Additional Financing Facility that are materially adverse to the New First Lien Facility Lenders; and</li>
<li>a $100 million restriction on asset sales subject to ordinary course transactions.</li>
</ul></td></tr>
<tr><td><b>Financial Covenants</b></td><td>None.</td></tr>
<tr><td><b>Representations and Warranties</b></td><td>Certain representations and warranties, affirmative and negative covenants and events of default will, in certain cases, contain materiality and knowledge qualifications, limitations, exceptions, dollar thresholds and baskets to be agreed.</td></tr>
<tr><td><b>Voting</b></td><td>Amendments and waivers of the New First Lien Facility will require (a) the approval of Tranche A Lenders holding more than 50% of the Tranche A loans (the "<b>Required Tranche A Lenders</b>") (provided that the consent of at least two Tranche A Lenders (including Tranche A Lenders affiliated to each other or under common management) shall be required) and (b) the approval of Tranche B Lenders and Tranche C Lenders holding more than 50% of the Tranche B loans and the Tranche C loans voting as a single class (the "<b>Required Tranche B/C Lenders</b>"); <i>provided</i> that, notwithstanding the foregoing (A) the vote of each affected New First Lien Facility Lender shall be required for (i) reductions of interest (or the rate thereon (including without limitation any change in LIBOR or the LIBOR floor or Base Rate or Base Rate Floor) or any increase in the allowed amount of, or acceleration in the allowed or prescribed date with respect to, interest payable in kind) or principal or fees or any postponement of any date for payment for any of the foregoing, (ii) changes to the sections entitled "Application of Proceeds" and "Prepayments" above, (iii) changes to certain customary pro rata provisions, (iv) releases of all or substantially all of the value of the guarantees of the Guarantors or a release of all or substantially all of the Collateral and (v) changes in the voting provisions, the definition of required lenders (or similar terms) or voting percentages specified in the definition of required lenders or related terms and (B) consent of Tranche B Lenders holding more than 50% of the Tranche B loans (the "<b>Required Tranche B Lenders</b>") will be required to change (I) any provision related to the Tranche B Dividend Block or the Anti-</td></tr>
</table>

| | |
|---|---|
| | Layering Covenant or (II) any provision under the New First Lien Facility (other than as otherwise specified in (A) of this section) that affects or benefits the Tranche A Lenders or the Tranche C Lenders disproportionately as compared to the Tranche B Lenders or would disproportionately adversely affect the Tranche B Lenders as compared to the Tranche A Lenders or the Tranche C Lenders. |
| **Remedies** | Following an Event of Default, the Required Tranche A Lenders shall control any remedies against the Collateral, subject to the ability of the Required Tranche B Lenders or the Required Tranche C Lenders to exercise remedies after a standstill period of 30 days (which 30-day period will commence upon the occurrence of such Event of Default), subject, in all cases, to the following modifications:<br><br>• Subject in all cases to the following bullet points, after the discharge in full of Tranche A, the exercise of remedies shall be controlled by the Required Tranche B/C Lenders (the "**Discharge Control Shift**"); <u>provided</u> that, whether or not a Discharge Control Shift shall have occurred, after a standstill period of 30 days (beginning with the occurrence of the relevant Event of Default), the Required Tranche B Lenders or the Tranche C Lenders holding more than 50% of the Tranche C loans (the "**Required Tranche C Lenders**") shall each have the ability to initially trigger the exercise of remedies against the Collateral ("**Remedies Shift**")<br><br>• Any exercise of remedies against the Collateral solely resulting from any of the following Event of Defaults (each a "**Tranche B Specific Event of Default**") for failure (i) to pay interest on the Tranche B loans when due (unless all interest (other than pay in kind interest) under the New First Lien Facility is then not being paid on such due date), (ii) to pay any amortization payment under the Tranche B loans (each Event of Default described in each of (i) and (ii), a "**Tranche B Payment Event of Default**") or (iii) to comply with the Tranche B Dividend Block or the Anti-Layering Covenant shall in the case of each of (i), (ii) and (iii) be controlled by the Required Tranche B Lenders without the requirement of the consent of any other New First Lien Facility Lenders or the New First Lien Facility Agent, subject, in the case of a Tranche B Payment Event of Default only, to a standstill period (beginning with the occurrence of such Tranche B Payment Event of Default) of 10 business days<br><br>• if any Event of Default has occurred and is continuing in addition to a Tranche B Specific Event of Default (a "**Dual Event of Default**"), both the Required Tranche A Lenders (subject to the Discharge Control Shift) and the Required Tranche B Lenders shall each have the ability to initially trigger the exercise of remedies against the Collateral<br><br>• notwithstanding anything to the contrary herein, subject to the proviso below, (i) if and as long as the Required Tranche A Lenders (subject to the Discharge Control Shift, Remedies Shift and except following a Tranche B Specific Event of Default where there is not then a Dual Event of Default) pursue the exercise of remedies following an Event of Default, such exercise of remedies will be exclusively controlled by |

<table>
<tr><td></td><td>the Required Tranche A Lenders (subject to the Discharge Control Shift and/or Remedies Shift) without the requirement of the consent of any other New First Lien Facility Lenders or the New First Lien Facility Agent, (ii) if and as long as the Required Tranche B Lenders pursue the exercise of remedies following a Tranche B Specific Event of Default where there is not then a Dual Event of Default, such exercise of remedies will be exclusively controlled by the Required Tranche B Lenders without the requirement of the consent of any other New First Lien Facility Lenders or the New First Lien Facility Agent, and (iii) upon a Discharge Control Shift or a Remedies Shift (other than in an event where clause (ii) is applicable), if the Required Tranche B Lenders or the Required Tranche C Lenders have initially triggered the exercise of remedies against the Collateral, such exercise of remedies will be controlled by the Required Tranche B/C Lenders; <u>provided</u> that (A) if clause (i) of this bullet is applicable and the Required Tranche A Lenders are not diligently pursuing remedies against a substantial portion of the Collateral, the exercise of remedies shall be controlled by the Required Tranche B/C Lenders and (B) if either clause (A) of this proviso or clause (iii) of this bullet is applicable and the Required Tranche B/C Lenders are not diligently pursuing remedies against a substantial portion of the Collateral, then the exercise of remedies shall be controlled by the Required Tranche B Lenders.<br><br>Furthermore, upon the occurrence of (w) any acceleration of the Tranche A Facility, (x) any payment Event of Default under the Tranche A Facility and expiration of a standstill period of 30 days (beginning with the occurrence of the relevant Event of Default), (y) a bankruptcy or insolvency Event of Default with respect to the Borrower or any material subsidiary of the Borrower or (z) any exercise of remedies against a substantial portion of the Collateral by or at the direction of the Tranche A Lenders, the Tranche B Lenders and Tranche C Lenders shall have the option (on customary terms), but not the obligation, to purchase (pro rata among them based on the principal amount of such Tranche B Lenders' and Tranche C Lenders' loans then outstanding under the New First Lien Facility) the Tranche A loans (in full but not in part) at par plus accrued and unpaid interest (it being understood that to the extent any Tranche B Lender or Tranche C Lender does not exercise its right to participate in such purchase option, the participating Tranche B Lenders and Tranche C Lenders may, if they wish to exercise such option, ratably increase their participation in such purchase option).</td></tr>
<tr><td><strong>Fees and Expenses Indemnification</strong></td><td>The Loan Parties shall pay all reasonable, documented out-of-pocket fees, costs and expenses incurred or accrued by the New First Lien Facility Agent and/or the New First Lien Facility Lenders in connection with any and all aspects of the New First Lien Facility, including, without limitation, the reasonable fees and expenses of legal counsel, hired by the New First Lien Facility Agent and/or the applicable New First Lien Facility Lenders (limited to (i) one primary counsel and one local counsel for the New First Lien Facility Agent, (ii) one primary counsel for the Tranche A Lenders and Tranche C Lenders, (iii) one primary counsel for the Tranche B Lenders (plus</td></tr>
</table>

|  | conflicts counsel in certain customary cases) and (iv) one local counsel in each applicable jurisdiction for the Tranche A Lenders, Tranche B Lenders and Tranche C Lenders).<br><br>The Loan Parties will indemnify the New First Lien Facility Agent and New First Lien Facility Lenders and their affiliates and related parties, and hold them harmless from and against all reasonable, documented out-of-pocket costs, expenses and liabilities arising out of or relating to the transactions contemplated hereby, except to the extent arising solely out of the gross negligence, bad faith or willful misconduct of such indemnified party as determined by a court of competent jurisdiction in a final and nonappealable judgment. |
|---|---|
| **New Money Participant Fee** | Upon the conversion of the DIP Facility to Tranche A loans under the New First Lien Facility, each DIP Facility Lender shall, at the time of Emergence, receive its Pro Rata share of 2.5% of the New Equity issued after Emergence (for the avoidance of doubt, this 2.5% of the New Equity shall be a part of and not in addition to the 75% of the New Equity to be distributed to the Term Loan B Creditors and DIP Facility Lenders at the time of Emergence). |
| **Tranche B Participant Fee; Term Loan A Agent Fee** | Upon Emergence, the Debtors will pay the Tranche B Lenders a fee equal to 70 bps calculated with respect to the aggregate principal amount of Tranche B. PNC Capital Markets LLC, an affiliate of the Term Loan A Agent, will receive a fee equal to $500,000, of which one-half will be paid by North Yard Entities upon execution of the Restructuring Support Agreement and one-half will be paid by the Debtors upon Emergence. |
| **Governing Law** | The laws of the State of New York. |
| **Miscellaneous** | The New First Lien Facility Term Sheet does not purport to summarize all of the conditions, covenants, representations, warranties, events of default and other terms and provisions which would be contained in definitive credit documentation, if any, relating to matters covered hereby, all of which shall be acceptable in form and substance to the New First Lien Facility Agent and New First Lien Facility Lenders. |

**Annex III**

**ADDITIONAL FINANCING FACILITY COMMITMENT LETTER**

*Execution Version*

**Sunoco Logistics Partners Operations L.P.**
3807 West Chester Pike
Newtown Square, PA 19073

January 11, 2018

Philadelphia Energy Solutions Refining and Marketing LLC
1735 Market Street
Philadelphia, PA 19103
Attention: John B. McShane

Re:    $75,000,000 Senior Secured Exit Financing

<u>AMENDED AND RESTATED COMMITMENT LETTER</u>

Ladies and Gentlemen:

1.    *Commitment.*

Sunoco Logistics Partners Operations L.P. ("**SXL**", "**we**" or "**us**") is pleased to advise you of its commitment to provide financing to Philadelphia Energy Solutions Refining and Marketing LLC ("**PES**" or "**you**") in the principal amount of $75,000,000 on the terms and subject to the conditions expressly set forth in this amended and restated commitment letter (collectively with all exhibits hereto, the "**Commitment Letter**") (such financing, the "**PES Loan**"). This Commitment Letter amends, restates and supersedes in its entirety that certain commitment letter dated April 7, 2017 from SXL to you. Each capitalized term used but not defined in this Commitment Letter shall have the meaning assigned thereto in the term sheet for the PES Loan attached hereto as <u>Exhibit A</u> (the "**Term Sheet**").

2.    *Conditions.*

SXL's commitment hereunder to make the PES Loan is subject solely to the prior or concurrent satisfaction of the conditions set forth on <u>Exhibit B</u> attached hereto.

3.    *Information.*

PES hereby represents and warrants that (i) all written information other than the Projections (as defined below) and other than general economic or specific industry information developed by, and obtained from, third party sources (the "**Information**"), when taken as a whole, that has been or will hereafter be made available to SXL by PES or any of its representatives in connection with the transactions contemplated hereby, is and will be, when furnished and taken as a whole, complete and correct in all material respects and does not and will not, when furnished and taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made and (ii) all financial projections, if any, that have been or will be prepared by PES and made available to SXL (the "**Projections**") have been or will be prepared in good faith based upon assumptions believed by you to be reasonable as of the date of preparation and when furnished (it being understood that such Projections are subject to significant uncertainties and contingencies, many of which are beyond PES's control, that no assurance can be given that the Projections will be realized and that actual results may vary materially from the Projections). If, at any time from the date hereof until the termination of this

Commitment Letter, any of the representations and warranties in the preceding sentence would not be accurate and complete in any material respect if the Information or such Projections were being furnished, and such representations and warranties were being made, at such time, then PES agrees to promptly supplement the Information and/or such Projections from time to time so that the representations and warranties contained in this paragraph remain accurate and complete in all material respects under those circumstances. In providing this Commitment Letter, SXL is relying on the accuracy of the information furnished to it by or on behalf of PES and its affiliates without independent verification thereof.

4.      *Indemnity.*

PES shall indemnify and hold harmless SXL and its affiliates and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and out-of-pocket expenses (including reasonable and documented attorneys' fees, out-of-pocket expenses and charges), to which any such Indemnified Party may become subject (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of this Commitment Letter, the Loan Documentation or the transactions contemplated hereby or thereby (for the avoidance of doubt, the indemnity herein shall not be applicable to any other contractual arrangements not entered into in connection with this Commitment Letter, the Loan Documentation or the transactions contemplated hereby or thereby), *provided* that (x) no Indemnified Party will have any right to indemnification for any of the foregoing to the extent resulting from such Indemnified Party's own gross negligence, bad faith or willful misconduct or a material breach of such Indemnified Party's obligations under this Commitment Letter or the Loan Documentation, in each case as determined by a final non-appealable judgment of a court of competent jurisdiction and (y) no Indemnified Party will have a right to indemnification for any of the foregoing to the extent resulting from any dispute among Indemnified Parties other than as a result of any act or omission by PES or its affiliates.  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by PES, any of its directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

No Indemnified Party shall have any liability (whether in contract, tort or otherwise) to PES or any of its affiliates or any of their respective security holders or creditors for or in connection with the transactions contemplated hereby except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence, bad faith, willful misconduct or a material breach of such Indemnified Party's obligations under this Commitment Letter or the Loan Documentation.  In no event, however, shall (i) PES, any of its affiliates or any of its or their officers, directors, employees, agents, advisors and representatives or (ii) any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings); *provided* that the foregoing shall not limit PES's indemnity obligations under the preceding paragraph of this Section 4.

5.      *Costs and Expenses.*

From time to time and promptly upon demand therefor, PES shall pay and/or reimburse all reasonable and documented out-of-pocket fees, costs and expenses (including, without limitation, due diligence expenses and fees and expenses of third party advisors, consultants and legal counsel) of SXL and its affiliates (including Sunoco Partners Marketing & Terminals L.P.) arising in connection with this

Commitment Letter, the PES Loan, the Loan Documentation or the Restructuring, regardless of whether the Funding Date occurs.

**6.** **_Confidentiality._**

This Commitment Letter is delivered to you on the understanding that neither the existence of this Commitment Letter nor the contents hereof, nor the activities of SXL pursuant hereto, shall be disclosed, directly or indirectly, to any other person except that such existence and contents may be disclosed, subject in all respects to the following paragraph hereof, (a) to you and your affiliates and your and their respective officers, directors, employees, attorneys, accountants and professional advisors on a confidential basis, (b) as required by applicable law or compulsory legal process or to the extent requested or required by applicable ratings agencies, governmental and/or regulatory authorities (in which case you agree to inform us promptly thereof to the extent not prohibited by law), (c) to the extent that such information becomes publicly available other than by reason of improper disclosure by you or any of your affiliates or (d) if SXL consents to such proposed disclosure; _provided_ that following and/or substantially concurrently with your execution and delivery of this Commitment Letter, you may make such disclosures to the other Consenting Creditors that are party to, and as defined in, the Restructuring Support Agreement (as hereinafter defined) and their respective officers, directors, employees, attorneys, accountants and professional advisors on a confidential basis.

**7.** **_Termination; Survival._**

SXL's commitment and other obligations set forth in this Commitment Letter will automatically terminate on the earliest to occur of (a) the date on which all conditions precedent set forth on Exhibit B hereto are satisfied in full, the Loan Documentation is duly executed and delivered by you to us and the PES Loan is funded (such date, the "Funding Date"), (b) July 31, 2018 and (c) the "Termination Date" under and as defined in that certain Restructuring Support Agreement in respect of the Restructuring of PES and its affiliates to which SXL is party as "Additional Financing Lender" thereunder (the "**_Restructuring Support Agreement_**").  PES may terminate the commitment and other obligations of SXL hereunder at any prior time by delivering written notice of such termination to SXL.

The indemnification, expense reimbursement, jurisdiction, waiver of jury trial, service of process, venue, governing law, no agency or fiduciary duty and confidentiality provisions contained herein shall remain in full force and effect regardless of whether the Loan Documentation is executed and delivered and notwithstanding the termination of this Commitment Letter or the commitment hereunder; _provided_ that your obligations under this Commitment Letter insofar as they relate to the Loan Documentation shall automatically terminate and be superseded by the Loan Documentation upon execution and delivery thereof, and you shall be released from all liability in connection therewith at such time.

**8.** **_Miscellaneous._**

This Commitment Letter may not be assigned by any party hereto without the prior written consent of the other party hereto (and any purported assignment without such consent will be null and void); _provided_, that SXL may assign its commitment and agreements hereunder, in whole or in part, to any of its affiliates without the consent of PES or any other person. Notwithstanding the foregoing, no such assignment by SXL shall relieve it of its obligations hereunder unless its assignee shall agree with PES in writing to fully assume SXL's obligations hereunder (for the avoidance of doubt, PES shall have no obligation to execute any such assumption agreement; provided, however, that PES shall not unreasonably withhold, condition or delay its execution of any such agreement).  This Commitment Letter is intended to be solely for the benefit of the parties hereto (and their successors and permitted assignees

in accordance with the foregoing sentence) and is not intended to confer any benefits upon, or create any rights in favor of, any other person (other than Indemnified Parties).

You acknowledge that SXL and its affiliates may have commercial or other relationships with or engage in transactions, activities, investments or holdings involving other companies in respect of which you or your affiliates may have conflicting interests, and you acknowledge and agree, on your own behalf and on behalf of each of your affiliates, that SXL has no obligation to disclose such interests to you. Neither we nor any of our affiliates will use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or our other relationships with you in connection with such transactions, and we will not furnish any such information to other companies except to the extent permitted under Section 6 above.

You further acknowledge and agree, on your own behalf and on behalf of each of your affiliates, that nothing in this Commitment Letter or the Loan Documentation or the nature of our services herein or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between us, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, on your own behalf and on behalf of each of your affiliates, to the fullest extent permitted by law, any claims you or your affiliates may have against SXL for breach of fiduciary duty or alleged breach of fiduciary duty and agree that SXL will have no liability (whether direct or indirect) to you or your affiliates in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge, on your own behalf and on behalf of each of your affiliates, that the transactions contemplated hereby (including the exercise of rights and remedies hereunder and under the Loan Documentation) are arms' length commercial transactions and that we are acting as principal and in our own best interests. You are relying on your own experts and advisors to determine whether such transactions are in your best interests and are capable of evaluating and understanding, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby.

This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by you and us. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration when interpreting, this Commitment Letter. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the Loan Documentation supersede all prior understandings, whether written or oral, between us with respect to the PES Loan.

9.      *Governing Law; Etc.*

This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the state of New York without regard to principles of conflicts of law.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or

proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby or thereby in any New York State court or in any such Federal court and (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.   You and we agree that service of any process, summons, notice or document by registered mail addressed to any of the parties hereto at the applicable addresses above shall be effective service of process for any suit, action or proceeding brought in any such court.

**EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER, THE LOAN DOCUMENTATION OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

10.    *Patriot Act.*

SXL hereby notifies you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "**PATRIOT Act**"), SXL may be required to obtain, verify and record information that identifies you or your affiliates, which information includes the name, address, tax identification number and other information regarding such person that will allow SXL to identify such person in accordance with the PATRIOT Act.

\*        \*        \*

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us your executed counterpart hereof not later than 5:00 p.m. Eastern Standard Time on the date hereof.  This Commitment Letter shall become effective when both PES and SXL have executed and delivered counterparts of this Commitment Letter. This Commitment Letter and the agreements contained herein will automatically expire at the aforementioned time in the event that we have not received such executed counterparts from you by such time.

[*Remainder of this page intentionally left blank*]

**EXHIBIT A TO COMMITMENT LETTER**

<u>TERM SHEET</u>

[*attached*]

*Execution Version*

**EXHIBIT A TO COMMITMENT LETTER**

<u>Summary of Principal Terms</u>

*Set forth below is a summary of the principal terms for the PES Loan to be provided pursuant to the Commitment Letter to which this <u>Exhibit A</u> is attached. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Commitment Letter to which this <u>Exhibit A</u> is attached or in the other Exhibits (including the Annexes hereto and thereto) attached thereto.*

| | |
|---|---|
| <u>Borrower</u>: | Philadelphia Energy Solutions Refining and Marketing LLC, a Delaware limited liability company ("<u>Borrower</u>"). |
| <u>Lender</u>: | Sunoco Logistics Partners Operations L.P. or an affiliate thereof ("<u>Lender</u>"). |
| <u>Amount</u>: | Up to $75,000,000 in aggregate principal amount. |
| <u>Loan Documentation</u>: | The PES Loan will be documented pursuant to a definitive loan agreement and/or promissory note and other definitive financing documentation including, without limitation, the Security Documents and the Sharing Agreement (each as hereinafter defined), in each case, reflecting the applicable terms and conditions set forth in this Term Sheet and in the Commitment Letter, all of which shall be in form and substance satisfactory to Lender and entered into by the parties thereto on and as of the Funding Date (collectively, the "<u>Credit Documentation</u>"). |
| <u>Purpose</u>: | The proceeds of the PES Loan will be used to provide additional liquidity in connection with the restructuring (the "<u>Restructuring</u>") of the Borrower, the Parent Companies (as defined below) and their affiliates (collectively, the "<u>Company</u>"). |
| <u>Availability</u>: | The PES Loan will be made available in a single drawing on the Funding Date. |
| <u>Maturity</u>: | The PES Loan will mature on the earlier of (x) the tenth (10th) anniversary of the Funding Date and (y) one business day following the date on which all other financing facilities made available to the Company in connection with the Restructuring have been paid in full or have otherwise terminated. |
| <u>Amortization</u>: | None. |
| <u>Interest Rate</u>: | 8.30% per annum, payable monthly in arrears. |
| <u>Sharing Agreement</u>: | Borrower will agree to pay to Lender certain amounts not to exceed $12,500,000 per annum (one-fourth of such amount, the "<u>Maximum Quarterly Payment</u>"), payable quarterly as set forth in, and subject to adjustment in accordance with, <u>Annex 1</u> hereto. The Loan Documentation reflecting the foregoing agreement of Borrower and the terms set forth in such <u>Annex 1</u> are collectively referred to herein |

|                          | as the "<u>Sharing Agreement</u>". |
|--------------------------|------------------------------------|

<u>Ranking</u>:

*Pari passu* in right of payment with all senior debt of Borrower.

<u>Security and Collateral</u>:

Pursuant to the Mortgage and other collateral documentation and instruments of perfection in form and substance satisfactory to Lender (the "<u>Security Documents</u>"), the PES Loan will be secured by a first-priority security interest in all of Borrower's right, title and interest in, to and under those "aboveground storage tanks" (as defined by the Pennsylvania Tank Act at 25 Pa. Code § 245.1) more particularly identified in the Mortgage and any substitutes or replacements for such aboveground storage tanks which are in the exact locations of such aboveground storage tanks, together with all Proceeds, products, replacements, additions, substitutions for, accessions to, rents and profits of or in respect of such aboveground storage tanks, and any and all proceeds of any insurance (whether or not Lender is loss payee), indemnity, warranty or guaranty payable from time to time in respect of such aboveground storage tanks (collectively, the "<u>Collateral</u>").

<u>Voluntary Prepayments</u>:

The PES Loan may be prepaid in whole or in part without premium or penalty, together with all unpaid interest accrued thereon to the date fixed for such prepayment and subject in all respects to the Sharing Agreement.

<u>Mandatory Prepayments</u>:

Borrower will be required to make mandatory prepayments of the PES Loan from 100% of the net cash proceeds of (x) any sale of all or any part of the Collateral or (y) any casualty or condemnation with respect to all or any material part of the Collateral.

<u>Lender Adverse Investments</u>:

If Borrower enters into any Lender Adverse Investment during the term of the PES Loan, Borrower will be required to prepay the PES Loan in full concurrently therewith, where "<u>Lender Adverse Investment</u>" shall mean any transaction in which Borrower, any Parent Company or any subsidiary thereof uses any proceeds of the PES Loan (or any funds made available to such persons by the PES Loan) to directly or indirectly own, construct, manage, operate or control, or participate in the ownership, construction, management, operation or control, of any assets or business, whether in corporate, partnership, limited liability or proprietorship form or otherwise, that compete (or could reasonably be expected to compete) with the business currently conducted by Lender, its parent companies or any subsidiary thereof in providing pipeline transportation and/or terminalling of natural gas liquids or ethane in Pennsylvania, New Jersey, New York, Delaware, Ohio, Texas and/or West Virginia; *provided*, *however*, that the foregoing shall not prohibit Borrower, any Parent Company or any subsidiary thereof from (i) utilizing existing infrastructure owned and/or operated by such person as of the Funding Date so long as such utilization is solely to support Borrower's refining business in Philadelphia or (ii) distributing, purchasing and/or selling refined product produced or processed at

Borrower's Philadelphia refining complex.

"Parent Companies" shall mean Philadelphia Energy Solutions LLC and PES Holdings, LLC.

| | |
|---|---|
| Conditions Precedent to Borrowing: | Those conditions expressly set forth in Exhibit B to the Commitment Letter. |
| Material Contracts: | All executory contracts and unexpired leases by and between Borrower, on the one hand, and either Sunoco Partners Marketing & Terminals L.P. or Sunoco Pipeline L.P., on the other, shall be assumed on the "Effective Date" of the "Plan" (as such terms are defined in the Restructuring Support Agreement) (or in the case of an asset sale, assumed and assigned to the successor entity as of the effective date of such sale) pursuant to Bankruptcy Code Section 365. |
| | The Loan Documentation will include representations and warranties, covenants and other terms reasonably required by Lender with respect to the Pipeline Consent Agreement and those executory contracts and unexpired leases by and between Borrower and Sunoco Partners Marketing & Terminals L.P. that are assumed in connection with the Restructuring. |
| Representations and Warranties: | Usual and customary for exit financings of this type, in form, scope and substance reasonably satisfactory to Lender. |
| Affirmative Covenants: | Usual and customary for exit financings of this type, in form, scope and substance reasonably satisfactory to Lender. |
| Negative Covenants: | Usual and customary for exit financings of this type, in form, scope and substance reasonably satisfactory to Lender. |
| Financial Covenants: | None. |
| Events of Default: | Usual and customary for exit financings of this type, in form, scope and substance reasonably satisfactory to Lender. |
| Assignments: | Usual and customary for exit financings of this type and consistent with the Commitment Letter. |
| Expenses and Indemnification: | Usual and customary for exit financings of this type and consistent with the Commitment Letter. The Loan Documentation will provide for the payment and/or reimbursement by Borrower of all reasonable fees and expenses (including, without limitation, the reasonable fees and expenses of counsel and other advisors) incurred by Lender and Sunoco Partners Marketing & Terminals L.P. in connection with the Restructuring. |

**Annex 1**
**to Exhibit A to Commitment Letter**

**Sharing Agreement—Credit Calculations**

The Term Sheet to which this <u>Annex 1</u> is attached provides for a Maximum Quarterly Payment to be paid by Borrower (also referred to herein as "<u>PES</u>") to Lender (also referred to herein as "<u>SXL</u>") each quarter, which maximum payment is subject to reduction (on a going-forward basis only) in proportion to any reduction of the principal amount of the PES Loan as a result of voluntary prepayments made by PES.  Such Maximum Quarterly Payment, as it may be reduced, if at all, is referred to as the "<u>Applicable Maximum Quarterly Payment</u>".  The aggregate interest payments remitted by PES to SXL in cash pursuant to the Term Sheet during each three month period during the term of the PES Loan (each such three month period is a "<u>Quarter</u>") shall be referred to herein as the "<u>Quarterly Interest Paid</u>."  The first Quarter shall end on _____.

**Credit, Banked Credit & Quarterly True-Up**

Within ten (10) Business Days after the end of each Quarter, SXL will calculate, and provide to PES for review, the following with respect to the immediately previous Quarter: (i) the Quarterly Interest Paid, (ii) the Shortfall, (iii) the aggregate PES Benefits, (iv) the aggregate SXL Benefits, (v) the Banked Excess PES Benefits as of the end of that Quarter, (vi) the Banked Excess SXL Benefits as of the end of that Quarter, (vii) the Total SXL Benefits, and (viii) the Credit.  Within 5 Business Days after receiving the calculations from SXL, PES shall either confirm its agreement with SXL's calculations or dispute the accuracy of any such calculation, providing notice stating the reasons why the disputed amount is incorrect.  SXL and PES shall work together in good faith to resolve any such dispute reasonably promptly.

<u>Credit Calculation</u>

A "<u>Shortfall</u>" is the (A) aggregate Applicable Maximum Quarterly Payment for the Quarter less (B) the sum of (i) the aggregate of PES Benefits for the Quarter, (ii) the Banked Excess PES Benefits available for draw that Quarter and (iii) any Carry Forward Amount (as defined below).

The "<u>PES Benefits</u>" and the "<u>SXL Benefits</u>" for the applicable Quarter shall be determined in accordance with the calculations set forth in <u>Schedule I</u> attached to this Annex.

The "<u>Banked Excess PES Benefits</u>" is the portion of PES Benefits for the Quarter that caused the Shortfall for such Quarter to equal a negative number, which portion of the benefits, together with any prior unused Banked Excess PES Benefits, shall be "banked" for use in calculating the Shortfall in subsequent Quarters.

The "<u>Banked Excess SXL Benefits</u>" is the portion of SXL Benefits for the Quarter that exceed the Credit for the Quarter, which portion of the benefits shall be "banked" for use in calculating the Credit in subsequent Quarters.  Banked Excess SXL Benefits shall not be available for draw and accordingly not used in calculating the Credit for a Quarter unless and until all available Banked Excess PES Benefits have been applied to the calculation of the Shortfall.

The "<u>Credit</u>" for the applicable Quarter shall be determined as follows:

- If the Shortfall is zero or such calculation results in a negative number, then no Credit shall be provided for the applicable Quarter.

- If the sum of the (i) aggregate of SXL Benefits for the Quarter and (ii) the Banked Excess SXL Benefits available for draw at that time (collectively, the "Total SXL Benefits") is equal to or less than the Shortfall, then the Credit for such Quarter shall equal the Total SXL Benefits.

- If the sum of the Total SXL Benefits is greater than the Shortfall, then the Credit for such Quarter shall equal the Shortfall. The amount by which the Total SXL Benefits that exceeds the Credit shall continue to be "banked" until applied.

For avoidance of doubt, the Credit for any Quarter shall never exceed the Applicable Maximum Quarterly Payment for that Quarter under any circumstances.

Quarterly True-Up

PES shall pay SXL the amount by which the Applicable Maximum Quarterly Payment exceeds the Quarterly Interest Paid less, to the extent that a Credit is payable in a Quarter, the amount of the Credit.   To the extent the foregoing results in a negative number, such amount (the "Carry Forward Amount") shall be "banked" by PES for use in calculating the Shortfall in future Quarters.  Unless any such amounts are under dispute and remain in dispute, any amounts payable hereunder shall be paid within 15 Business Days of the end of the applicable Quarter.  If any such amounts are under dispute beyond such 15 Business Day period, payor shall promptly refund to payee such amount upon the resolution of such dispute.

Quarterly True-Up Example:

*Assumptions:*   Quarterly Interest Paid = $1.55625MM
Applicable Maximum Quarterly Payment = $3.125MM
PES Benefits = $2.0MM
Banked Excess PES Benefits in Bank = $125M
SXL Benefits = $500M
Banked Excess SXL Benefits in Bank:  $1MM
Total SXL Benefits:  $1.5MM ($500M+$1MM)

*Calculation of Shortfall:*
3.125MM – ($2.0MM+$125M) = $1.0MM
Banked Excess PES Benefits for Future Quarters = $0
*Calculation of Credit:*
Shortfall ($1MM) < Total SXL Benefits ($1.5MM)
Credit = $1MM
Banked Excess SXL Benefits for Future Quarters = $500M
*Calculation of Quarterly True-Up:*
$3.125 MM (Applicable Maximum Quarterly Payment)
-$1.55625 MM (Quarterly Interest Paid)
-$1 MM  (Credit)
 $.71875MM payable by PES to SXL

Exhibit A-5

PES and SXL shall endeavor to resolve any dispute, controversy or claim (a "Dispute") arising from or in connection with the calculations set forth in this Annex 1 in a fair and equitable manner.  Prior to initiating legal proceedings with respect to any such Dispute, the parties hereto will seek resolution through discussions between senior executives of the respective parties.  In addition, SXL and PES may agree to engage in mediation of a Dispute, in which case the cost of the mediator shall be shared equally.

**SCHEDULE I to Annex 1**

**Calculation of PES Benefits & SXL Benefits**

Set forth below is a list of arrangements between SXL's subsidiaries and PES that are used above in the determination of the Shortfall and the Credit.  For each arrangement, there is a description of the calculation of the benefit, if applicable, that will be attributed to each of SXL's subsidiaries (the "<u>SXL Benefits</u>") and PES (the "<u>PES Benefits</u>") for a Quarter.  From time to time, PES and SXL's subsidiaries may enter into new or amended commercial arrangements.  PES and SXL may mutually agree to make such arrangements a party of the calculation of the Credit but solely to the extent that PES and SXL agree in writing to an amendment to this Annex.

1. **Amendment No. 1 to the Terminaling & Storage Agreement between Sunoco Partners Marketing & Terminals L.P. ("SPMT") and PES dated as of December 15, 2016, amending the Terminaling & Storage Agreement effective as of February l, 2015 (Eagle Point Terminal) – Tanks 117, 118, 119**

Amendment #1 provides for monthly storage fees due to SPMT by PES for SPMT Tanks 117, 118, 119. The SPMT tanks have a Shell Capacity of 686,212 bbls and the agreement has a term ending January 31, 2019 (which will be further amended to extend the term to 2020).

For purposes of calculating the Credit, the benefits shall be calculated based upon the monthly storage fees actually paid by PES to SPMT during the Quarter.

| PES Benefits Calculation | SXL Benefits Calculation |
|---|---|
| PES Benefits will equal the difference between the prior monthly storage fee of $.62/bbl and the new monthly storage fee of $.30/bbl multiplied by the Shell Capacity of 686,212 bbls. | SXL Benefits will equal the new monthly storage fee of $.30/bbl multiplied by the Shell Capacity of 686,212 bbls. |

*

**Example of Calculations:**

Monthly PES Benefit:  ($.62/bbl -$.30/bbl)*686,212 bbls = $219,588

Monthly SXL Benefit:  $.30/bbl*686,212 bbls = $205,864

**2.  Inter-Refinery Pipeline Lease between Sunoco Pipeline L.P.  ("SPLP") and PES dated November 30, 2012 (the "IRPL")**

Pursuant to the IRPL, PES is obligated to pay to SPLP in 2018 and 2019 amounts related to certain meter installation work by SPLP on the inter-refinery pipeline, which pipeline is the subject of the IRPL.  Because PES is currently not using IRPL lines 3N and 5N, SPLP has agreed to waive $3.0 million of these payments due from PES.  For avoidance of doubt, if at some point in the future PES begins to use IRPL lines 3N and 5N, PES will be obligated for the cost of the meter installations, and the applicable adjustment will be made to the PES Benefit calculation.

For purposes of calculating PES Benefits, the value of the meter work not being installed is $3.0 million, which will be divided by 24, with the resulting quotient being PES Benefit for the applicable month.  There shall be no SXL Benefit with respect to this item.  This PES Benefit shall be capped at $3 million in the aggregate and the monthly application of PES Benefit shall terminate 24 months after the Funding Date.

| | |
|---|---|
| **PES Benefits Calculation**:  PES Benefits shall equal $125,000.00/month (i.e., the quotient of $3,000,000.00 divided by 24) | **SXL Benefits Calculation**: SXL Benefits Calculation shall be $-0-. |

**3. Rack Throughput Agreement dated September 8, 2012 between SPMT and PES (Belmont Terminal)**

SXL and SPMT are parties to a Rack Throughput Agreement for SPMT's Belmont terminal that was amended (Amendment 6) effective July 1, 2017 providing a $.0050/gallon (50 point) discount to the existing throughput fees for any volume moved across the Belmont rack above 30,000 barrels/day. SPMT will effectively cancel this discount and further amend the existing contract with a new discount of $.0040/gallon (40 point) for all PES volume moved across the Belmont terminal rack.

For purposes of calculating the Credit, the benefits shall be calculated based upon fees actually paid by PES to SPMT during the Quarter for products sold across the Belmont rack by PES.

| PES Benefits Calculation | SXL Benefits Calculation |
|---|---|
| PES Benefits will equal the volume of PES products sold by PES across SPMT'S Belmont rack multiplied by the rates as stipulated in Amendment 6 less the volume of PES products sold by PES across SPMT'S Belmont rack multiplied by the rate to be stipulated in Amendment 7 ($.0040 discount). | SXL Benefits will equal the revenue generated from PES using the new discount structure of $.0040/gallon less the revenue generated from PES using the Amendment 6 discount structure. For clarity, there is no benefit until this calculation is greater than zero. Also, for clarity, currently PES transfers product to Sunoco, L.P. at Belmont (as Sunoco, L.P. is also a customer of SPMT at Belmont). If in lieu of those historical transfers, PES chooses to instead sell that volume of product across the rack to Sunoco, L.P, at Belmont, that volume of product will be deducted from the "Belmont volume" used in the SXL Benefit Calculation. |

**Example of Calculations:**

Assumptions:   PES 2017 avg Belmont volume through June 30, 2017 = 28,971 bbls/day
            PES 2017 July through November 2017 avg Belmont volume = 35,328 with a $.0050/ Gallon discount for any volume moved above 30,000 bbls/day as per Amendment 6
            New Discount: Amendment 7 will be written with a $.0040/gallon discount across all PES volume moved at the Belmont rack


The Quarterly PES Benefit:   (Belmont volume * Amendment 6 rates) – (Belmont volume * Amendment 7 rates)

The Quarterly SXL Benefit:   SXL benefit will equal the revenue generated from PES using the new discount rate of $.0040/gallon versus the rates contained in Amendment 6. For clarity, there is no benefit until this calculation is greater than zero.

**EXHIBIT B TO COMMITMENT LETTER**

<u>CONDITIONS PRECEDENT</u>

(a)     <u>Pipeline Consent Agreement</u>.  SXL shall have received from PES the duly executed Pipeline Consent Agreement dated on or prior to the date of this Commitment Letter by and between Sunoco Pipeline L.P. and PES (the "**Pipeline Consent Agreement**") and such Pipeline Consent Agreement shall be valid and binding on PES and in full force and effect.

(b)     <u>Restructuring</u>.  (i) In the event of an Out-of-Court Restructuring, all conditions precedent thereto set forth in the Restructuring Support Agreement shall have been satisfied in full in accordance therewith; *or* (ii) in the event of an In-Court Restructuring, the Plan shall be in full force and effect (all capitalized terms in this clause (b) having the meanings assigned thereto in the Restructuring Support Agreement).

(c)     <u>Borrowing Notice</u>.  SXL shall have received from PES at least five (5) business days' prior written notice of the requested Funding Date (for the avoidance of doubt, such notice may be revocable and conditioned on, among other things, the consummation of the transactions contemplated by the Plan).

(d)     <u>Loan Documentation</u>.   SXL shall have received from PES the duly executed Loan Documentation, which shall be consistent in all material respects with the Term Sheet and the Restructuring Support Agreement and otherwise in form and substance reasonably satisfactory to SXL, and each of which shall be in full force and effect.

(e)     <u>Representations</u>.  The representations and warranties of PES under the Loan Documentation shall be true and correct in all respects on and as of the date thereof (immediately prior to and after the funding of the PES Loan).

(f)     <u>Security and Collateral</u>.

      i.     SXL shall have received a duly executed release of any and all existing security interests or liens on the Collateral from any person holding any such security interest or lien.

      ii.     SXL shall have received from PES, UCC financing statements in form ready for filing in all applicable jurisdictions in accordance with applicable law, and PES shall have taken all other actions necessary or reasonably requested by SXL to establish that SXL will have a perfected first priority security interest (subject to liens permitted under the Loan Documentation) in the Collateral.

(g)     <u>Real Property</u>.

      i.     SXL shall have received from PES a duly executed mortgage substantially in the form attached as <u>Annex 1</u> to this <u>Exhibit B</u> (the "**Mortgage**"), to be recorded in all applicable recording offices in accordance with applicable law, together with all other instruments necessary to grant a mortgage lien under applicable law.

      ii.     SXL shall have received from PES real property lien search results as of a recent date showing no security interests or liens on the applicable real estate interests other than as permitted under the Loan Documentation and other liens securing indebtedness

that will be released prior to or substantially contemporaneously with the funding date of the PES Loan.

(h)    <u>Insurance</u>.    SXL shall have received customary insurance certificates in respect of material insurance policies relating to the Collateral.

(i)    <u>Opinion</u>.    SXL shall have received a legal opinion from counsel to PES in form and substance customary for transactions of this type.

(j)    <u>Solvency</u>.    SXL shall have received a solvency certificate in respect of PES duly executed by the chief financial officer or treasurer thereof, in form and substance reasonably satisfactory to SXL and customary for transactions of this type (for the avoidance of doubt, such solvency shall be tested on a pro forma basis after giving effect to the transactions contemplated by the Plan).

(k)    <u>Commitment Letter</u>.    PES shall not be in material breach of any of its obligations under this Commitment Letter.

**Annex 1 to Exhibit B**

**Form of Mortgage**

[*attached*]

*ANNEX 1 TO*
*EXHIBIT B TO THE COMMITMENT LETTER*

**THIS INSTRUMENT PREPARED BY, AND**
**AFTER RECORDING PLEASE RETURN TO:**

Vinson & Elkins LLP
1001 Fannin, Suite 2500
Houston, Texas 77002
*Attention:* E. Scot Dixon, Esq.

Property Parcel Number(s):     884096701; 884096702; & 884096703

---

**OPEN END MORTGAGE, ASSIGNMENT OF RENTS,**
**SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING**

**FROM**

**PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING LLC,**

as Mortgagor,

**TO**

**SUNOCO LOGISTICS PARTNERS OPERATIONS L.P.,**

as Mortgagee

Dated: _____ ____, 2018
Effective as of: _____ ____, 2018

THIS OPEN-END MORTGAGE SECURES FUTURE ADVANCES AND RE-ADVANCES UP TO A MAXIMUM PRINCIPAL AMOUNT OF $75,000,000.00 AT ANY TIME OUTSTANDING PLUS ACCRUED INTEREST AND OTHER INDEBTEDNESS DESCRIBED IN 42 PA.C.S.A. §8143.

ATTENTION: FILING OFFICER--THIS INSTRUMENT COVERS GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN AND IS TO BE FILED FOR RECORD IN THE RECORDS WHERE MORTGAGES ON REAL PROPERTY ARE RECORDED. ADDITIONALLY, THIS INSTRUMENT SHOULD BE APPROPRIATELY INDEXED, NOT ONLY AS A MORTGAGE BUT ALSO AS A FINANCING STATEMENT FILED AS A FIXTURE FILING COVERING GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN. THE MAILING ADDRESSES OF MORTGAGOR AND MORTGAGEE ARE SET FORTH IN THIS INSTRUMENT

---

**OPEN END MORTGAGE, ASSIGNMENT OF RENTS,
SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING**

**THIS OPEN END MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING**, dated _____ ____, 2018, but effective as of _____ _____, 2018, is from PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING LLC, a Delaware limited liability company ("Mortgagor"), having an office at 1735 Market Street, Philadelphia, Pennsylvania 19103, to SUNOCO LOGISTICS PARTNERS OPERATIONS L.P., a Delaware limited partnership ("Mortgagee"), having an office at 3807 West Chester Pike, Newtown Square PA 19073.  References to this "Mortgage" shall mean this instrument and any and all renewals, modifications, amendments, amendments and restatements, supplements, extensions, consolidations, substitutions, spreaders and replacements of this instrument.

BACKGROUND

WHEREAS, Mortgagor has executed and delivered to Mortgagee that certain [Loan Agreement], dated of even date with this Mortgage and payable to the order of Mortgagee in the original principal amount of Seventy Five Million and No/100ths Dollars ($75,000,000.00), lawful money of the United States (the ["Note"]);

WHEREAS, Mortgagor is the owner of the fee simple estate in and to the parcel or parcels of real property described on Exhibit "A" attached hereto (the "Land"), and Mortgagor further owns certain improvements, structures, and fixtures now or subsequently located on the Land, all as more particularly described below;

WHEREAS, it is a requirement under the [Note] that Mortgagor shall have executed and delivered this Mortgage to Mortgagee;

GRANTING CLAUSES

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) paid and other good and lawful consideration, the receipt and sufficiency of which are hereby acknowledged and in order to secure the full and timely payment and performance of the Obligations (as defined in the [Note]), Mortgagor hereby MORTGAGES, GRANTS, ASSIGNS, RELEASES, TRANSFERS, PLEDGES AND SETS OVER UNTO MORTGAGEE, and has by these presents MORTGAGED, GRANTED, ASSIGNED, RELEASED, TRANSFERRED, PLEDGED AND SET OVER UNTO MORTGAGEE, to the extent provided herein or by law, and confirms that this Mortgage constitutes a valid first lien upon, and grants to Mortgagee a security interest in, the following property:

(a)    all estate, right, title, claim, interest or demand whatsoever Mortgagor now has or may hereafter acquire in and to those certain "Aboveground storage tanks" (as defined by the Pennsylvania Tank Act at 25 Pa. Code § 245.1) situated on the Land and more particularly identified on Exhibit "B" attached hereto as a circle with an "X" in the same (collectively, the "ASTs");

1

(b)    all right, title and interest of Mortgagor in and to all substitutes and replacements of, and all additions and improvements to, the ASTs subsequently acquired by or released to Mortgagor (for avoidance of doubt, the only stationary Aboveground storage tanks encumbered by the lien and /or security interest granted by this is Mortgage and included in the defined term "ASTs" are those Aboveground storage tanks specifically identified on Exhibit B and any substitutes or replacements for such Aboveground storage tanks which are in the exact locations of the Aboveground storage tanks identified on Exhibit B);

(c)    all rights of Mortgagor to receive and collect the revenues, income and rents from Mortgagor's leasing or licensing of the use of the ASTs by any Person other than Mortgagor (collectively, the "Rents"; for avoidance of doubt, under no circumstance does the term "Rents" include any revenue, income, profit, royalty or the like derived from the sale, transfer or use of any product, substance, liquid or gas stored in any of the ASTs);

(d)    all unearned premiums under insurance policies now or subsequently obtained by Mortgagor relating to the ASTs and Mortgagor's interest in and to all proceeds of any such insurance policies including the right to collect and receive such proceeds, and Mortgagor's interest in any and all awards and other compensation, including the interest payable thereon and the right to collect and receive the same, made to the present or any subsequent owner of the ASTs for the taking by eminent domain, condemnation or otherwise, of all or any part of the ASTs (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the foregoing;

(e)    to the extent permitted by applicable law and not prohibited under the applicable contract, consent, license or other item unless the appropriate consent has been obtained, all right, title and interest of Mortgagor in and to (i) all contracts from time to time executed by Mortgagor or any manager or agent on its behalf relating to the ownership, construction, maintenance, repair, operation, occupancy, sale or financing of the ASTs or any part thereof and all leases of the ASTs, (ii) all consents, licenses, building permits, certificates of occupancy and other governmental approvals relating to construction, completion, occupancy, use or operation of the ASTs or any part thereof, and (iii) all drawings, plans, specifications and similar or related items relating to the ASTs;

(f)    all proceeds, products, replacements, additions, substitutions, renewals and accessions of any of the foregoing, including personal property acquired with cash proceeds; and

(g)    all proceeds, both cash and noncash, of the foregoing.

All of the foregoing property and rights and interests now owned or held or subsequently acquired by Mortgagor are collectively referred to as the "Mortgaged Property".

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS MORTGAGE, THE LIEN AND SECURITY INTEREST CREATED BY THIS**

MORTGAGE SHALL NOT EXTEND TO, AND THE TERM "MORTGAGED PROPERTY" EXPRESSLY EXCLUDES, ANY INTEREST IN OR TO THE LAND AND ANY AND ALL OTHER FIXTURES, IMPROVEMENTS, PERSONAL PROPERTY OF THE MORTGAGOR (INCLUDING, ANY AND ALL ABOVEGROUND STORAGE TANKS SITUATED ON THE LAND AND NOT DESCRIBED OR IDENTIFIED ON EXHIBIT "B"), WHETHER OR NOT, NOW OR HEREAFTER, LOCATED ON, ATTACHED TO, OR FORMING A PART OF THE LAND.

TO HAVE AND TO HOLD the Mortgaged Property and the rights and privileges hereby mortgaged unto Mortgagee, its successors and assigns for the uses and purposes set forth, until the Obligations are fully paid and performed. This Mortgage shall terminate and be of no further force or effect (and shall be released on Mortgagor's written request and at Mortgagor's cost and expense) upon full payment and performance of the Obligations (other than unmatured or contingent indemnity or reimbursement obligations and those Obligations which, by their terms, expressly survive the repayment and satisfaction of the [Note]).

## TERMS AND CONDITIONS

Mortgagor further represents, warrants, covenants and agrees with Mortgagee as follows:

1.    Defined Terms.  Capitalized terms used herein (including in the "Background" and "Granting Clauses" sections above) and not otherwise defined herein shall have the meanings ascribed thereto in the [Note], *mutatis mutandis*.

2.    Warranty of Title.  Mortgagor warrants that it has good title to the Mortgaged Property, free and clear of all Liens other than as permitted by Section [__] of the [Note] ("Permitted Exceptions").  Mortgagor shall warrant, defend and preserve such title and the lien of this Mortgage against all claims of all persons and entities, subject to Permitted Exceptions. Mortgagor represents and warrants that, as of the date hereof it has the right to mortgage the Mortgaged Property.

3.    Payment and Performance of Obligations.  Mortgagor shall pay and perform the Obligations at the times and places and in the manner specified in the [Note Documents].

4.    Certain Terms of [Note] Incorporated into Mortgage.  The terms and provision provisions of: Section [__] (Compliance with Laws; Taxes), Section [__] (Maintenance of Property), Section [__] (Maintenance of Insurance), Section [__] (Liens), and Section [__] (Sale of Assets) of the [Note] are each hereby incorporated herein by reference.

5.    Condemnation/Eminent Domain.  Promptly upon obtaining notice of the institution of any proceedings for the condemnation of all or any portion of the Mortgaged Property or the Land, Mortgagor will notify Mortgagee of the pendency of such proceedings.

6.    Further Assurances.  To further assure Mortgagee's rights under this Mortgage, Mortgagor agrees promptly upon demand of Mortgagee to do any reasonable act or execute any additional documents (including, but not limited to, security agreements on any personalty included or to be included in the Mortgaged Property) as may be reasonably required by

3

Mortgagee to confirm the lien of this Mortgage and all other rights or benefits conferred on Mortgagee by this Mortgage.

7.    <u>Mortgagee's Right to Perform.</u>  If Mortgagor fails to perform any of the covenants or agreements of Mortgagor, within the applicable grace period, if any, provided for in the [Note], Mortgagee, without waiving or releasing Mortgagor from any obligation or default under this Mortgage, may, at any time upon ten (10) Business Days' written notice to Mortgagor ( if during such ten (10) Business Day period such failure continues), but shall be under no obligation to, pay or perform the same, and the out-of-pocket amount or cost thereof, with interest at the rate provided for in the [Note], shall be due from Mortgagor to Mortgagee within ten (10) days after demand by Mortgagee together with supporting documentation and the same shall be secured by this Mortgage and shall be a lien on the Mortgaged Property to the fullest extent permitted by applicable law prior to any right, title to, interest in, or claim upon the Mortgaged Property attaching subsequent to the lien of this Mortgage. No payment or advance of money by Mortgagee under this <u>Section 7</u> shall be deemed or construed to cure Mortgagor's default or waive any right or remedy of Mortgagee.

8.    <u>Remedies.</u>

a.    Upon the occurrence and during the continuance of any Event of Default, Mortgagee may immediately take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Mortgaged Property, including, but not limited to, the following actions, each of which shall be in accordance with applicable law and may be pursued concurrently or otherwise, at such time and in such manner as Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mortgagee, Mortgagee may, to the extent permitted by applicable law, (A) institute and maintain an action of mortgage foreclosure against all or any part of the Mortgaged Property, (B) institute and maintain an action on the [Note or any other Note Document], or (C) take such other action at law or in equity for the enforcement of this Mortgage or any of the other [Note] Documents as the law may allow.  Mortgagee may proceed in any such action to final judgment and execution thereon for all sums due hereunder, together with interest thereon at the rate provided for in the [Note] and all costs of suit, including, without limitation, reasonable attorneys' fees and disbursements.  Interest at the rate provided for in the [Note] shall be due on any judgment obtained by Mortgagee from the date of judgment until actual payment is made of the full amount of the judgment.

b.    In case of a foreclosure sale, the Mortgaged Property may be sold in accordance with applicable law, at Mortgagee's election, in one parcel or in more than one parcel and Mortgagee is specifically empowered (without being required to do so, and in its sole and absolute discretion) to cause successive sales of portions of the Mortgaged Property to be held.

c.    In the event of any breach of any of the covenants, agreements, terms or conditions contained in this Mortgage which continues beyond any applicable notice and grace period, Mortgagee shall be entitled to enjoin such breach and obtain specific performance of any covenant, agreement, term or condition and Mortgagee shall have the right to invoke any equitable right or remedy as though other remedies were not provided for in this Mortgage.

d.      It is agreed that if an Event of Default shall occur and be continuing, any and all proceeds of the Mortgaged Property received by Mortgagee shall be held by Mortgagee as collateral security for the Obligations (whether matured or unmatured), and shall be applied in payment of the Obligations in the manner set forth in the [Note]

e.      After entry of a judgment on any of the [Note Documents] or a judgment in mortgage foreclosure hereunder, interest shall continue to accrue under the [Note] and this Mortgage at the rate of interest provided for in the [Note].  This Mortgage shall not, solely for purposes of determining interest payable under the [Note], merge with any judgment on any [Note Document] or a judgment in mortgage foreclosure under this Mortgage.

9.      <u>Right of Mortgagee to Credit Sale.</u>  Upon the occurrence of any sale made under this Mortgage, whether made by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, to the extent permitted by applicable law Mortgagee may bid for and acquire the Mortgaged Property or any part thereof.  In lieu of paying cash therefor, Mortgagee may make settlement for the purchase price by crediting upon the Obligations or other sums secured by this Mortgage, the net sales price after deducting therefrom the expenses of sale and the cost of the action and any other sums which Mortgagee is authorized to deduct under this Mortgage. In such event, this Mortgage, the [Note], and the other documents evidencing expenditures secured hereby may be presented to the person or persons conducting the sale in order that the amount so used or applied may be credited upon the Obligations as having been paid.

10.     <u>Appointment of Receiver.</u>  If an Event of Default shall have occurred and be continuing, Mortgagee upon notice to Mortgagor, and without regard to the adequacy or inadequacy of the Mortgaged Property or any other collateral or the interest of Mortgagor therein as security for the Obligations, shall have the right to apply to any court having jurisdiction to appoint a receiver or receivers or other manager of the Mortgaged Property, without requiring the posting of a surety bond, and, to the extent permitted by applicable law, without reference to the adequacy or inadequacy of the value of the Mortgaged Property or the solvency or insolvency of Mortgagor or any other party obligated for payment of all or any part of the Obligations, and whether or not waste has occurred with respect to the Mortgaged Property, and Mortgagor hereby irrevocably consents to such appointment and waives notice of any application therefor (except as may be required by law).  Any such receiver or receivers or manager shall have all the usual powers and duties of receivers in like or similar cases and all the powers and duties of Mortgagee in case of entry as provided in this Mortgage, including, without limitation and to the extent permitted by law, the right to enter into leases of and other contracts or agreements relating to all or any part of the Mortgaged Property, and shall continue as such and exercise all such powers until the date of confirmation of sale of the Mortgaged Property unless such receivership is sooner terminated.  In no event shall any such receiver have the power or authority to sell any of the Mortgaged Property.

11.     <u>Entry.</u>  Prior to the occurrence of an Event of Default, Mortgagee, personally, or by its agents, attorneys or representatives, may enter upon all or any part of Mortgaged Property and any portion of the Land containing the Mortgaged Property and inspect the Mortgaged Property at all reasonable times and upon reasonable prior notice (other than in cases of emergency).  If an Event of Default shall have occurred and be continuing, Mortgagee personally, or by its agents, attorneys, or representatives, may enter upon all or any part of Mortgaged

Property and any portion of the Land containing the Mortgaged Property, without prior notice, and may inspect the Mortgaged Property and/or take such action as Mortgagee may deem necessary or appropriate in order to protect, preserve and maintain the Mortgaged Property.  Any and all such rights of access by Mortgagee shall be without liability for trespass, damages or otherwise.  Upon each such entry, Mortgagee, at the expense of Mortgagor from time to time, either by purchase, repairs or construction, may maintain and restore the Mortgaged Property, and, at the expense of Mortgagor, Mortgagee may make, from time to time, all necessary or desirable repairs, renewals and replacements and such alterations, additions, betterments and improvements thereto and thereon as Mortgagee may deem advisable.  This <u>Section 11</u> shall survive any exercise of Mortgagee's rights and remedies pursuant hereto, including, but not limited to, foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the [Note or any of the other Note Documents], or any transfer of all or any portion of the Mortgaged Property (whether by Mortgagor or by Mortgagee following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time).

Notwithstanding anything to the contrary in this <u>Section 11</u>, Mortgagee, personally, or by its agents, attorneys or representatives, shall not enter upon the Land without first complying with and satisfying all of the reasonable safety, security and other site procedures, requirements and standards promulgated by Mortgagor, from time to time, and Mortgagee's exercise of any and all rights to access the Land under or pursuant to this Section 11 or otherwise under or pursuant to this Mortgage shall be subject to any and all such standards, *provided that* (i) Mortgagee shall have been previously provided with written notice of same (and written notice of any revisions or modifications to same) and (ii) such safety, security and other site procedures, requirements and standards shall be uniformly enforced by Mortgagor;

12.    <u>Post-Foreclosure Easements and Rights of Use and Access; Certain Other Obligations of Mortgagor.</u>

a.    Without limiting the provisions of this Mortgage, including, without limitation, the provisions of <u>Section 11</u>, in the event of a foreclosure sale against all or any part of the Mortgaged Property, or if Mortgagee or any other Person acquires title to or possession of all or any portion of the Mortgaged Property pursuant to a conveyance in lieu of foreclosure of the Mortgaged Property or pursuant to the exercise of any other remedy provided for in this Mortgage, at law or otherwise (in each such case as described above, a "<u>Foreclosure Sale</u>"), then Mortgagor hereby grants and conveys to Mortgagee and to any such other Person who acquires title to or possession of all or such applicable portion of the Mortgaged Property (in each case, including Mortgagee, whether pursuant to Mortgagee's rights under <u>Section 9</u> hereof or otherwise, a "<u>Foreclosure Purchaser</u>") non-exclusive easements and rights-of-way in, on, over, under and across the Land for the purposes of: (i) the maintenance, repair and removal of the ASTs, and (ii) vehicular and pedestrian ingress, egress and access by Foreclosure Purchaser, its employees, agents, invitees, guests, contractors and subcontractors to and from the ASTs on, along and across the roads, rights-of-way, entrances, exits, walkways, and other areas at the Land from time to time used for pedestrian and vehicular use (collectively, the "<u>Access Areas</u>") as reasonably necessary for Foreclosure Purchaser's maintenance, repair and removal of the ASTs.

b.    In addition to those easements and other rights granted in <u>Section 12.a</u> above, in the event of a Foreclosure Sale, Mortgagor hereby grants and conveys to a Foreclosure

6

Purchaser the right to access and use (and does hereby grant a non-exclusive easement and right-of-way for the access and use of) the following assets and utilities to the extent reasonably necessary to remove any and all products and other contents from the ASTs (including, without limitation, any hydrocarbons or other goods, including crude oil, natural gas, natural gas liquids condensate, refined products or asphalt, collectively, "<u>Products</u>"): (i) all parts of the "storage tank systems" (as defined by the Pennsylvania Tank Act at 25 Pa. Code § 245.1) at the Land of which the ASTs are a part, and (ii) all related systems, equipment and utilities, including but not limited to functional foam firefighting systems, separators, pumps, steam, electricity, alarms and gauging.[1]

c.    Except in cases of emergency, where no prior written notice shall be required, Foreclosure Purchaser shall provide to Mortgagor prior written notice not less than five (5) Business Days before maintaining, repairing or removing any of the ASTs, or any undertaking activity affecting any of the Access Areas (excluding, however, any routine maintenance of such items) and Foreclosure Purchaser shall communicate with Mortgagor regarding the performance and progress for such work.  Foreclosure Purchaser shall perform any maintenance, repair or removal of the ASTs, or any activity affecting any Access Areas diligently in a good and workmanlike manner, in compliance, in all material respects, with all applicable Laws, free and clear of all liens or claims of subcontractors, mechanics, laborers, or materialmen.

d.    After any period of maintenance, repair, and/or removal of any of the ASTs, Foreclosure Purchaser shall, at its sole cost and expense, restore the surface of the affected portions of the Land (including without limitation any Access Areas) to the same or better condition than which it existed immediately prior to Foreclosure Purchaser's undertaking such activities.

e.    Mortgagor reserves the right to modify, relocate, alter or otherwise change the location or configuration of the Access Areas, so long as: (i) all such modifications, relocations, alterations or changes are made diligently by Mortgagor at its expense and in a manner that minimizes, to the extent reasonably practicable, any interruption of, or material adverse effect on, the operation of the ASTs, and (ii) such modifications, relocations, alterations or changes do not impair the use of, or deprive Foreclosure Purchaser of the use and benefit of, the easements and rights-of-way granted pursuant to this <u>Section 12</u> so as to result in a material adverse effect upon the maintenance, repair and/or removal of the ASTs and/or any Products or related contents contained therein.

f.    While the commencement or exercise of certain easements, rights of way and related access rights granted and conveyed by this Mortgage, including without limitation, those described in <u>Section 11</u>, and this <u>Section 12</u> may be subsequent to the Effective  Date of this Mortgage and may, in some respects, be initially "blanket" in nature, it is expressly agreed and understood by Mortgagor that such easements and rights of way shall be and hereby are currently presently granted and conveyed by this Mortgage and shall be considered presently vested, and shall not be construed as contingent, "springing" or otherwise executory in nature.

---

[1] Subject to PES lender discussion

g.      Notwithstanding anything to the contrary in this Section 12, Mortgagee, personally, or by its agents, attorneys or representatives, shall not enter upon the Land without first complying with and satisfying all of the reasonable safety, security and other site procedures, requirements and standards promulgated by Mortgagor, from time to time, and Mortgagee's exercise of any and all rights to access the Land under or pursuant to this Section 12 or otherwise under or pursuant to this Mortgage shall be subject to any and all such standards, *provided that* (i) Mortgagee shall have been previously provided with written notice of same (and written notice of any revisions or modifications to same) and (ii) such safety, security and other site procedures, requirements and standards shall be uniformly enforced by Mortgagor.

h.      In the event of a Foreclosure Sale, Mortgagor shall be obligated, at its sole cost and expense, to surrender the ASTs free and clear of any Products.

i.      This Section 12 shall survive any exercise of Mortgagee's rights and remedies pursuant hereto, including, but not limited to, foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the [Note or any of the other Note Documents], or any transfer of all or any portion of the Mortgaged Property (whether by Mortgagor or by Mortgagee following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time).

13.     Collection of Rents, etc.  If an Event of Default shall have occurred and be continuing, Mortgagee may collect and receive all Rents.  Mortgagee may deduct, from the monies so collected and received, after Mortgagee first paying for all costs, expenses and liabilities to be paid for in the satisfaction and performance of any and all terms, covenants, obligations and liabilities of the lessor under and pursuant to any lease of any of the ASTs, all expenses of all maintenance, repairs, and removals and amounts necessary to pay for insurance, Taxes and assessments, liens or other charges upon the Mortgaged Property or any part thereof, as well as reasonable compensation for the services of Mortgagee and for all attorneys,  agents, clerks, servants, and other employees engaged and employed by Mortgagee.  After such deductions and the establishment of all reasonable reserves, Mortgagee shall apply all such monies to the payment of the unpaid Obligations.  Mortgagee shall account only for Rents actually received by Mortgagee.

14.     Extension, Release, etc.

a.      Without affecting the lien or charge of this Mortgage upon any portion of the Mortgaged Property not then or theretofore released as security for the full amount of the Obligations, Mortgagee may, from time to time and without notice, agree to (i) release any person liable for the indebtedness borrowed or guaranteed under the [Note Documents], (ii) extend the maturity or alter any of the terms of the indebtedness borrowed or guaranteed under the [Note Documents] or any other guaranty thereof, (iii) grant other indulgences, (iv) release or reconvey, or cause to be released or reconveyed at any time at Mortgagee's option any parcel, portion or all of the Mortgaged Property, (v) take or release any other or additional security for any obligation herein mentioned, or (vi) make compositions or other arrangements with debtors in relation thereto.

b.      Subject to applicable law, no recovery of any judgment by Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Mortgagor shall affect the lien of this Mortgage or any liens, rights, powers or remedies of Mortgagee hereunder, and such liens, rights, powers and remedies shall continue unimpaired.

15.    <u>Security Agreement under Uniform Commercial Code; Fixture Filing.</u>

a.      It is the intention of the parties hereto that this Mortgage shall constitute a security agreement within the meaning of the Uniform Commercial Code (the "<u>Code</u>") of the State in which the Mortgaged Property is located.  If an Event of Default shall occur and be continuing, then in addition to having any other right or remedy available at law or in equity, Mortgagee shall have the option of either (i) proceeding under the Code and exercising such rights and remedies as may be provided to a secured party by the Code with respect to all or any portion of the Mortgaged Property which is personal property (including, without limitation, taking possession of and selling such property) or (ii) to the extent permitted by applicable law, treating such property as real property and proceeding with respect to both the real and personal property constituting the Mortgaged Property in accordance with Mortgagee's rights, powers and remedies with respect to the real property (in which event the default provisions of the Code shall not apply).  If Mortgage shall elect to proceed under the Code, then ten (10) days' notice of sale of the personal property shall be deemed reasonable notice and the reasonable expenses of retaking, holding, preparing for sale, selling and the like incurred by Mortgagee shall include, but not be limited to, reasonable attorneys' fees and legal expenses.  At Mortgagee's request, Mortgagor shall assemble the personal property and make it available to Mortgagee at a place designated by Mortgagee which is reasonably convenient to both parties.

b.      Certain portions of the Mortgaged Property are or will become "fixtures" (as that term is defined in the Code) on the Land, and this Mortgage, upon being filed for record in the real estate records of the county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Code upon such portions of the Mortgaged Property that are or become fixtures.  The real property to which the fixtures relate is described in <u>Exhibit A</u> attached hereto.  The record owner of the real property described in <u>Exhibit A</u> hereto is Mortgagor.  The name, type of organization and jurisdiction of organization of the debtor for purposes of this financing statement are the name, type of organization and jurisdiction of organization of Mortgagor set forth in the first paragraph of this Mortgage, and the name of the secured party for purposes of this financing statement is the name of Mortgagee set forth in the first paragraph of this Mortgage.  The mailing address of Mortgagor/debtor is the address of Mortgagor set forth in the first paragraph of this Mortgage. The mailing address of Mortgagee/secured party from which information concerning the security interest hereunder may be obtained is the address of Mortgagee set forth in the first paragraph of this Mortgage.  Mortgagor's organizational identification number is _____

16.    <u>Assignment of Rents.</u>

a.      Mortgagor hereby assigns to Mortgagee the Rents as further security for the payment of and performance of the Obligations. The foregoing assignment and grant is present and absolute and shall continue in effect until the Obligations are fully paid and performed, but Mortgagor shall be entitled to collect, receive, use and retain the Rents, and to commence and

prosecute to completion actions, arbitrations and proceedings with tenants and to sue for and to collect Rents, until the occurrence and during the continuance of an Event of Default; such right of Mortgagor to collect, receive, use and retain the Rents may be revoked by Mortgagee upon the occurrence and during the continuance of any Event of Default by giving not less than five (5) Business Days' written notice of such revocation to Mortgagor; in the event such notice is given, Mortgagor shall pay over to Mortgagee, or to any receiver appointed to collect the Rents, any lease security deposits allocated to any period commencing from and after the occurrence of such Event of Default. Any Rents received hereunder by Mortgagee shall be first applied and disbursed in payment of all costs, expenses and liabilities to be paid for in the satisfaction and performance of any and all terms, covenants, obligations and liabilities of the lessor under and pursuant to any lease of any of the ASTs, then to the payment of Taxes and insurance and other costs of all maintaining, repairing, and removing the ASTs, and then to the payment, performance and discharge of the Obligations, subject to the terms of the other [Note Documents].

b.    Mortgagor represents and warrants to Mortgagee that Mortgagor has not affirmatively done any act which would prevent Mortgagee from, or limit Mortgagee in, acting under any of the provisions of the foregoing assignment.

c.    Mortgagor represents and warrants to Mortgagee that, except for any matter disclosed in the other [Note Documents], no action has been brought or, so far as is known to Mortgagor, is threatened in writing, which would interfere in any way with the right of Mortgagor to execute the foregoing assignment and perform all of Mortgagor's obligations contained in this Section 16.

17.    Notices.    All notices, requests and demands to or upon the Mortgagee or the Mortgagor hereunder shall be effected in the manner provided for in the [Note]; provided that any such notice, request or demand to or upon Mortgagor shall be addressed to Mortgagor at its address set forth above.

18.    Modification in Writing.    No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by the Mortgagor therefrom, shall be effective unless the same shall be made in accordance with the terms of the [Note] and shall be in writing and signed by the Mortgagee. Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by the Mortgagor from the terms of any provision hereof in each case shall be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Mortgage or any other document evidencing the Obligations, no notice to or demand on the Mortgagor in any case shall entitle the Mortgagor to any other or further notice or demand in similar or other circumstances. Any agreement made by Mortgagor and Mortgagee after the date of this Mortgage relating to this Mortgage shall, to the extent permitted by applicable law, be superior to the rights of the holder of any intervening or subordinate lien or encumbrance.

19.    Partial Invalidity.    In the event any one or more of the provisions contained in this Mortgage shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, but each shall be construed as if such invalid, illegal or unenforceable provision had never been included.

Notwithstanding to the contrary anything contained in this Mortgage or in any provisions of any [Note Document], the obligations of Mortgagor and of any other obligor under any [Note Documents] shall be subject to the limitation that Mortgagee shall not charge, take or receive, nor shall Mortgagor or any other obligor be obligated to pay to Mortgagee, any amounts constituting interest in excess of the maximum rate permitted by law to be charged by Mortgagee.

20.     Mortgagor's Waiver of Rights.

a.     Mortgagor hereby voluntarily and knowingly releases and waives any and all rights to retain possession of the Mortgaged Property after the occurrence and during the continuance of an Event of Default and any and all rights of redemption from sale under any order or decree of foreclosure (whether full or partial), pursuant to rights, if any, therein granted, as allowed under any applicable law, on its own behalf, on behalf of all persons claiming or having an interest (direct or indirectly) by, through or under each constituent of Mortgagor and on behalf of each and every person acquiring any interest in the Mortgaged Property subsequent to the date hereof, it being the intent hereof that any and all such rights or redemption of each constituent of Mortgagor and all such other persons are and shall be deemed to be hereby waived to the fullest extent permitted by applicable law or replacement statute. Each constituent of Mortgagor shall not invoke or utilize any such law or laws or otherwise hinder, delay, or impede, in each case in bad faith, the execution of any right, power, or remedy herein or otherwise granted or delegated to Mortgagee, but shall permit the execution of every such right, power, and remedy as though no such law or laws had been made or enacted.

b.     To the fullest extent permitted by law, Mortgagor waives the benefit of all laws now existing or that may subsequently be enacted providing for (i) any appraisement before sale of any portion of the Mortgaged Property, (ii) any extension of the time for the enforcement of the collection of the Obligations or the creation or extension of a period of redemption from any sale made in collecting such debt and (iii) exemption of the Mortgaged Property from attachment, levy or sale under execution or exemption from civil process. To the full extent Mortgagor may do so, Mortgagor agrees that Mortgagor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force, in each case in bad faith, providing for any appraisement, valuation, stay, exemption, extension or redemption, or requiring foreclosure of this Mortgage before exercising any other remedy granted hereunder and Mortgagor, for Mortgagor and its successors and assigns, and for any and all persons ever claiming any interest in the Mortgaged Property by, through or under Mortgagor, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature (except as expressly provided in the Note) or declare due the whole of the secured indebtedness and marshalling in the event of exercise by Mortgagee of the foreclosure rights or other rights hereby created.

21.     Remedies Not Exclusive. Mortgagee shall be entitled to enforce payment and performance of the Obligations and to exercise all rights and powers under this Mortgage or under any of the other [Note Documents] or other agreement or any laws now or hereafter in force, notwithstanding some or all of the Obligations may now or hereafter be otherwise secured, whether by deed of trust, mortgage, security agreement, pledge, lien, assignment or otherwise. Neither the acceptance of this Mortgage nor its enforcement, shall prejudice or in any manner affect Mortgagee's rights to realize upon or enforce any other security now or hereafter held by

Mortgagee, it being agreed that Mortgagee shall be entitled to enforce this Mortgage and any other security now or hereafter held by Mortgagee in such order and manner as Mortgagee may determine in its absolute discretion.  No remedy herein conferred upon or reserved to Mortgagee is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.  Every power or remedy given by any of the [Note Documents] to Mortgagee or to which either may otherwise be entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Mortgagee, as the case may be. In no event shall Mortgagee, in the exercise of the remedies provided in this Mortgage (including, without limitation, in connection with the assignment of Rents to Mortgagee, or the appointment of a receiver and the entry of such receiver on to all or any part of the Mortgaged Property), be deemed a "mortgagee in possession," and Mortgagee shall not in any way be made liable for any act, either of commission or omission, in connection with the exercise of such remedies, except for Mortgagee's gross negligence or willful misconduct.

        22.    <u>Multiple Security.</u>  If (a) the Mortgaged Property shall consist of one or more discrete parcels or units, whether or not contiguous and whether or not located in the same county, or (b) in addition to this Mortgage, Mortgagee shall now or hereafter hold or be the beneficiary of one or more additional mortgages, liens, deeds of trust or other security (directly or indirectly) for the Obligations upon other property in the State in which the Mortgaged Property is located (whether or not such property is owned by Mortgagor or by others) or (c) both the circumstances described in clauses (a) and (b) shall be true, then to the fullest extent permitted by law, Mortgagee may, at its election, commence or consolidate in a single foreclosure action all foreclosure proceedings against all such collateral securing the Obligations (including the Mortgaged Property), which action may be brought or consolidated in the courts of, or sale conducted in, any county in which any of such collateral is located.  Mortgagor acknowledges that the right to maintain a consolidated foreclosure action is a specific inducement to Mortgagee to extend the indebtedness borrowed pursuant to or guaranteed by the [Note Documents], and Mortgagor expressly and irrevocably waives any objections to the commencement or consolidation of the foreclosure proceedings in a single action and any objections to the laying of venue or based on the grounds of *forum non conveniens* which it may now or hereafter have.  Mortgagor further agrees that if Mortgagee shall be prosecuting one or more foreclosure or other proceedings against a portion of the Mortgaged Property or against any collateral other than the Mortgaged Property, which collateral directly or indirectly secures the Obligations, or if Mortgagee shall have obtained a judgment of foreclosure and sale or similar judgment against such collateral, then, whether or not such proceedings are being maintained or judgments were obtained in or outside the State in which the Mortgaged Property is located, Mortgagee may commence or continue any foreclosure proceedings and exercise its other remedies granted in this Mortgage against all or any part of the Mortgaged Property and Mortgagor waives any objections to the commencement or continuation of a foreclosure of this Mortgage or exercise of any other remedies hereunder based on such other proceedings or judgments, and waives any right to seek to dismiss, stay, remove, transfer or consolidate either any action under this Mortgage or such other proceedings on such basis.  Neither the commencement nor continuation of proceedings to foreclose this Mortgage, nor the exercise of any other rights hereunder nor the recovery of any judgment by Mortgagee in any such proceedings or the occurrence of any sale in any such proceedings shall prejudice, limit or preclude Mortgagee's right to commence or continue one or more foreclosure or other proceedings or obtain a judgment against any other collateral (either in or outside the State in

which the Mortgaged Property is located) which directly or indirectly secures the Obligations, and Mortgagor expressly waives any objections to the commencement of, continuation of, or entry of a judgment in such other sales or proceedings or exercise of any remedies in such sales or proceedings based upon any action or judgment connected to this Mortgage, and Mortgagor also waives any right to seek to dismiss, stay, remove, transfer or consolidate either such other sales or proceedings or any sale or action under this Mortgage on such basis. It is expressly understood and agreed that to the fullest extent permitted by law, Mortgagee may, at its election, cause the sale of all collateral which is the subject of a single foreclosure action at either a single sale or at multiple sales conducted simultaneously and take such other measures as are appropriate in order to effect the agreement of the parties to dispose of and administer all collateral securing the Obligations (directly or indirectly) in the most economical and least time-consuming manner.

23.    <u>Successors and Assigns.</u> All covenants of Mortgagor contained in this Mortgage are imposed solely and exclusively for the benefit of Mortgagee and Mortgagor, and their respective successors and assigns, and no other person or entity shall have standing to require compliance with such covenants or be deemed, under any circumstances, to be a beneficiary of such covenants, any or all of which may be freely waived in whole or in part by Mortgagee or Mortgagor, as the case may be, at any time if in the sole discretion of either of them such a waiver is deemed advisable.  All such covenants of Mortgagor shall run with the land and bind Mortgagor, the successors and assigns of Mortgagor (and each of them) and all subsequent owners, encumbrancers and tenants of the Mortgaged Property, and shall inure to the benefit of Mortgagee and its successors and assigns.  The word "Mortgagor" shall be construed as if it read "Mortgagors" whenever the sense of this Mortgage so requires and if there shall be more than one Mortgagor, the obligations of the Mortgagors shall be joint and several.

24.    <u>No Waivers, etc.</u> Any failure by Mortgagee to insist upon the strict performance by Mortgagor of any of the terms and provisions of this Mortgage shall not be deemed to be a waiver of any of the terms and provisions hereof, and Mortgagee, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Mortgagor of any and all of the terms and provisions of this Mortgage to be performed by Mortgagor.  Mortgagee may release, regardless of consideration and without the necessity for any notice to or consent by the holder of any subordinate lien on the Mortgaged Property, any part of the security held for the obligations secured by this Mortgage without, as to the remainder of the security, in any way impairing or affecting the lien of this Mortgage or the priority of such lien over any subordinate lien or deed of trust.

25.    <u>Governing Law, etc.</u>  This Mortgage shall be governed by and construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania.

26.    <u>Certain Definitions.</u> Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage shall be used interchangeably in singular or plural form and the word "Mortgagor" shall mean "each Mortgagor or any subsequent owner or owners of the Mortgaged Property or any part thereof or interest therein," the word "Mortgagee" shall mean ""Mortgagee or any successor-in-interest to Mortgagee," the word "person" shall include any individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority, or other

entity, and the words "Mortgaged Property" shall include any portion of the Mortgaged Property or interest therein. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa. The captions in this Mortgage are for convenience or reference only and in no way limit or amplify the provisions hereof.

27.    <u>Last Dollars Secured; Priority.</u> To the extent that this Mortgage secures only a portion of the indebtedness owing or which may become owing by Mortgagor to Mortgagee, the parties agree that any payments or repayments of such indebtedness shall be and be deemed to be applied first to the portion of the indebtedness that is not secured hereby, it being the parties' intent that the portion of the indebtedness last remaining unpaid shall be secured hereby. If at any time this Mortgage shall secure less than all of the principal amount of the Obligations, it is expressly agreed that any repayments of the principal amount of the Obligations shall not reduce the amount of the lien of this Mortgage until the lien amount shall equal the principal amount of the Obligations outstanding.

28.    <u>Enforcement Expenses Indemnification.</u> Mortgagor agrees to pay, and to save the Mortgagee harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Mortgaged Property or in connection with any of the transactions contemplated by this Mortgage Mortgagor agrees to pay, and to save the Mortgagee harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Mortgage to the extent the Mortgagor would be required to do so pursuant to the [Note]. The agreements in this <u>Section 28</u> shall survive repayment of the Obligations and all other amounts payable.

29.    <u>Release.</u> If any of the Mortgaged Property shall be sold, transferred or otherwise disposed of by any Mortgagor in a transaction permitted by the [Note] or if all of the Obligations shall be paid, performed and discharged (other than unmatured or contingent indemnity or reimbursement obligations and those Obligations which, by their terms, expressly survive the repayment and satisfaction of the [Note]), then the Mortgagee, at the request and sole expense of such Mortgagor, shall execute and deliver to such Mortgagor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Mortgaged Property.

30.    <u>Future Advances.</u>

a.    This Mortgage shall constitute an "Open-End Mortgage" as such term is defined in 42 Pa.C.S. §8143(f), and shall secure future advances and shall have lien priority in accordance with the provisions of 42 Pa.C.S. §§8143 and 8144. Notwithstanding the foregoing, to the maximum extent permitted by law, Mortgagor hereby unconditionally and irrevocably waives its right to submit a notice to Mortgagee under 42 Pa.C.S. §8143(c). In addition to the other remedies available hereunder and under the other [Note Documents], any advances made after receipt of any such notice, whether or not made pursuant to 42 Pa. C.S. §8143 and/or §8144, shall be secured hereby and shall relate back to the date when this Mortgage was left for recording with the recorder of deeds. In the event any Person or entity shall submit a notice to Mortgagee

14

under 42 Pa.C.S. §8143(b), in addition to the other remedies available hereunder and under the other [Note Documents], Mortgagor shall have the lien or encumbrance which is the subject of such notice removed of record in accordance with this Mortgage; and any advances made by Mortgagee after receipt of any such notice whether or not made under 42 Pa.C.S. §8143(b) shall be deemed to be obligatory advances made under, shall be secured hereby, and shall relate back to the date when this Mortgage was left for recording with the recorder of deeds. By placing or accepting any such lien or encumbrance against any or all of the Mortgaged Property, the holder thereof shall be deemed to have agreed to the maximum extent permitted by law that its lien or encumbrance shall be subject and subordinate in lien priority to this Mortgage and to any subsequent advances made under the [Note] to all accrued and unpaid interest and to all other sums secured hereby.

b.      The amount of principal indebtedness that may be secured by this Mortgage may increase or decrease from time to time.  The maximum amount of principal indebtedness outstanding at any one time shall not exceed $75,000,000.00, exclusive of accrued and unpaid interest and unpaid balances of advances and other extensions of credit secured by this Mortgage made for the payment of taxes, assessments, maintenance charges, insurance premiums and costs incurred for the protection of the Mortgaged Property within the meaning of 42 Pa. C.S.A. § 8143(f), and expenses incurred by Mortgagee by reason of the default by Mortgagor under this Mortgage and other costs and advances to the fullest extent permitted by the terms of 42 Pa. C.S.A. § 8144.

c.      Mortgagor shall not give any notice pursuant to 42 Pa. C.S. §8143(c) or otherwise terminate the operation of this Mortgage as security for future advance or future obligations made or incurred after the date Mortgagee receive such notice, nor shall Mortgagor take any other similar action for the purpose of limiting or attempting to limit the operation of this Mortgage as such security

d.      Mortgagor shall ensure that the Mortgagee shall not receive any notice pursuant to 42 Pa. C.S. §8143(b) which such notice is not rescinded or any related lien otherwise discharged or bonded against to Mortgagee's satisfaction, in its sole discretion, within thirty (30) days thereafter.

31.      <u>Waiver of Jury Trial</u>.   MORTGAGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS MORTGAGE, THE [NOTE], OR THE OTHER LOAN INSTRUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY MORTGAGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  MORTGAGEE IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY MORTGAGOR.

**32.      <u>Recorded Environmental Covenants.</u>**

**MORTGAGEE ACKNOWLEDGES AND AGREES THAT IT IS AWARE THAT THE LAND IS SUBJECT TO THE COVENANTS AND RESTRICTIONS, AS COVENANTS RUNNING WITH THE LAND, SET FORTH IN THAT CERTAIN SPECIAL WARRANTY DEED DATED SEPTEMBER 7, 2012, EFFECTIVE SEPTEMBER 8, 2012, FROM SUNOCO INC. (R & M) TO PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING LLC, FILED OF RECORD IN THE OFFICE OF THE DEPARTMENT OF RECORDS, CITY AND COUNTY OF PHILADELPHIA, PENNSYLVANIA  ON OCTOBER 3, 2012 AS DOCUMENT ID 52542486 AND THAT CERTAIN DEED OF CONFIRMATION OF MORTGAGOR DATED FEBRUARY 16, 2015 AND FILED OF RECORD IN THE OFFICE OF THE DEPARTMENT OF RECORDS, CITY AND COUNTY OF PHILADELPHIA, PENNSYLVANIA ON FEBRUARY 23, 2015 AS DOCUMENT ID 52884740 AND THAT THIS MORTGAGE IS SUBJECT, IN ALL RESPECTS, TO  THE SAME.**

<u>**REMAINDER INTENTIONALLY LEFT BLANK**</u>

**IN WITNESS WHEREOF**, Mortgage has been duly executed by Mortgagor as of the date first above written and is intended to be effective as of such date.

**PHILADELPHIA ENERGY SOLUTIONS
REFINING AND MARKETING LLC**
a Delaware limited liability company

By: _____
           Name:
           Title:

STATE OF _____         §
                                      §
COUNTY OF _____  §

BEFORE ME, _____, the undersigned Notary Public, personally appeared _____, with whom I am personally acquainted and who acknowledges that he/she executed the within instrument for the purposes therein contained and further acknowledges that he/she executed the document as a(n) _____ of (and thereby as the act and deed of) **PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING LLC,** a Delaware limited liability company after first having been duly authorized by said entity so to do.

Given this _____ day of _____, 2018.

[S E A L]                             _____
                                       Notary Public, State of _____

My Commission Expires:             _____
                                         Printed Name of Notary Public

_____

[signature page for Pennsylvania Mortgage]

CERTIFICATION OF MAILING ADDRESS
OF MORTGAGEE

The undersigned hereby certifies that the mailing address of SUNOCO LOGISTICS
PARTNERS OPERATIONS L.P., is 3807 West Chester Pike, Newtown Square PA 19073

SUNOCO LOGISTICS PARTNERS
OPERATIONS L.P.

By: Sunoco Logistics Partners GP LLC, its
general partner

By:_____
Name:
Title:

[signature page for Pennsylvania Mortgage]

## EXHIBIT A

### Legal Description of Land

Lot #10

Beginning at a point on the eastern side of Essington Avenue and a corner of lands of Pacific Atlantic Terminal;
thence along lands of Pacific Atlantic Terminal the four following courses and distances:

    (1) South 78°40'08" East, a distance of 364.693 feet;

    (2) South 74°29'09" East, a distance of 666.454 feet to a point of curvature;

    (3) By a curve to the left having a radius of 1463.349 feet and a central angle of 25°40'33.76" an arc length of 655.772 feet a chord which bears South 15°28'35.12 East 650.299 feet;

    (4) South 28°18'52" East a distance of 1586.100 feet to a point a corner of Lot #11;

thence along Lot #11 the 14 following courses and distances:

    (1) North 73°45'55.82" West, a distance of 316.884 feet;

    (2) North 73°39'19.79" West, a distance of 655.756 feet;

    (3) South 16°12'18.33 West, a distance of 34.507 feet;

    (4) North 73°47'41.67" West, a distance of 270.118 feet;

    (5) North 16°11'09.17" East, a distance of 290.706 feet;

    (6) North 73°52'15.18" West, a distance of 360.233 feet;

    (7) North 16°12'18.33" East, a distance of 1095.661 feet;

  (8)    North 74°20'38.45 West, a distance of 157.207 feet;

  (9)    South 16°04'45.41" West, a distance of 35.834 feet;

  (10)    North 75°22'14.72" West, a distance of 75.952 feet;

  (11)    South 16°14'57.70" West, a distance of 124.820 feet;

  (12)    North 74°11'14.92" West, a distance of 215.977 feet;

  (13)    South 16°20'02.25" West, a distance of 178.945 feet;

  (14)   North 73°15'29.97" West, a distance of 410.393 feet to a point on the eastern side of Essington Avenue.

thence along Essington Avenue North 14°21'18" East, a distance of 633.298 feet to the Point of Beginning.

Containing 39.50 Acres / 1,720,972 sq.ft.
Being known as 6904 Essington Avenue.
OPA #88-4-0967-03

Lot #11

Beginning at a point on the eastern side of Essington Avenue and a corner of Lot #10;

Thence along Lot #10 the 14 following courses and distances:

(1)     South 73°15'29.97" East, a distance of 410.393 feet;

(2)     North 16°20'02.25" East, a distance of 178.945 feet;

(3)     South 74°11'14.92" East, a distance of 215.977 feet;

(4)     North 16°14'57.70" East, a distance of 124.820 feet;

(5)     South 75°22'14.72" East, a distance of 75.952 feet;

(6)     North 16°04'45.41" East, a distance of 35.834 feet;

(7)     South 74°20'38.45 East, a distance of 157.207 feet;

(8)     South 16°12'18.33" West, a distance of 1095.661 feet;

(9)     South 73°52'15.18" East, a distance of 360.233 feet;

(10)    South 16°11'09.17" West, a distance of 290.706 feet;

(11)    South 73°47'41.67" East, a distance of 270.118 feet;

(12)    North 16°12'18.33" East, a distance of 34.507 feet;

(13)    South 73°39'19.79" East, a distance of 655.756 feet;

(14)    South 73°45'55.82" East, a distance of 316.884 feet to a point in line of lands of
        Pacific Atlantic Terminal ;


Thence along lands of Pacific Atlantic Terminal South 28°18'52" East, a distance of 692.486
feet;
thence along Mingo Creek South 61°46'72" West, a distance of 531.355 feet to a point a corner
of Lot #12;
thence along Lot #12 the 13 following courses and distances:

(1)     North 73°21'23.85" West, a distance of 817.222 feet;

(2)     North 16°13'40.59" East, a distance of 58.863 feet;

(3)     North 73°21'23.85" West, a distance of 291.434 feet;

(4)     North 16°13'14.08 East, a distance of 629.875 feet;

(5)     North 73°46'45.92" West, a distance of 498.753 feet;

(6)     South 16°13'14.08" West, a distance of 725.198 feet;

(7)     North 73°46'45.92" West, a distance of 101.252feet;

(8)     South 16°13'14.08" West, a distance of 1225.421 feet;

(9)     North 64°57'05.99" West, a distance of 241.292 feet;

(10)     North 16°20'07.97" East, a distance of 517.687 feet;

(11)     North 73°39'52.03" West, a distance of 214.664 feet;

(12)     North 16°20'07.97" East, a distance of 1451.316 feet;

(13)     North 75°50'45.56" West, a distance of 374.920 feet to the eastern side of Essington
        Avenue ;


Thence along the eastern side of Essington Avenue North 14°21'18" East, a distance of 1138.651
feet to the Point of Beginning.

Containing 72.99 Acres / 3,179,527 sq.ft.
Being known as 6902 Essington Avenue.
OPA #88-4-0967-02

Lot #12

Beginning at a point on the eastern side of Essington Avenue and a corner of Lot #11;
Thence along Lot #11 the 13 following courses and distances:

    (1)    South 75°50'45.56" East, a distance of 374.920 feet;

    (2)    South 16°20'07.97" West, a distance of 1451.316 feet;

    (3)    South 73°39'52.03" East, a distance of 214.664 feet;

    (4)    South 16°20'07.97" West, a distance of 517.687 feet;

    (5)    South 64°57'05.99" East, a distance of 241.292 feet;

    (6)    North 16°13'14.08" East, a distance of 1225.421 feet;

    (7)    South 73°46'45.92" East, a distance of 101.252 feet;

    (8)    North 16°13'14.08" East, a distance of 725.198 feet;

    (9)    South 73°46'45.92" East, a distance of 498.753 feet;

    (10)  South 16°13'14.08" West, a distance of 629.875 feet;

    (11)   South 73°21'23.85" East, a distance of 291.434 feet;

    (12)   South 16°13'40.59" West, a distance of 58.863 feet;

    (13)  South 73°21'23.85" East, a distance of 817.222 feet to a point.

Thence along the north side of Mingo Creek South 61°46'58.72" West, a distance of 2159.913 feet to a monument;
Thence North 61°09'05.89" West a distance of 671.429 feet to a point on the eastern side of Mingo Avenue;
Thence along the eastern side of Mingo Avenue North 03°30'13.66" West, a distance of 1414.856 feet to the eastern side of Essington Avenue ;
Thence along the eastern side of Essington Avenue North 14°21'18" East, a distance of 724.906 feet to the Point of Beginning.

Containing 57.68 Acres / 2,512,561 sq.ft.
Being known as 6900 Essington Avenue.
OPA #88-4-0967-01

1

# EXHIBIT B

## [Description of Storage Tanks]



**Schedule 2.1(a)**

| Tank Number | Tank Status | Tank Type | Floating Roof Type | Dia (FT) | HT (FT) | Capacity (GAL) | Capacity (BBL) | Prim. Prod. | Connectivity in | Connectivity Out |
|---|---|---|---|---|---|---|---|---|---|---|
| SR-6 | IS | IFR | Pontoon | 120 | 40 | 3,045,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-8 | TOOU | IFR | Pan, W/Bulkheads | 120 | 40 | 3,045,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-7 | IS | IFR | Pontoon | 120 | 40 | 2,982,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-14 | IS | IFR | Pontoon | 120 | 40 | 3,010,000 | 70,526 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-15 | IS | IFR | Pan, W/Bulkheads | 120 | 40 | 3,045,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-16 | IS | IFR | Pan, W/Bulkheads | 120 | 40 | 3,045,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-18 | IS | IFR | Pan, W/Bulkheads | 120 | 40 | 3,045,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-19 | IS | IFR | Pontoon | 120 | 40 | 3,045,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-20 | IS | IFR | Pontoon | 120 | 40 | 3,045,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-22 | IS | IFR | Pontoon | 120 | 40 | 2,834,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-23 | IS | IFR | Pontoon | 120 | 40 | 3,045,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |

| Tank Number | Tank Status | Tank Type | Floating Roof Type | Dia (FT) | HT (FT) | Capacity (GAL) | Capacity (BBL) | Prim. Prod. | Connectivity in | Connectivity Out |
|---|---|---|---|---|---|---|---|---|---|---|
| SR-24 | IS | IFR | Pontoon | 120 | 40 | 3,384,360 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-25 | IS | IFR | Pan, W/Bulkheads | 120 | 40 | 3,045,000 | 72,500 | Gasoline | Blender, CPL, Barge | GP Dock, HPL, LPL, Keystone |
| SR-35 | IS | IFR | Pontoon | 140 | 48 | 5,065,200 | 120,600 | Gasoline Component | HIW,GP Docks, Unit Production | Blender, GP Docks |
| SR-36 | IS | IFR | Pontoon | 140 | 48 | 5,527,200 | 120,600 | Gasoline Component | HIW,GP Docks, Unit Production | Blender, GP Docks |
| SR-37 | TOOU | IFR | Pontoon | 140 | 48 | 5,065,200 | 120,600 | Gasoline Component | HIW,GP Docks, Unit Production | Blender, GP Docks |
| SR-56 | IS | EFR | Pontoon | 140 | 48 | 5,527,200 | 131,600 | Heavy Cat Gas | Unit Production | Blender, GP Docks |
| SR-59 | IS | IFR | Pan, W/Bulkheads | 140 | 48 | 5,065,200 | 120,600 | Heavy Reformate | Unit Production | Blender, GP Docks |
| SR-60 | IS | IFR | Pontoon | 140 | 48 | 5,065,200 | 120,600 | Raffinate | Unit Production | Blender, GP Docks |
| SR-62 | IS | EFR | Pontoon | 140 | 48 | 5,527,200 | 131,600 | Alkylate | Unit Production | Blender, GP Docks |
| SR-63 | IS | IFR | Pan, W/Bulkheads | 140 | 48 | 5,065,200 | 120,600 | Light Cat Gas | Unit Production | Blender, GP Docks |
| SR-64 | TOOU | IFR | Pontoon | 140 | 48 | 5,065,200 | 120,600 | Alkylate | Unit Production | Blender, GP Docks |
| SR-38 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | #2 Furnace Oil | Unit Production, CPL, barge, PB LSD Tankage | GP Docks, HPL, LPL, FM2 |

| Tank Number | Tank Status | Tank Type | Floating Roof Type | Dia (FT) | HT (FT) | Capacity (GAL) | Capacity (BBL) | Prim. Prod. | Connectivity in | Connectivity Out |
|---|---|---|---|---|---|---|---|---|---|---|
| SR-39 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | #2 Furnace Oil | Unit Production, CPL, barge, PB LSD Tankage | GP Docks, HPL, LPL, FM2 |
| SR-40 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | ULSD#2 | Unit Production, CPL, barge, PB LSD Tankage | GP Docks, HPL, LPL, FM2 |
| SR-41 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | ULSD#2 | Unit Production, CPL, barge, PB LSD Tankage | GP Docks, HPL, LPL, FM2 |
| SR-42 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | ULSD#2 | Unit Production, CPL, barge, PB LSD Tankage | GP Docks, HPL, LPL, FM2 |
| SR-43 | TOOU | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | ULSD#2 | Unit Production, CPL, barge, PB LSD Tankage | GP Docks, HPL, LPL, FM2 |
| SR-61 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | Jet / Kero | Unit Production, CPL, barge, PB LSD Tankage | GP Docks, HPL, LPL, FM2, CPL |
| SR-65 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | ULSD #2 | Unit Production, CPL, barge, PB LSD Tankage | GP Docks, HPL,LPL, FM2, CPL |
| SR-66 | IS | Cone Roof | (none) | 140 | 47 | 5,253,035 | 125,072 | ULSD#2 | Unit Production, CPL, barge, PB LSD Tankage | GP Docks, HPL,LPL, FM2, CPL |

| Tank Number | Tank Status | Tank Type | Floating Roof Type | Dia (FT) | HT (FT) | Capacity (GAL) | Capacity (BBL) | Prim. Prod. | Connectivity in | Connectivity Out |
|---|---|---|---|---|---|---|---|---|---|---|
| SR-52 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | Heavy Gas Oil | Unit Production, GP GO & MFB Tankage | Barge, GP Hv Oil Tankage, PBNYOM |
| SR-90 | IS | Cone Roof | (none) | 190 | 48 | 10,188,780 | 242,590 | Heavy Gas Oil | Unit Production, GP GO & MFB Tankage | Barge, GP Hv Oil Tankage, PBNYOM |
| SR-33 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | #6 Fuel Oil | Unit Production, NYOM tankage, GP Hv Oil tankage | Barge, GP Hv Oil Tankage |
| SR-34 | TOOU | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | #6 Fuel Oil | Unit Production, NYOM tankage, GP Hv Oil tankage | Barge, GP Hv Oil Tankage |
| SR-30 | IS | Cone Roof | (none) | 140 | 48 | 5,527,200 | 131,600 | #6 Fuel Oil | Unit Production, NYOM tankage, GP Hv Oil tankage | Barge, GP Hv Oil Tankage |

**EXHIBIT B TO THE DISCLOSURE STATEMENT**
RESTRUCTURING SUPPORT AGREEMENT

*SOLICITATION VERSION*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

### RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (including all exhibits and schedules attached hereto and in accordance with Section 2, this "**Agreement**")[1] is made and entered into as of January 12, 2018, by and among the following parties and any such party that subsequent to the date hereof executes and delivers a joinder to this Agreement ("**Joinder Agreement**") in the form of **Exhibit C** (each of the foregoing described in sub-clauses (i), (ii), (iii), (iv), (v), and (vi), a "**Party**" and, collectively, the "**Parties**"):

    i.    PES Holdings, LLC, North Yard Financing, LLC ("**North Yard Financing**"), North Yard GP, LLC ("**North Yard GP**"), North Yard Logistics, L.P. ("**North Yard Logistics**" and together with North Yard Financing and North Yard GP, the "**North Yard Entities**"), PES Administrative Services, LLC ("**PES Admin**"), PES Logistics GP, LLC, PES Logistics Partners, L.P., Philadelphia Energy Solutions Refining and Marketing LLC ("**PESRM**"), and PESRM Holdings, LLC (each a "**Debtor**," and together, collectively, the "**Debtors**");

    ii.    Philadelphia Energy Solutions LLC (the "**Parent**") and its undersigned members (collectively, the "**Parent Parties**");

    iii.    (x) the undersigned lenders or investment advisors or managers of discretionary accounts that hold Claims against the Debtors and who have signed this Agreement in a capacity as a lender under the NYL Credit Agreement, and (y) PNC Bank, National Association, in its capacity as administrative agent (the "**Consenting Term Loan A Agent**") under that certain Credit Agreement, dated as of November 24, 2015 (as amended from time to time, the "**NYL Credit Agreement**"), by and among North Yard Logistics, as borrower, certain of the other Debtors, as guarantors, the Consenting Term Loan A Agent, and the lenders party thereto, including any Permitted Transferee (as defined below) of such claims in accordance with Section 6 of this Agreement (such claims, the "**NYL Credit Agreement Claims**" and, collectively, the "**Consenting NYL Creditors**");

    iv.    the undersigned lenders or investment advisors or managers of discretionary accounts that hold Claims against the Debtors under that certain Term Loan Agreement, dated

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan (as defined herein), attached hereto as **Exhibit A**, subject to Section 2 hereof.

as of April 4, 2013 (as amended from time to time, the "**Term Loan B Credit Agreement**" and, together with the NYL Credit Agreement, the "**Credit Agreements**"), by and among PESRM, as borrower, certain of the other Debtors, as guarantors, the Term Loan B Agent, and the lenders party thereto, including any Permitted Transferee (as defined below) of such Claims in accordance with Section 6 of this Agreement (such claims, the "**Term Loan B Claims**" and together with the NYL Credit Agreement Claims, the "**Outstanding Claims**") (collectively, the "**Consenting Term Loan B Creditors**," and, together with the Consenting NYL Creditors, the "**Consenting Cash Flow Creditors**");

  v. Halcyon Capital Management LP ("**HCM**") and its subsidiary management companies and Credit Suisse Asset Management, LLC ("**CSAM**"), in each case on behalf of certain investment vehicles that will commit to provide the postpetition financing to the Debtors pursuant to the Restructuring (collectively, the "**DIP Commitment Parties**" and together with the Consenting Cash Flow Creditors, the "**Consenting Creditors**"); and

  vi. Sunoco Logistics Partners Operations L.P., or an affiliate thereof (the "**Additional Financing Lender**") that will commit to provide a financing facility of $75,000,000.00 (the "**Additional Financing Facility**").

*provided, however*, that unless otherwise specified herein, (x) the term "Consenting NYL Creditor," shall not include any distinct business unit of a Party or an entity other than such business unit or a Party expressly identified on the signature pages hereto with respect to the Outstanding Claim held by such Consenting NYL Creditor and specified on the signature page of such Consenting NYL Creditor unless such other business unit or entity is or becomes party to this Agreement with respect to the specific Outstanding Claim and (y) the term "NYL Credit Agreement Claim," shall not include any Claim held in a fiduciary capacity or held by any other distinct business unit of a Party or an entity other than the business unit or Party expressly identified on the signature pages hereto with respect to the specific Outstanding Claim unless such other business unit or entity is or becomes party to this Agreement with respect to the specific Outstanding Claim.

## *RECITALS*

  **WHEREAS**, the Debtors, the Parent, and the Consenting Creditors have negotiated certain restructuring and recapitalization transactions with respect to the Debtors' capital structure, including the Debtors' respective obligations under the Credit Agreements; and

  **WHEREAS**, the Debtors intend to undertake a financial restructuring of the Debtors and certain related transactions, all of which shall be on terms and conditions described in this Agreement (such transactions, the "**Restructuring**") which are to be effected by commencing voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to effectuate the Restructuring through a prepackaged chapter 11 plan of reorganization substantially in the form attached hereto

as **Exhibit A,** as may be amended or supplemented from time to time in accordance with the terms of this Agreement (the "**Plan**").

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.** *Agreement Effective Date.*   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m. (prevailing Eastern Time), on the date on which:

(a)     the Debtors have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Consenting Creditors and the Parent Parties;

(b)     the Parent Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Consenting Creditors and the Debtors;

(c)     lenders under the NYL Credit Agreement holding at least 66.67% of the aggregate outstanding principal amount of the NYL Credit Agreement Claims (in each case determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) shall have executed and delivered to the Debtors and the Parent Parties counterpart signature pages of this Agreement;

(d)     lenders under the Term Loan B Credit Agreement holding at least 66.67% of the aggregate outstanding principal amount of the Term Loan B Claims (in each case determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) shall have executed and delivered to the Debtors and the Parent Parties counterpart signature pages of this Agreement;

(e)     the Additional Financing Lender shall have executed and delivered to the Debtors:

(i)     counterpart signature pages to this Agreement; and

(ii)     a commitment letter (the "**Additional Financing Facility Commitment Letter**") to provide the Additional Financing Facility; and

(f)     PESRM, PES Admin, and the DIP Commitment Parties shall have executed that certain Fee Letter, dated January 11, 2018, providing for payment of the DIP Commitment Fee; and

(g)     The Term Loan A Agent, PNC Capital Markets LLC ("**PNCCM**") and North Yard Logistics shall have executed that certain Restructuring Support Agreement Fee Letter dated as of January 11, 2018 (the "**PNC Fee Letter**"), providing for payment of the Fee (as defined in the PNC Fee Letter (the "**PNC Fee**")).

The Debtors have given notice to counsel to each of the Consenting Creditors and the Parent in accordance with Section 19.09 hereof that each of the foregoing conditions set forth in this Section

1, in each case, has been satisfied and this Agreement is effective (such date, the "**Agreement Effective Date**").[2]

**Section 2.** *Exhibits Incorporated by Reference.*  Each of the exhibits attached hereto (including the Plan) and any annexes, schedules or exhibits to such exhibits (collectively, the "**Exhibits and Schedules**") is expressly incorporated herein and made a part of this Agreement, and as used in this Agreement, all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

**Section 3.** *Definitive Documentation.*  The definitive documents and agreements governing the Restructuring (collectively, the "**Restructuring Documents**") shall consist of any material document relating to the Restructuring, including:

(a) the Plan (and all exhibits and supplements thereto);

(b) an order confirming the Plan (the "**Confirmation Order**") and pleadings in support of entry of the Confirmation Order;

(c) the Disclosure Statement and the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**");

(d) the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**");

(e) the credit agreement and all other loan documents to be entered into in connection with the debtor-in-possession financing facility provided by the DIP Commitment Parties (or their affiliates or funds managed by them) on the terms and conditions set forth in the DIP Facility and Adequate Protection Term Sheet attached hereto as **Exhibit B** (such term sheet, the "**DIP Facility Term Sheet**", such credit agreement and documents the "**DIP Documents**" and the financing facility provided thereunder, the "**DIP Facility**");

(f) the orders authorizing certain  Debtors to enter into the DIP Documents, obtain financing thereunder and use cash collateral and granting adequate protection to prepetition secured creditors on an interim basis (the "**Interim DIP Order**") and on a final basis (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**");

(g) the order or orders granting relief in respect of the Amended and Restated Supply and Offtake Agreement, dated as of October 7, 2014, by and among PESRM and Merrill Lynch Commodities, Inc. (together with the related ancillary agreements, the "**Intermediation Agreement**," and the claims thereunder, the "**Intermediation Claims**,") including any relief from

---

[2]    For the avoidance of doubt, the obligations and rights of the Consenting Creditors described in this Agreement shall apply to any postpetition claims acquired by such Consenting Creditors in accordance with the Restructuring.

the automatic stay, as contemplated by any assurance agreement related thereto (the "**Intermediation Assurance Agreement**") (the "**Intermediation Order**");

(h) the motions and pleadings filed with the Bankruptcy Court seeking certain "first day" relief (the "**First Day Pleadings**");

(i) the organizational and corporate governance documents of the Debtors and any other person of which a Consenting Creditor will become an equity holder pursuant to the Restructuring, including any stockholders agreements, registration rights agreements or similar agreements, charters, bylaws, operating agreements, certificates of formation, LLC agreements and other formation documents, and any plans, agreements, documents or instruments to give effect to any mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, contributions, conversions, dispositions, liquidations, dissolutions, or other corporate transactions to consummate the Restructuring (the "**Governance Documents**"), which shall be substantially consistent with the term sheet attached as Annex I to the Plan;

(j) the documents governing the New First Lien Term Loan to be issued to prepetition and postpetition creditors pursuant to the terms of the Plan (as applicable and substantially consistent with the term sheet attached as Annex II to the Plan) (the "**New First Lien Term Loan Documents**");

(k) the credit agreement, Pipeline Consent Agreement, and all other loan documents to be entered into in connection with the Additional Financing Facility (as amended from time to time, the "**Additional Financing Facility Documents**"), substantially consistent with the Additional Financing Facility Commitment Letter attached as Annex III to the Plan; and

(l) the agreement and all other documents to be entered into in connection with a new facility for the Debtors to purchase and sell crude oil, certain non-crude feedstocks, refined product, and, as required, other goods (the "**New Intermediation Facility**") and, if applicable, a first loss facility thereunder (the "**New First Loss Facility**").

Certain of the Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement. The Restructuring Documents shall otherwise be reasonably acceptable to the Debtors, the Parent (to the extent that the Parent is a party thereto), the Required Consenting Term Loan B Creditors and the Required Consenting NYL Creditors, and, solely with respect to provisions relating to their treatment or rights, the DIP Commitment Parties and the Parent Parties; *provided* that

(a) the DIP Documents and DIP Orders shall also be in form and substance reasonably acceptable to each DIP Commitment Party;

(b) the Additional Financing Facility Documents shall also be in form and substance reasonably acceptable to the Additional Financing Lender; and

(c) the Governance Documents shall also be in form and substance reasonably acceptable to the Parent and the Required Consenting Term Loan B Creditors.

As used herein, the term "**Required Consenting Term Loan B Creditors**" means, at any relevant time, Consenting Term Loan B Creditors holding greater than 66.67% by principal amount outstanding of the Term Loan B Claims held by the Consenting Term Loan B Creditors.  As used herein, the term "**Required Consenting NYL Creditors**" means, at any relevant time, Consenting NYL Creditors holding greater than the greater of (x) 66.67% by principal amount outstanding of the NYL Credit Agreement Claims held by the Consenting NYL Creditors and (y) such percentage by principal amount outstanding of the NYL Credit Agreement Claims as would then constitute at least a majority by principal amount of NYL Credit Agreement Claims; *provided* that with respect to the flood due diligence provisions of the New First Lien Term Loan Documents (or any changes therein), the Required Consenting NYL Creditors shall mean each Consenting NYL Creditor.  As used herein, the term "**Required Consenting Cash Flow Creditors**" means the Required Consenting Term Loan B Creditors and the Required Consenting NYL Creditors.  As used herein, the term "**Required Consenting Creditors**" means the Required Consenting Cash Flow Creditors.

## Section 4. *Milestones*

4.01.    The following milestones (the "**Milestones**") shall apply to this agreement unless extended or waived in writing by counsel to the Debtors and (x) in the case of clauses (b), and (e) below, the Required Consenting Cash Flow Creditors, (y) in the case of clauses (a), (c), (d), and (f) below, the Required Consenting Term Loan B Creditors and (z) in the case of clause (g) below, the Required Consenting NYL Creditors:

(a)    the Debtors shall commence solicitation of the Restructuring no later than five (5) business days after the Agreement Effective Date;

(b)    the Chapter 11 Cases shall be commenced in each case no later than January 16, 2018 (or, if North Yard Logistics, L.P. waives or defers the fourth quarter payment due under the Rail Terminaling Services Agreement, as amended, January 31, 2018), and the Plan and Disclosure Statement shall be filed with the Bankruptcy Court on such date;

(c)    the Interim DIP Order shall be entered within five days of the Petition Date;

(d)    the Final DIP Order shall be entered within 45 days of the Petition Date;

(e)    the Disclosure Statement Order and Confirmation Order shall be entered within 90 days of the Petition Date;

(f)    the Effective Date shall have occurred no later than 120 days after the Confirmation Order is entered unless, after entry of the Confirmation Order, the Required Consenting Term Loan B Creditors deliver notice to the Debtors, which notice may shorten the Effective Date Milestone under this Section 4.01(f) to no later than 30 days after delivery of such notice; and

(g)    the Effective Date shall have not occurred on or before the Outside Date.

**Section 5. *Commitments Regarding the Restructuring.***

5.01.   Mutual Commitments.

(a) During the period beginning on the Agreement Effective Date and ending on a Termination Date (as defined in Section 13.07) (such period, the "**Effective Period**"), each of the Parties shall:

(i)      support the Restructuring and the transactions contemplated by the Plan, and act in good faith and take all commercially reasonable actions necessary to consummate the Restructuring and the transactions contemplated by the Plan, in a manner consistent with this Agreement; and

(ii)     not directly or indirectly (A) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring or (B) propose, file, support, or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Restructuring (such transaction, an "**Alternative Transaction**").

5.02.   Commitment of the Consenting Creditors and Consenting Term Loan A Agent.

(a)      During the Effective Period, each of the Consenting Creditors and Consenting Term Loan A Agent shall:

(i)      in good faith negotiate any applicable definitive documentation for the Restructuring, including  the Restructuring Documents, which will contain terms consistent with this Agreement;

(ii)     not direct the applicable agents under the NYL Credit Agreement or Term Loan B Credit Agreement, as applicable, to take any action contemplated in clause (A) or (B) of Section 5.01(a)(ii);

(iii)    use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 5.02(a)(ii), including by directing the applicable agent to join in such opposition; *provided*, that the Debtors agree to reimburse any reasonable and documented out-of-pocket fees and expenses incurred by the Consenting Creditors pursuant to such commercially reasonable efforts;

(iv)     not, and shall not direct any other person to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Claims or Interests against the Parent or the Parent Parties;

(v)      subject to the receipt by such Consenting Creditor of the Disclosure Statement and the Solicitation Materials, in each case, to the extent a class of Claims is permitted to vote to accept or reject the Plan, vote each of its Claims against the Debtors (including each of its NYL Credit Agreement Claims, Term Loan B Claims, or Intermediation Claims, as applicable, and any other claims against the Debtors); but in the case of any Consenting NYL Creditor, only with respect to the Outstanding Claims held by such Consenting NYL Creditor identified on such

Consenting NYL Creditor's signature page (such claims or interests, as applicable, collectively, the "**Debtors Claims/Interests**") to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot, and not change or withdraw (or cause to be changed or withdrawn) such vote;

(vi)    support and take all commercially reasonable actions necessary or reasonably requested by the Debtors to facilitate the solicitation of votes on the Plan, approval of the Disclosure Statement and the Solicitation Materials, and confirmation and consummation of the Plan; and

(vii)   support and consent to the release, discharge, exculpation, and injunctive provisions contained in the Plan.

(b)    Subject to the termination rights of each DIP Commitment Party set forth in Section 13, each DIP Commitment Party commits to provide its share of the DIP Facility as set forth on Schedule 1 hereto on the terms and conditions substantially as set forth in the DIP Facility Term Sheet and otherwise subject to relevant Restructuring Documents, *provided* that any Consenting Term Loan B Creditor that executes a Joinder to this Agreement by the earlier of (i) seven days following the Agreement Effective Date and (ii) the Solicitation Commencement Date (as defined in the Plan) (*provided* that if the Solicitation Commencement Date is not a business day, the Solicitation Commencement Date shall be deemed to be the last business day prior to the Solicitation Commencement Date for purposes of this section 5.02(b)) (the "**DIP Election Date**") may, by making the appropriate election on such Joinder, commit to provide a share of the DIP Facility equal in percentage to the pro rata percentage of Term Loan B Claims held by such Consenting Term Loan B Creditor as of the Agreement Effective Date, and otherwise on the terms and conditions agreed to by the DIP Commitment Parties in the DIP Facility Term Sheet and the DIP Credit Agreement, as applicable (any Consenting Term Loan B Creditor that elects to make such commitment, a "**Joining DIP Creditor**"); *provided, further* that each DIP Commitment Party's commitment to provide its share of the DIP Facility shall be reduced, pro rata, based on the percentages set forth on Schedule 1 hereto, for the share of the DIP Facility to be provided by the Joining DIP Creditors; *provided, further* that upon a termination of this Agreement as to the DIP Commitment Parties by the DIP Commitment Parties in accordance with the provisions hereof prior to the funding of the DIP Facility, the commitment of any Joining DIP Creditor to provide its share of the DIP Facility as set forth in this paragraph 5.02(b) shall also terminate.

5.03.   Rights of Consenting Creditors and Consenting Term Loan A Agent Unaffected.

Nothing contained herein shall limit:

(a)    the rights of a Consenting Creditor or Consenting Term Loan A Agent under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Bankruptcy Cases, in each case, so long as the exercise of any such right is consistent with such obligations hereunder;

(b)     the ability of a Consenting Creditor or Consenting Term Loan A Agent to purchase, sell, or enter into any transactions in connection with its Claims or Interests, subject to the terms hereof and applicable law;

(c)     any right of a Consenting Creditor or Consenting Term Loan A Agent to take or direct any action relating to the maintenance, protection, or preservation of any collateral; *provided* that such action is consistent with this Agreement;

(d)     subject to the terms hereof, any right of a Consenting Creditor or Consenting Term Loan A Agent under (x) the Term Loan B Credit Agreement, or constitute a waiver or amendment of any provision of the Term Loan B Credit Agreement, (y) the NYL Credit Agreement (including without limitation the right to receive payments of amortization and interest thereunder and the right to enforce the covenant for North Yard Logistics to receive payments under the Rail Terminaling Service Agreement), or constitute a waiver or amendment of any provision of the NYL Credit Agreement, or (z) any other applicable agreement, instrument or document that gives rise to a Consenting Creditor's Claims or Interests, as applicable, or constitute a waiver or amendment of any provision of any such agreement, instrument or document;

(e)     the ability of a Consenting Creditor or Consenting Term Loan A Agent to consult with any holder of any Claim or Interest or the Debtors; or

(f)     the ability of a Consenting Creditor or Consenting Term Loan A Agent to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Restructuring Documents.

5.04.   Commitment of the Parent Parties.

(a)     During the Effective Period, each of the Parent Parties agrees that it shall:

(i)     subject to the receipt by the Parent of the Disclosure Statement and the Solicitation Materials, in each case, to the extent a class of Claims or Interests is permitted to vote to accept or reject the Plan, vote each of its Claims against the Debtors and any Interests in the Debtors to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot, and not change or withdraw (or cause to be changed or withdrawn) such vote;

(ii)    continue to file all tax-related documentation that the Parent Parties typically filed in the ordinary course before the Agreement Effective Date with the relevant federal, state, and/or local taxing authorities.

(iii)   unless (a) otherwise expressly permitted or required by this Agreement, (b) any of the employees, directors, and officers of the Parent, in their capacity as a member, director, or officer of the Debtors, take any alternative action consistent with the Debtors' fiduciary duties pursuant to Section 17 hereof, or (c) otherwise consented to in writing by the Consenting Creditors, it shall (i) support and use commercially reasonable efforts to take all actions necessary or reasonably requested by the Debtors to facilitate the solicitation, confirmation and consummation of the Plan, (ii) support and consent to the release, discharge, exculpation, and

injunction provisions contained in the Plan, and (iii) comply with all of its obligations under this Agreement (including the Plan);

(iv)   not be entitled to (i) any management fees or similar fees payable by the Debtors or any of their affiliates and hereby waives the right to receive payment on account of any such fees, whether arising from the PES Advisory Agreement or otherwise or (ii) any dividends, distributions, or other payment in respect of its Interests in any Debtor (other than, for the avoidance of doubt, guaranteed distributions to members of management in lieu of salaries); and

(v)   upon the Effective Date (as defined in the Plan), the Parent shall provide the Parent Cash Contribution on the terms and conditions set forth in the Plan.

(b) The Parent Parties agree to cause Parent to assign, sell, transfer, and deliver to the Assignee all of the rights, title and interest of Parent in, to and under the Assumed Agreements and Permits (as defined in the Plan), effective as of the Effective Date, free and clear of all Liens, Claims, charges, or other encumbrances, including the Excluded Liabilities.  The Assignee will be deemed to be the successor-in-interest of Parent for all of the Assumed Agreements and Permits as of the Effective Date.  The Assignee shall assume only the Assumed Agreements and Permits and shall not assume any other liability or obligation of Parent (or any predecessor of Parent or any prior owner of all or part of its businesses and assets) of whatever nature, whether presently in existence or arising hereafter.

(c) Without limiting the scope of Section 5.04(b) or 13.02(m) hereof, the Parent Parties hereby mutually agree to sell, assign, grant, convey and transfer all of Parent's rights, indemnities, title, and interests in the PES Refining Contribution Agreement to the Assignee, from and after, and subject to the occurrence of, the Effective Date.  The Parent Parties further mutually agree that the PES Refining Contribution Agreement shall survive the Restructuring Transactions, irrespective of any assignment, and remain in full force and effect.

5.05.   Commitment of the Debtors.

(a)   During the Effective Period, subject to Section 17 hereof, the Debtors shall use commercially reasonable efforts to, in good faith, take all steps, as applicable, reasonably necessary or desirable to:

(i)   obtain orders of the Bankruptcy Court in respect of the Restructuring, including obtaining entry of the Confirmation Order;

(ii)   support and consummate the Restructuring in accordance with this Agreement, including the preparation and filing of the Restructuring Documents within the timeframe provided herein and in the Plan;

(iii)   execute and deliver any other required agreements to effectuate and consummate the Restructuring;

(iv)   obtain any and all required regulatory and/or third-party approvals for the Restructuring;

(v)     complete the Restructuring within the time-frame provided herein;

(vi)    operate their business in the ordinary course, taking into account the Restructuring; and

(vii)   take all actions reasonably necessary or requested by the Consenting Creditors to obtain any and all required regulatory and/or third-party approvals for the Restructuring.

(b) During the Effective Period, the Debtors shall:

(i)     not enter into any material non-ordinary course transactions or make any material non-ordinary course payments inconsistent with this Agreement or the Plan, including entering into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation, without the consent of the Required Consenting Cash Flow Creditors (provided that, in the case of entering into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation, only the consent of the Required Consenting Term Loan B Creditors, and not the consent of the Required Consenting NYL Creditors, shall be required), such consent not to be unreasonably withheld; and

(ii)    not file any pleading inconsistent with the Restructuring or the terms of this Agreement,

(iii)   not seek to amend or modify, or file a pleading seeking authority to amend or modify, the Restructuring Documents in a manner that is inconsistent with this Agreement;

(iv)    not directly or indirectly object to, delay, impede, or take any other action to interfere with or delay or that is inconsistent with acceptance or implementation of the Restructuring; and

(v)     before the Effective Date, not use cash, cash equivalents or other assets held or owned by any North Yard Entity, and not grant or suffer to exist any lien or security interest with respect to such cash, cash equivalents or other assets, directly or indirectly, in each case for any purpose other than (x) exclusively for the operations of any North Yard Entity in the ordinary course of business of such North Yard Entity consistent with past practices of such North Yard Entity, (y) to satisfy any obligation to holders of NYL Credit Agreement Claims or the Consenting Term Loan A Agent under the NYL Credit Agreement (or any document or fee letter entered into in connection with the NYL Credit Agreement) or the DIP Orders, or (z) the payment of fees and expenses specified in Section 10(B) and  Section 10(E) of this Agreement.

(c) Notwithstanding anything to the contrary herein and without duplication of Section 17 hereof, nothing in this Agreement shall require the board of directors, board of managers, directors, managers, or officers or any other fiduciary of the Debtors to take any action, or to refrain from taking any action, with respect to the Restructuring to the extent such person or persons determines, upon the advice of counsel, that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law, or its fiduciary obligations under applicable law.

(d)    During the Effective Period, the Debtors, jointly and severally, shall use commercially reasonable efforts to:

(i)    provide the Consenting Term Loan B Creditors' advisors (upon request) or the Consenting NYL Creditors' advisors (upon request), as the case may be, with (A) reasonable access (without any material disruption to the conduct of the Debtors' businesses) during normal business hours to the Debtors' books, records and facilities, (B) reasonable access to the management and advisors of the Debtors for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, (C) prompt responses to all reasonable diligence requests, (D) the terms of any agreements regarding executive compensation and (E) reasonable information with respect to all material executory contracts and unexpired leases of the Debtors;

(ii)    subject to applicable law and privileges, promptly notify counsel to the Consenting Term Loan B Creditors and counsel to the Consenting NYL Creditors of any material governmental or third party complaints, litigations, investigations, or hearings; and

(iii)    provide the Consenting Cash Flow Creditors' advisors with copies of any director and officer liability insurance policies and employee arrangements, including with respect to the Severance Program, as soon as reasonably practicable after the Agreement Effective Date.

5.06.    CFIUS / HSR Cooperation.

(a) if (1) there is a CFIUS Investigation or (2) CFIUS requests that Parent, any of the Debtors or the Consenting Creditors make a CFIUS Filing then each of Parent, the Debtors and the Consenting Creditors shall cooperate with such CFIUS Investigation, including using its commercially reasonable efforts to:

(i)    if Parent, any of the Debtors or any Consenting Creditor receives any request from CFIUS for information with respect to a CFIUS Investigation, a CFIUS Filing or otherwise, the requested party shall (A) promptly provide notice to counsel to Parent and counsel to the other Consenting Creditors, (B) provide any such requested information (1) to CFIUS within three business days of such request, and (2) to counsel to Parent, counsel to the Debtors and counsel to the other Consenting Creditors as far in advance of the disclosure of such requested information to CFIUS as is reasonably practicable to permit review and discussion in advance, and shall consider in good faith the views of the other parties in connection with, any material written analyses or arguments or other materials to be submitted to CFIUS;

(ii)    if a CFIUS Filing is to be made pursuant to this Section 5.06(a),

(A)    promptly provide all necessary information within their respective control to complete a CFIUS Filing and thereafter to respond promptly to any request for additional information or documentary material that may be made by CFIUS pursuant to 31 C.F.R. Part 800 and 50 U.S.C. App. § 2170;

12

(B)     as promptly as practicable, jointly submit a draft of the CFIUS Filing to CFIUS as contemplated under 31 C.F.R. § 800.401(f); and

(C)     as soon as practicable, and in any event no more than five business days after receiving notification from CFIUS that the CFIUS Filing meets all requirements of 31 C.F.R. § 800.402 and is, accordingly, complete, together file with CFIUS the CFIUS Filing as contemplated by 31 C.F.R. § 800.401(a).

(b) If in the reasonable judgment of the Debtors and the Required Consenting Term Loan B Creditors an HSR filing is required under applicable law in connection with the consummation of the Restructuring before the Effective Date, each of Parent, the Debtors and the Consenting Creditors shall use commercially reasonable efforts to:

(i)     make an HSR Filing as promptly as practicable; and

(ii)     supply as promptly as practicable any additional information and documentary material that may be requested pursuant to the HSR Act and to use their reasonable best efforts to take all other actions necessary to cause the expiration or termination of the applicable waiting periods under the HSR Act, as applicable, as soon as practicable.

5.07.    Interest on Credit Agreements.  For the avoidance of doubt, it is understood and agreed that the Debtors shall use commercially reasonable efforts to pay all interest payments under the Credit Agreements as they come due and nothing in this Agreement or any Restructuring Document shall prohibit or limit any ability to make any such interest payments.

**Section 6.** *Transfer of Interests and Securities.*

(a)     During the Effective Period, no Consenting Creditor shall sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of (each, a "**Transfer**") any ownership (including any beneficial ownership[3]) in the Debtors Claims/Interests to any unaffiliated party, unless it satisfies all of the following requirements (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"), *provided* that the following provisions shall not apply to any Transfer in the Debtors Claims/Interests between affiliated parties:

(i)     the intended transferee executes and delivers to counsel to the Debtors on the terms set forth below an executed form of the transfer agreement in the form attached hereto as **Exhibit D** (a "**Transfer Agreement**") (it being understood that the effectiveness of any Transfer shall be subject to Section 6(a)(ii) and Section 6(b), below); and

---

[3]     As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, Debtors Claims/Interests or the right to acquire Debtors Claims/Interests.

(ii)    other than in the case of any Transfer of any NYL Credit Agreement Claims, the Transfer shall not, in the reasonable business judgment of the Debtors and their legal advisors, adversely affect the Debtors' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring.

(b)    Other than in the case of any Transfer of any NYL Credit Agreement Claims, the Debtors shall have five (5) business days from receiving notice of the Transfer Agreement in accordance with Section 6(a)(i) to object to such Transfer Agreement for the reasons described in Section 6(a)(ii).   Failure of the Debtors to object to such Transfer Agreement within five (5) business days of receiving notice of the Transfer Agreement shall be deemed a determination that the requirements of Section 6(a)(ii) have been satisfied with respect to such transfer.

(c)    Notwithstanding Section 6(a) and Section 6(b), a Qualified Marketmaker[4] that acquires any Debtors Claims/Interests subject to this Agreement with the purpose and intent of acting as a Qualified Marketmaker for such Debtors Claims/Interests, shall not be required to execute and deliver to counsel a Transfer Agreement in respect of such Debtors Claims/Interests if (i) such Qualified Marketmaker transfers such Debtors Claims/Interests (by purchase, sale, assignment, participation, or otherwise) to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) if the Transfer relates to a Debtor Claim/Interest with respect to which the holder is a Party to this Agreement, the transferee otherwise is a Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement); and (iii) the transfer otherwise is a Permitted Transfer.  Notwithstanding the foregoing, if, at the time of the proposed Transfer of such Notes to the Qualified Marketmaker, such Claims (A) may be voted on the Plan, the proposed transferor must first vote such Claims in accordance with the requirements of this Agreement or (B) have not yet been and may not yet be voted on the Agreed Plan and such Qualified Marketmaker does not effect a Transfer of such Claims to a Permitted Transferee prior to the third (3rd) business day prior to the expiration of the voting deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) business day immediately following the Qualified Marketmaker Joinder Date, become a Party with respect to such Notes in accordance with the terms hereof for the purposes of voting in favor of the Plan as contemplated hereunder (provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Party with respect to such Claims at such time that the transferee of such Notes becomes a Party with respect to such Claims).

(d)    This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Debtors Claims/Interests; *provided* that (i) any Consenting Creditor that acquires additional Debtors Claims/Interests, as applicable, after the Agreement Effective Date shall promptly notify the Debtors and the Consenting Cash Flow Creditors of such acquisition including the amount of such acquisition and (ii) such additional Debtors Claims/Interests shall

---

[4]    As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of any Debtor (or enter with customers into long and short positions in claims against any Debtor), in its capacity as a dealer or market maker in claims against any Debtor and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

automatically and immediately upon acquisition by a Consenting Creditor, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Debtors or counsel to the Consenting Creditors).

(e)     This Section 6 shall not impose any obligation on the Debtors to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any Debtors Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent the Debtors and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information in connection with any proposed Restructuring (each such executed agreement, a "**Confidentiality Agreement**"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.  The filing of this Agreement and related exhibits hereto shall satisfy the Debtors' existing obligations under any such Confidentiality Agreements.

(f)     Any Transfer made in violation of this Section 6 shall be void *ab initio* and of no force and effect and shall not create any obligation or liability of any Consenting Creditor or the Debtors to any purported transferee.  Any Consenting Creditor that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

(g)     The restrictions on Transfer set forth in this Section 6 shall not apply to the grant of any liens or encumbrances on any Debtors Claims/Interests (i)  by any collateralized loan obligation or in favor of a bank or broker dealer holding custody of such Debtors Claims/Interests in the ordinary course of business and which lien or encumbrance is released automatically upon the Transfer of such Debtors Claims/Interests and (ii) by any holder of NYL Credit Agreement Claims or Term Loan B Claims to secure obligations of such holder or any of its affiliates to any Federal Reserve Bank or other central bank having jurisdiction over such holder or any of such holder's affiliates.

**Section 7.** *Representations and Warranties of Consenting Creditors.*  Each Consenting Creditor, severally, and not jointly, represents and warrants that:

(a)     it is the beneficial owner of the face amount of the Debtors Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Debtors Claims/Interests, as reflected in such Consenting Creditor's signature block to this Agreement (such Debtors Claims/Interests, the "**Owned Debtors Claims/Interests**");

(b)     it has the full power and authority to act on behalf of, vote and consent to matters concerning the Owned Debtors Claims/Interests;

(c)     the Owned Debtors Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     in the case of a Consenting Term Loan B Creditor, (i) it or each beneficial owner it represents herein is either (A) a qualified institutional buyer as defined in Rule 144A of the

Securities Act, (B) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the "**Securities Act**"), (C) a Regulation S non-U.S. person, or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of the Debtors acquired by the applicable Consenting Creditor in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(e)    as of the date such Party executes this Agreement, Joinder Agreement or Transfer Agreement, as applicable, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

**Section 8. *Representations of the Parent*.**  Each of the Parent and the Debtors represents and warrants that:

8.01.    No Assets or Rights.  Other than as set forth on Schedule 2 to this Agreement, as of the date hereof, Parent has no other assets (other than the Excluded Parent Cash and Parent Cash Contribution (as defined in the Plan)) or material rights, whether contractual or otherwise and is not a party to, or beneficiary under, any other material agreements, contracts, licenses, franchises, permits, certifications, approvals or other similar authorizations.  Parent has delivered to counsel to the Required Consenting Cash Flow Creditors true and complete copies of all Parent Agreements and Parent Permits, set forth on Schedule 2 to this Agreement.  The amount of Excluded Parent Cash held by Parent immediately prior to the entry of the Parties into this Agreement is as separately communicated in writing to counsel to the Required Consenting Term Loan B Creditors.

8.02.    No Consents.  There are no material Parent Agreements or material Parent Permits (each as defined in the Plan), in each case that may require a consent or other action by a governmental authority, a Party hereto or any other person other than Parent (i) as a result of the execution, delivery and performance of this Agreement or (ii) to effectuate the Restructuring contemplated by this Agreement, other than as set forth on Schedule 3 to this Agreement.

**Section 9. *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties represents, warrants, and covenants to each other Party:

9.01.    Enforceability.  It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

9.02.    No Consent or Approval.  Except as expressly provided in this Agreement, including Section 8.02 with respect to Parent and the Debtors, the Plan, or the Bankruptcy Code, no consent or approval from any other person or entity (i) is required under such Party's certificate of incorporation, bylaws, partnership or LLC agreement or similar governing documents; (ii) is required pursuant to law applicable to such Party or from a governmental entity, agency or court with jurisdiction over such party; (iii) is required under an agreement that is binding on such Party

or its subsidiaries which is material to such Party and its subsidiaries, taken as a whole; or (iv) where the failure to obtain such consent or approval would have a material adverse effect on the Restructuring or such Party, in each case, in order for it to effectuate the Restructuring contemplated by, and perform the respective obligations under, this Agreement.

9.03.    Power and Authority; Due Authorization.  Except as expressly provided in this Agreement, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement, and the execution, delivery and performance of this Agreement by it have been duly authorized by all necessary corporate action.  Without limiting the foregoing, the Parent Parties have authorized the Restructuring and all necessary actions pursuant thereto, in each case subject to the occurrence of the Effective Date.

9.04.    Governmental Consents.  Except for CFIUS Approval (to the extent required), HSR Approval (to the extent required), or as expressly set forth herein and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring), the execution, delivery, and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

9.05.    No Conflicts.  The execution, delivery, and performance of this Agreement does not and shall not:  (a) violate any provision of law, rules or regulations applicable to it or any of its subsidiaries in any material respect; (b) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material and adverse effect on the Restructuring.

**Section 10.    *Fees and Expenses*.**  The Debtors hereby agree, and each Debtor agrees jointly and severally, to pay in cash, in full:  (A) in accordance with their respective engagement letters and fee letters, as applicable, and the Term Loan B Credit Agreement (and in any case within three (3) business days), all invoiced and out-of-pocket expenses of the Consenting Term Loan B Creditors' advisors, including (a) Davis Polk & Wardwell LLP, (b) Houlihan Lokey Capital, Inc., including, for the avoidance of doubt, the financing fee and completion fee payable in accordance with the terms of the Houlihan Lokey Engagement Letter, (c) Morris, Nichols, Arsht & Tunnell LLP, (d) Norton Rose Fulbright US LLP as counsel to the administrative agent under the DIP Facility to represent it in its own capacity, and (e) Ramboll Environ US Corporation (subject to execution of an engagement letter therefor in form and substance reasonably satisfactory to the Debtors which shall require the Debtors' consent before Ramboll incurs fees on account of services in excess of $75,000, such consent not to be unreasonably withheld) in each case incurred prior to the earlier of the Effective Date and the termination of this Agreement; provided, following the Petition Date, payment of fees and expenses pursuant to this clause (A) of this Section 10 shall be subject to the terms of the Interim DIP Order and Final DIP Order, as applicable; (B) the fees and expenses of one primary counsel to the Consenting NYL Creditors (which counsel shall be Cahill Gordon & Reindel LLP) and local counsel to the Consenting NYL Creditors in the relevant jurisdiction of the Chapter 11 Cases (the fees and expenses paid pursuant to this clause (B) to be payable solely

17

from assets held or owned by the North Yard Entities), in each case incurred prior to the earlier of the Effective Date and the termination of this Agreement; *provided*, that following the Petition Date, the Debtors shall use commercially reasonable efforts to provide the adequate protection set forth in the DIP Facility Term Sheet attached hereto as **Exhibit B**, including pursuant to clause (B) of this Section 10, under the Interim DIP Order and Final DIP Order, as applicable, with any payments on account thereof to be payable solely from assets held or owned by the North Yard Entities; (C) in accordance with applicable Commitment Letter(s), all reasonable fees and expenses incurred by the Additional Financing Lender, Sunoco Pipeline L.P., Sunoco Partners Marketing & Terminals L.P. and PES Equity Holdings, LLC in connection with the Restructuring; (D) all reasonable fees and expenses of Latham & Watkins LLP incurred in connection with the Restructuring on behalf of certain Parent Parties; *provided,* that the fees and expenses pursuant to clause (C) and (D) of this Section 10 shall not be payable if this Agreement is terminated other than pursuant to Section 13.06 hereof; and (E) in accordance with the PNC Fee Letter, the PNC Fee.

**Section 11.**   *Acknowledgement*.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.  The Debtors will not solicit acceptances of any Plan from Consenting Creditors in any manner inconsistent with the Bankruptcy Code or applicable bankruptcy law.

**Section 12.**   *Bankruptcy Court Pleadings.*

During the Effective Period, the Debtors will use commercially reasonable efforts to provide draft copies of all material motions, pleadings, and documents other than the First Day Pleadings that the Debtors intend to file with the Bankruptcy Court to counsel to the Consenting Creditors and counsel to the Parent at least four (4) days before the date on which Debtors intend to file such motions.  To the extent such documents do not constitute Restructuring Documents (which shall be approved in accordance with Section 3 of this Agreement), the Debtors shall consult in good faith with counsel to the Consenting Creditors and counsel to the Parent regarding the form and substance of such documents.

**Section 13.**   *Termination Events*.

13.01.  Consenting Creditor Termination Events.  This Agreement may be terminated upon five (5) business days' written notice, delivered in accordance with Section 19.09 hereof by (x) Consenting NYL Creditors constituting the Required Consenting NYL Creditors, or (y) Consenting Term Loan B Creditors representing the Required Consenting Term Loan B Creditors, in each case as to such Consenting Creditors (such terminating Consenting Creditors, the "**Terminating Consenting Creditors**"), upon the occurrence and continuation of any of the following events.

(a)   the Effective Date of the Plan shall not have occurred on or before July 31, 2018 (the "**Outside Date**");

(b)    the breach by any Party other than the Terminating Consenting Creditors of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would have, or could reasonably be expected to have, a material adverse effect on the Restructuring; *provided*, that such Terminating Consenting Creditors shall transmit a notice to the Debtors, counsel to the other Consenting Creditors and the breaching Party pursuant to Section 19.09 hereof, detailing any such breach and, if such breach is capable of being cured, the breaching Party shall have five (5) business days after receiving such notice to cure any breach; *provided, further*, that any breach of a representation, warranty, covenant or agreement under Sections 5.04, 8.01, 8.02, or 9.02 of this Agreement may be cured by (i) a conveyance to the Reorganized Debtors of such assets, rights, Parent Agreements or Parent Permits (the lack or absence of which caused such breach), or causing such Parent Agreements (the lack or absence of which caused such breach), or Parent Permits (the lack or absence of which caused such breach) (or their equivalent) to vest in the Reorganized Debtors; or (ii) modifying the Plan to include the Parent as a Reorganized Debtor under the Plan, which modification shall not require the consent of any Party other than the Debtors and the Parent notwithstanding anything in this Agreement to the contrary;

(c)    the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have, or could reasonably be expected to have, a material and adverse effect on the consummation of the Restructuring; *provided*, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring;

(d)    the Debtors propose, support, assist, solicit, or file a pleading seeking approval of any Alternative Transaction for the Debtors (or any approval of any sales, voting or other procedures in connection with such Alternative Transaction) without the consent of the Required Consenting Creditors;

(e)    the Debtors' loss of the exclusive right to file a plan of reorganization;

(f)    the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code; or (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Required Consenting Creditors (as represented by counsel to the applicable Consenting Creditors); or (iii) appointment of a trustee, receiver, examiner with expanded power, responsible person or responsible officer in the Chapter 11 Cases;

(g)    the Debtors file any motion or pleading seeking to avoid, disallow, subordinate or recharacterize any claim held by any Terminating Consenting Creditors arising under the NYL Credit Agreement, or Term Loan B Credit Agreement, as applicable, or the Debtors file any motion or pleading seeking to avoid and recover any payment previously made to any of the Debtors or any of the Terminating Consenting Creditors;

(h)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Debtors and such relief would have, or could reasonably be expected to have a material and adverse effect on the Restructuring;

(i)      (a) the Debtors make any payment on account of management fees or similar fees payable to the Debtors obligations under the PES Advisory Agreement or otherwise, or (b) any Debtor makes any dividends, distributions or other payment in respect of any of its Interests in any Debtor (other than, for the avoidance of doubt, guaranteed distributions to members of management in lieu of salaries);

(j)      entry into an agreement regarding an in-court or out-of-court restructuring or recapitalization transaction involving the Debtors or any subsidiary, without the prior written consent of the Required Consenting Creditors;

(k)      the termination by any of (i) the Parent under Section 13.03 or (ii) the Debtors under Section 13.04;

(l)      any of the Restructuring Documents shall have been materially and adversely modified or withdrawn without the requisite prior written consent set forth in Section 3 with respect to such Restructuring Document;

(m)      in the case of the Consenting Term Loan B Creditors, the payment of principal or amortization on account of the NYL Credit Agreement Claims other than in accordance with the Plan;

(n)      in the case of the Consenting NYL Creditors, the payment of principal or amortization on account of the Term Loan B Claims other than in accordance with the Plan;

(o)      in the case of the Consenting Term Loan B Creditors, the payment by Philadelphia Energy Solutions Refining and Marketing LLC of any amounts due under the Rail Terminaling Services Agreement, as amended; or

(p)      in the case of the Consenting Term Loan B Creditors or Consenting NYL Creditors, except to the extent the Consenting Term Loan B Creditors or Consenting NYL Creditors, as applicable, have waived such Milestone in accordance with Section 4.01 of this Agreement, the failure to meet any of the Milestones.

13.02.  DIP Commitment Parties' Termination Events. This Agreement may be terminated (i) in the case of subsections (a) through (l) of this Section 13.02, upon five (5) business days' written notice,  and (ii) in the case of subsections (m) and (n) of this Section 13.02, immediately upon written notice, such notice in each case delivered in accordance with Section 19.09 hereof by DIP Commitment Parties (such DIP Commitment Parties, the "**Terminating DIP Commitment Parties**") representing each DIP Commitment Party upon the occurrence and continuation of any of the following events:

(a)      the Effective Date of the Plan shall not have occurred on or before the Outside Date;

(b)      the breach by any Party other than the Terminating DIP Commitment Parties of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would have, or could reasonably be expected to have, a material adverse effect on the Restructuring; *provided*, that such Terminating DIP Commitment Parties shall transmit a notice to the Debtors, counsel to the Consenting Creditors and the breaching Party pursuant to Section

19.09 hereof, detailing any such breach and, if such breach is capable of being cured, the breaching Party shall have five (5) business days after receiving such notice to cure any breach; *provided*, *further* that any breach of a representation under Section 8.01, 8.02, or 9.02 of this Agreement may be cured by (i) a conveyance to the Reorganized Debtors of such assets, rights, Agreements or Permits, or causing such Agreements, or Permits (or their equivalent) to vest in the Reorganized Debtors; or (ii) modifying the Plan to include the Parent as a Reorganized Debtor under the Plan, which modification shall not require the consent of any Party other than the Debtors and the Parent notwithstanding anything in this Agreement to the contrary.

(c)     the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have, or could reasonably be expected to have, a material adverse effect on the Restructuring; *provided*, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring;

(d)     the Debtors propose, support, assist, solicit, or file a pleading seeking approval of any Alternative Transaction (or any approval of any sales, voting or other procedures in connection with such Alternative Transaction) without the consent of the Required Consenting Creditors;

(e)     the Debtors' loss of the exclusive right to file a plan of reorganization;

(f)     the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code; or (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Required Consenting Creditors (as represented by counsel to the applicable Consenting Creditors); or (iii) appointment of a trustee, receiver, examiner with expanded power, responsible person or responsible officer in the Chapter 11 Cases;

(g)     the Debtors file any motion or pleading seeking to avoid, disallow, subordinate or recharacterize any claim held by any Terminating Consenting Creditors arising under the NYL Credit Agreement or the Term Loan B Credit Agreement, as applicable;

(h)     the termination by any of (i) the Consenting Creditors under Section 13.01, (ii) the Parent under Section 13.03 or (iii) the Debtors under Section 13.04;

(i)     entry into an agreement regarding an in-court or out-of-court restructuring or recapitalization transaction involving the Debtors or any subsidiary, without the prior written consent of the DIP Commitment Parties, such consent not to be unreasonably withheld;

(j)     any of the Restructuring Documents shall have been materially and adversely modified or withdrawn without the requisite prior written consent set forth in Section 3 with respect to such Restructuring Document;

(k)     the payment by Philadelphia Energy Solutions Refining and Marketing LLC of any amounts due under the Rail Terminaling Services Agreement, as amended;

(l)      the failure to meet any of the Milestones unless such Milestones have been waived or extended in accordance with Section 4.01 of this Agreement;

(m)      prior to the Solicitation Commencement Date, the failure by the Parent and the other parties to the PES Refining Contribution Agreement to have mutually agreed in writing (such agreement to be in form and substance acceptable to the DIP Commitment Parties) to sell, assign, grant, convey and transfer all of Parent's rights, indemnities, title, and interests in the PES Refining Contribution Agreement to the Assignee, from and after, and subject to the occurrence of, the Effective Date; *provided*, that such written agreement shall provide that the PES Refining Contribution Agreement shall survive the Restructuring Transactions, irrespective of any assignment, and remain in full force and effect;  or

(n)      prior to the Solicitation Commencement Date, the failure by the Parent and the other parties to the PES Advisory Agreement to have mutually agreed in writing (such agreement to be in form and substance acceptable to the DIP Commitment Parties) to the termination of the PES Advisory Agreement from and after, and subject to the occurrence of, the Effective Date; *provided*, that such written agreement shall provide that any and all PES Advisory Agreement Liabilities shall be released and deemed satisfied in full and with no further force and effect from and after, and subject to the occurrence of, the Effective Date.

13.03.   Parent's Termination Events.  This Agreement may be terminated by the Parent (on behalf of itself and the other Parent Parties) upon five (5) business days' written notice, delivered in accordance with Section 19.09 hereof, upon the occurrence and continuation of any of the following events:

(a)      the Effective Date of the Plan shall not have occurred on or before the Outside Date;

(b)      the breach by any of the Consenting Creditors or the Debtors of any material provision set forth in this Agreement that would have, or could reasonably be expected to have, a material adverse effect on the Restructuring and if such breach is capable of being cured, remains uncured for a period of ten (10) business days after the receipt by the Consenting Creditors or the Debtors, as applicable, of notice of such breach;

(c)      the termination by any of (i) the Consenting Creditors under Section 13.01 or (ii) the Debtors under Section 13.04;

(d)      any of the Restructuring Documents shall have been materially and adversely modified or withdrawn without the requisite prior written consent set forth in Section 3 with respect to such Restructuring Document; or

(e)      the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have, or could reasonably be expected to have, a material adverse effect on the consummation of the Restructuring; *provided*, that, to the extent such relief is capable of being obtained, the Consenting Creditors, Debtors or DIP Commitment Parties, as applicable, shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring.

13.04.  Debtors' Termination Events.  The Debtors may terminate this Agreement as to all Parties upon five (5) business days' prior written notice, delivered in accordance with Section 19.09 hereof, upon the occurrence of any of the following events:

(a)  the Effective Date of the Plan shall not have occurred on or before the Outside Date;

(b)  the breach by any of the Consenting Creditors or the Parent of any material provision set forth in this Agreement that would have, or could reasonably be expected to have, a material adverse effect on the Restructuring and if such breach is capable of being cured, remains uncured for a period of ten (10) business days after the receipt by the Consenting Creditors or the Parent, as applicable, of notice of such breach;

(c)  the board of directors, board of managers, or a similar governing body of either a Debtor, on its own, or the Debtors, collectively, determines in good faith based on advice of counsel that proceeding with the Restructuring would be inconsistent with applicable law or its fiduciary obligations under applicable law; or

(d)  the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have, or could reasonably be expected to have, a material adverse effect on the consummation of the Restructuring; *provided*, that, to the extent such relief is capable of being obtained, the Consenting Creditors, Parent or the DIP Commitment Parties, as applicable, shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring.

13.05.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among the Debtors and the Required Consenting Creditors.

13.06.  Termination Upon Completion of the Restructuring.  This Agreement shall terminate automatically without any further required action or notice upon the Effective Date.

13.07.  Effect of Termination.  No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.  The date on which termination of this Agreement as to a Party is effective in accordance with this Section 13 shall be referred to as a "**Termination Date**."  Upon the occurrence of a Termination Date as to a Party, other than as otherwise specified in Section 16, this Agreement shall be of no further force and effect and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement.  Upon the occurrence of a Termination Date, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by

the Parties in connection with the Restructuring and this Agreement or otherwise. Notwithstanding anything to the contrary in this Agreement, other than in the case of a termination under Section 13.06, the foregoing shall not be construed to prohibit the Debtors, the Parent Parties, or any of the Consenting Creditors from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of the Debtors or the ability of the Debtors to protect and preserve their rights (including rights under this Agreement), remedies, and interests, including their claims against any Consenting Creditor, (b) any right of any Consenting Creditor, or the ability of any Consenting Creditor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including their claims against the Debtors or any Consenting Creditor, and (c) any right of the Parent Parties or the ability of the Parent Parties to protect and preserve their rights (including rights under this Agreement), remedies, and interests, including their claims against the Debtors or any Consenting Creditor. Nothing in this Section 13.07 shall restrict any of the Debtors' right to terminate this Agreement in accordance with Section 13.04. For the avoidance of doubt, the occurrence or non-occurrence of any of the event or circumstance in Sections 13.01(o) or 13.02(k) (or any termination of this Agreement upon or following any such event or circumstance) shall in no way limit any right or remedy of the Consenting Term Loan A Agent or any holder of any NYL Credit Agreement Claim under the NYL Credit Agreement or otherwise as a result of such event or circumstance.

**Section 14.**    *Reserved.*

**Section 15.**    *Reserved.*

**Section 16.**    *Survival.*    Notwithstanding the termination of this Agreement pursuant to Section 13, the agreements and obligations of the Parties in Sections 10, 17, 18 and 19 hereof (and any defined terms needed for the interpretation of any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

**Section 17.**    *Fiduciary Duties.*    Nothing in this Agreement shall require the Debtors, including any of the Debtors' directors, managers, and officers in their capacities as such (including any employee, director or officer of the Parent serving in such capacity) to take or refrain from taking any action, with respect to the Restructuring (including terminating this Agreement under Section 13) to the extent such person or persons determines, based on the advice of counsel, that taking, or refraining from taking, such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law. The Debtors shall give prompt written notice of any determination made in accordance with this Section 17.

**Section 18.**    *Amendments*.    Except to the extent otherwise specified herein, this Agreement may not be modified, amended, supplemented or waived, and no consent may be granted hereunder, in each case in any manner except in writing signed by each of the Debtors and the Required Consenting Cash Flow Creditors; *provided* however, that (a) if the proposed modification, amendment, supplement or consent could reasonably be expected to have a direct, material and adverse effect on any of the rights or obligations of, or the treatment of the Claims held by, the DIP Commitment Parties, the Parent Parties, or the Additional Financing Lender, then the consent of the DIP Commitment Parties, the Parent Parties, or the Additional Financing Lender, as

applicable, shall also be required to effectuate such modification, amendment, supplement or consent and (b) no provision of this Agreement which provides for benefits or rights of the Consenting Term Loan A Agent or PNCCM may be amended, modified, consented to or supplemented without the prior written consent of the Consenting Term Loan A Agent and PNCCM. Any proposed modification, amendment, supplement or consent that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*.

**Section 19.    *Miscellaneous*.**

19.01.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring, as applicable, including (i) preparing and filing as promptly as practicable with any governmental authority or third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications, consents to assignment or otherwise and other documents and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any governmental authority, a Party hereto or other third party that are necessary, proper or advisable to consummate the Restructuring.

19.02.  <u>Complete Agreement</u>.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

19.03.  <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

19.04.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.  THIS AGREEMENT, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in either the United States District Court for the Southern District of New York or any New York state court located in the County of New York (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter; *provided* that after the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

19.05.   Trial by Jury Waiver.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

19.06.   Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

19.07.   Interpretation and Rules of Construction.  This Agreement is the product of negotiations among the Debtors and the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Debtors and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

19.08.   Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

19.09.   Notices.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)   if to the Debtors, to:

PES Holdings, LLC
1735 Market Street
Philadelphia, PA 19103
Attention:  John McShane
          john.mcshane@pes-companies.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Steven N. Serajeddini
          steven.serajeddini@kirkland.com

-and-

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Edward O. Sassower, P.C.
            esassower@kirkland.com

            Matthew C. Fagen
            matthew.fagen@kirkland.com


(b)     if to PESRM, to:

        Curtis, Mallet-Prevost, Colt & Mosle LLP
        101 Park Avenue
        New York, New York 10178
        Attention: Steven Reisman
                sreisman@curtis.com

                Theresa Foudy
                tfoudy@curtis.com

(c)     if to NY GP, to:

        Proskauer Rose LLP
        70 W. Madison, Suite 3800
        Chicago, Illinois
        Attention: Mark Thomas
                mthomas@proskauer.com

                -and-

        Proskauer Rose LLP
        2049 Century Park East
        Los Angeles, California
        Attention:  Peter Young
                pyoung@proskauer.com


(d)     if to a Consenting NYL Creditor, to:

        Cahill Gordon & Reindel LLP
        80 Pine Street
        New York, NY 10005-1702
        Attention:  Susanna M. Suh
                ssuh@cahill.com

                Joel Levitin
                jlevitin@cahill.com

27

Darren Silver
dsilver@cahill.com

(e)     if to a Consenting Term Loan A Agent, to:

PNC Bank, National Association
201 East Fifth Street
Cincinnati, OH 45202
Attention: S. Griffin Vollmer, Jr.
          stephen.vollmer@pnc.com

(f)     if to a Consenting Term Loan B Lender or DIP Commitment Party, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:  Damian Schaible
          damian.schaible@davispolk.com

(g)     if to a Consenting Additional Financing Lender, to:

Energy Transfer Partners, L.P.
1300 Main Street, Houston, TX 77002
Houston, Texas 75231
Attention:  Jim Wright
          jim.wright@energytransfer.com

and

Akerman LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Attention:  John E. Mitchell

(h)     if to the Parent Parties to:

Philadelphia Energy Solutions LLC
1735 Market Street
Philadelphia, PA 19103
Attention:  General Counsel

and

Akerman LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Attention:  John E. Mitchell

and

Latham and Watkins LLP
885 Third Avenue
New York, New York 10022
Attention: Keith A. Simon
                  Paul Sheridan

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.

19.10.  Independent Due Diligence and Decision Making.  Each Party hereby confirms that its decision to execute this agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors.

19.11.  Waiver.  If the Restructuring is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence and to the extent provided therein, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring, or the payment of damages to which a Party may be entitled under this Agreement.

19.12.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, in addition to any other remedy to which such non-breaching Party may be entitled at law or in equity.

19.13.  Several, Not Joint, Claims.  The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

19.14.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

19.15.  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

*[Remainder of page intentionally left blank.]*

**<u>Schedule 1</u> to**
**Restructuring Support Agreement**

**DIP Commitments**

See attached

EXECUTION VERSION

**Schedule 2 to**
**Restructuring Support Agreement**

**Assets or Rights**

The Parent owns (i) the Equity Interests in PES Holdings, LLC, and has $108,954,488 in cash, (ii) the trademark "Philadelphia Energy Solutions" (Registration # 4426486). All of the material Parent Agreements and material Parent Permits are listed in the table below:

| Type of Agreement | Party | Execution Date |
|---|---|---|
| NDA | Holt Logistics Corp | 5/17/2016 |
| NDA | Edgewood Holdings LLC | 5/20/2016 |
| NDA | Trafigura | 5/20/2016 |
| NDA | ARFA Enterprises, Inc. | 9/7/2017 |
| NDA | Tudor, Pickering, Holt & Co. - Calumet Lubricants Co. Limited Partnership | 2/3/2017 |
| Contribution Agreement | PES Holdings, LLC | 7/19/2012 |
| Contribution Agreement | PES Holdings, LLC, PESRM | 11/30/12 |
| Master Services Agreement (as amended) | Quality Transportation Services, Inc. | 2/1/2013 |
| Addendum Agreement | Sunoco, Inc., Sunoco, Inc. (R&M), PES Equity Holdings, LLC | 6/25/2014 |
| Incentive Unit Agreement | Michael Colavita | 2/4/2014 |
| Incentive Unit Agreement | Greg Gatta | 12/19/2012 |
| Incentive Unit Agreement | Steve Herzog | 12/19/2012 |
| Incentive Unit Agreement | Abraham Kaplan | 12/6/2012 |

| Type of Agreement | Party | Execution Date |
|---|---|---|
| Incentive Unit Agreement | James Keeler | 2/14/2014 |
| Incentive Unit Agreement | Gregory King | 2/14/2014 |
| Incentive Unit Agreement | John McShane | 12/19/2012 |
| Incentive Unit Agreement | John Pickering | 2/14/2014 |
| Incentive Unit Agreement | James T. Rens | 12/6/2012 |
| Incentive Unit Agreement | Philip Rinaldi | 12/6/2012 |
| Incentive Unit Agreement | David Ritter | 8/1/2014 |
| Incentive Unit Agreement | Lisa A Runyon | 12/19/2012 |
| Incentive Unit Agreement | Thomas Scargle | 2/14/2014 |
| Incentive Unit Agreement | Robert C. Stewart | 12/19/2012 |
| Incentive Unit Agreement | Nithia Thaver | 12/19/2012 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | Mark Brandon | 1/15/2016 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | Michael Colavita | 2/14/2014 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | Gregory G. Gatta | 12/19/2012 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | Steve Herzog | 12/19/2012 |

| Type of Agreement | Party | Execution Date |
|---|---|---|
| Confidentiality, Non-Compete and Non-Solicit Agreement | James Keeler | 2/14/2014 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | Gregory King | 2/14/2014 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | John McShane | 12/19/2012 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | John Pickering | 2/14/2014 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | Lisa A Runyon | 12/19/2012 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | John Sadlowski | 1/15/2016 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | Thomas Scargle | 2/14/2014 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | Robert C. Stewart | 12/19/2012 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | Nithia Thaver | 12/19/2012 |
| Confidentiality, Non-Compete and Non-Solicit Agreement | James T. Rens | 1/19/2016 |
| Severance Agreements (as amended) | Valentine Steve Herzog | 1/26/2015 |
| Severance Agreements (as amended) | Thomas Scargle | 1/26/2015 |
| Severance Agreements | James T. Rens | 1/19/2016 |

| Type of Agreement | Party | Execution Date |
|---|---|---|
| Severance Agreements | Gregory G. Gatta | 1/26/2015 |
| Severance Agreements | John B. McShane | 1/26/2015 |
| Severance Agreements | Nithia K. Thaver | 1/26/2015 |
| Severance Agreements | Mark Brandon | 1/15/2016 |
| Severance Agreements | John Sadlowski | 1/15/2016 |
| Subscription Agreement | Abraham Kaplan | 12/6/2012 |
| Subscription Agreement | Philip Rinaldi | 12/6/2012 |
| Subscription Agreement | James T. Rens | 12/6/2012 |
| Guaranty (as amended) | PES Equity Holdings LLC | 6/25/2014 |
| Publicity Agreement | GE (General Electric International, Inc., GE Energy (USA) LLC, GE Wired energy LLC) | 4/22/2014 |
| Refining Contribution Agreement | Sunoco, Inc. & Carlyle PES, LLC | 7/2/2012 |
| Amendment No. 1 to Refining Contribution Agreement | Philadelphia Energy Solutions Refining and Marketing, LLC, Sunoco, Inc. & Carlyle PES, LLC | 9/8/2012 |
| Registration Rights | Sunoco, Inc. & Carlyle PES, LLC | 9/8/2012 |
| Advisory Agreement | Carlyle Investment Management, LLC & Sunoco, Inc. | 9/8/2012 |
| Amended & Restated Limited Liability Company Agreement (as amended) | | 9/8/2012 |
| Agreement | Psychemedics Corporation | 1/8/2013 |

| Type of Agreement | Party | Execution Date |
|---|---|---|
| Pilot Agreement | City of Philadelphia, The School District of Philadelphia, PES Holdings, LLC, PESRM Holdings LLC, PESRM, LLC, PES Admin Services, LLC, North Yard GP, LLC & North Yard Logistics, LP | 6/13/2016 |
| Engagement Letter | Akin Gump | 8/2/2017 |
| Engagement Letter | Buchanan Ingersoll | 2/4/2015 |
| Engagement Letter | McNees Wallace & Nurick LLC | 4/24/2015 |
| Engagement Letter | McNees Wallace & Nurick LLC | 2/3/2016 |
| Engagement Letter | Skadden, Arps, Slate, Meagher & Flom LLP | 10/10/2017 |
| Engagement Letter | KPMG LLP | 9/21/2015 |
| Engagement Letter | KPMG LLP | 10/16/2017 |
| Engagement Letter (Restructuring) | KPMG LLP | 8/17/2017 |
| Engagement Letter (Tax opinion) | KPMG LLP | 8/17/2017 |
| Engagement Letter | Stradley Ronon | 12/23/2013 |
| Legal Tracker | Thomson Reuters | 4/20/2017 |
| Practice Point | Thomson Reuters | 5/25/2017 |
| Prospective Purchaser Agreement (Settlement Agreement and Covenant Not to Sue) | PESRM LLC & Sunoco, Inc. | 7/27/2012 |
| Buyer - Seller Consent Order Agreement | Sunoco, Inc. | 8/14/2012 |
| Fourth Amendment to Consent Decree | United States of America, Commonwealth of Pennsylvania, City of Philadelphia, State of Oklahoma, State of Ohio & Sunoco, Inc. | 8/4/2012 |

| Type of Agreement | Party | Execution Date |
|---|---|---|
| General Release of Claims | Michael Colavita | 10/31/2016 |
| Release Agreement | David Ritter | 4/1/2015 |
| General Release of Claims | James Keeler | 12/18/2015 |
| General Release of Claims | John Pickering | 12/18/2015 |
| Release Agreement | Philip Rinaldi | 3/31/2017 |
| General Release of Claims | Robert C. Stewart | 4/21/2017 |
| Separation Agreement | Philip Rinaldi | 3/31/2017 |
| Separation Agreement | David Ritter | 4/1/2015 |
| Guaranty | Valero and PESRM | 3/27/2017 |
| Guaranty | Sunoco Partners Marketing & Terminals L.P. and /or Sunoco Pipeline L.P. and PESRM | 6/28/2017 |
| Agreement | Sheraton Suites | 1/1/2018 |
| Aon Contract for Insurance Policy MACAR1700076 | Aon UK Limited | 2/1/2017 |
| AFCO Ins Premium Finance Agreement (Aon) | PES LLC & PESRM LLC | |
| AFCO Ins Premium Finance Agreement (Aon Other) | PES LLC & PESRM LLC | |
| AFCO Ins Premium Finance Agreement (Lockton) | PES LLC | |
| AFCO Ins Premium Finance Agreement (Lockton) Joint & Several | PES LLC & PESRM LLC | |

**EXECUTION VERSION**

| Type of Agreement | Party | Execution Date |
|---|---|---|
| Lockton Fee Arrangement | PES LLC | |
| Chubb Global Casualty Program Proposal 2-1-17 - 2-1-18 | PES LLC | |
| ACE (Chubb) Collateral & Payment Agreement | PES LLC | |
| BAML Signature Card, Banking Resolution, & Certificate of Incumbency | PES LLC | |
| BAML Authorization and Agreement for Treasury Services | PES LLC | |
| ACE (Chubb) Surety Agreement of Indemnity | PES LLC | |
| ACE (Chubb) Surety Agreement of Indemnity | Addendum per Oct 2014 SOA (adding PESIC LLC) | |
| ACE (Chubb) LC for Primary Insurance Program | PES LLC & PESRM LLC | |
| ACE (Chubb) LC for Primary Insurance Program - Admendment 1 | PES LLC & PESRM LLC | |
| ACE (Chubb) LC for Primary Insurance Program - Admendment 2 | PES LLC & PESRM LLC | |
| ACE (Chubb) Workers Compensation Insurance Policy No. C49107912 | Ace American Insurance Company | 2/1/2017 |

| Type of Agreement | Party | Execution Date |
|---|---|---|
| ACE (Chubb) Commercial Umbrella Liability Policy No. G27833056 002 | Ace Property and Casualty Insurance Company | 2/1/2017 |
| ACE Catastrophe Liability Plus Policy No. G24317092 005 | Ace American Insurance Company | 2/1/2017 |
| Commercial Liability Insurance Policy Nos. 001452904; 002583001 | Ironhorse Specialty Insurance Company | 2/1/2017 |
| Excess Liability Policy No. EAU76934 | Axis Surplus Insurance Company | 2/1/2017 |
| Excess Liability Policy No. 10F152461-2017-1; 1000030402171; US00073774LI17A; 1000030578171; B0713ENGLO1700260 | Lockton Companies, LLC | 2/1/2017 |
| AIG Marine Terminal Operators Liability Policy No. 045779282 | American International Group, Inc. | 2/1/2017 |
| AIG Marine Terminal Operators Liability Policy No. 045779283 | American International Group, Inc. | 2/1/2017 |
| Pollution Insurance Policy No. PEC004698301 | Lockton Companies, LLC | 2/1/2017 |
| Excess Environmental Insurance Policy No. AEC 0117876-01 | Zurich American Insurance Company | 2/1/2017 |
| ESIS Risk Mangement Services Agreement (Sep 2012 Original) | PES LLC | |
| ESIS Risk Mangement Services Agreement (Amendment through Jan 2018) | PES LLC | |

**EXECUTION VERSION**

| Type of Agreement | Party | Execution Date |
|---|---|---|
| Lockton Casualty Insurance Schedule | PES LLC & PESRM LLC | |
| Aon Property Insurance Schedule | PES LLC & PESRM LLC | |
| Databank | Philadelphia Energy Solutions | |
| Cisco | PES LLC | |
| Oracle | Philadelphia Energy Solutions | |
| Igen Fuels | Philadelphia Energy Solutions | |
| Merrill | Philadelphia Energy Solutions | |
| Thompson Reuters | Philadelphia Energy Solutions | |
| SABA | Philadelphia Energy Solutions | |
| SolarWinds | Philadelphia Energy Solutions | |
| Symantec | Philadelphia Energy Solutions | |
| Integration Point | Philadelphia Energy Solutions | |
| Citrix | Philadelphia Energy Solutions | |
| Iron Mountain | Philadelphia Energy Solutions | |
| Click Here Labs | Philadelphia Energy Solutions | |
| Sysaid | Philadelphia Energy Solutions | |
| SOTI Inc. | Philadelphia Energy Solutions | 7/27/2012 |
| Avalon | Philadelphia Energy Solutions | |
| R.M. Stoof & Associates, Inc. | Philadelphia Energy Solutions | 2/2/2016 |
| MessageOPS | PES | |
| Purchase Order | CDW Direct | 10/31/2017 |
| Purchase Order | Presidio Networked Solutions | 12/20/2017 |

EXECUTION VERSION

## Licenses, Permits and Approvals
## LICENSES, PERMITS AND APPROVALS

**433 Heater 1H1 NOx Limit Change Request –** submitted July 30, 2014 to City of Philadelphia, Department of Public Health, Air Management Services. Revised permit 06050A issued March 20, 2015.

**AMS Permit #17000061** issued February 10, 2017 to allow reactivation of Schuylkill River Tank Farm tank SR-64.

**Girard Point Wharf – DEP File No. CZ7;E51-128 Maintenance, including mechanical dredging (CENAP-OP-R-200002383-46) 082003.** Issued by the Pennsylvania Department of Environmental Protection – Office for River Basin Cooperation. Effective Date: August 20, 2003. No Termination Date. Additional Army Corps of Engineers approval under Nationwide Permit and E51-128 for bulkhead repairs dated December 20, 2016 and August 28, 2017. Similar PADEP acknowledgement and approval signed August 23, 2016 (3 areas) and April 24, 2017.

**Girard Point Wharf – mechanical maintenance dredging. CENAP-OP-R-2011-1083-46.** Issued by Army Corps of Engineers. Effective Date: January 15, 2014. Expires December 31, 2023. Army Corps approved revision on June 3, 2014.

**NJDEP Permit – maintenance dredging – NJDEP Permit # 0000-13-0014.1, CDT14001 -** approval for disposal at Weeks Marine Whites Basin, Logan Township, Gloucester County. Approval Date: January 14, 2014. Expiration date: January 13, 2019.

**PADEP Approval Letter – May 13, 2014** – approval for disposal of maintenance dredging material at

Biles Island CDF. No expiration date.

**401 Certification Fort Mifflin Confined Disposal Facility - 091903. Request for Water Quality Certification**. Effective Date: October 27, 2003. No Termination Date.

**401 Certification Fort Mifflin Confined Disposal Facility - 102703.** Water Quality Certification. Effective Date: October 27, 2003. No Termination Date.

**Certificate of Boiler of Pressure Vessel Operation, Water Tube Power Boiler 45 #3 BLRHS**. Certificate issued by the Commonwealth of Pennsylvania Department of Labor and Industry. Inspection completed; awaiting certificate.

**Settlement Agreement and Covenant Not to Sue in Docket No. CERC/RCRA-03-2012-0224DC, by and among PES LLC, PESRM, the City of Philadelphia, the PADEP and the U.S.** Effective August 9, 2012.

**Applications Submitted For Review**

**AMS Permit #16000225** application to allow ammonia injection for opacity control in the 868 FCCU Electrostatic Precipitator submitted October 13, 2016. Revised application submitted February 13, 2017. Draft permit went through public comment period that ended November 20, 2017. Clean Air Council submitted two comments that have delayed issuance of the permit.

**Health and Safety**

**Operation Permit No. 25116 for Hotworks Installation**. Issued by the PADEP on August 29, 2017. Expires August 29, 2018.

**Operation Permit No. 25117 for Hotworks Installation**. Issued by the PADEP on August 29, 2017. Expires August 29, 2018.

**Operation Permit No. 25118 for Hotworks Installation**. Issued by the PADEP on August 29, 2017. Expires August 29, 2018.

**Schedule 3 to**
**Restructuring Support Agreement**

**Agreements and Permits**
**Consents**

| Type of Agreement | Party | Execution Date |
|---|---|---|
| NDA | Edgewood Holdings LLC | 5/20/2016 |
| NDA | Trafigura | 5/20/2016 |
| NDA | Tudor, Pickering, Holt & Co. - Calumet Lubricants Co. Limited Partnership | 2/3/2017 |
| Severance Agreements (as amended) | Valentine Steve Herzog | 1/26/2015 |
| Severance Agreements (as amended) | Thomas Scargle | 1/26/2015 |
| Severance Agreements | James T. Rens | 1/19/2016 |
| Severance Agreements | Gregory G. Gatta | 1/26/2015 |
| Severance Agreements | John B. McShane | 1/26/2015 |
| Severance Agreements | Nithia K. Thaver | 1/26/2015 |
| Severance Agreements | Mark Brandon | 1/15/2016 |
| Severance Agreements | John Sadlowski | 1/15/2016 |
| Guaranty (as amended) | PES Equity Holdings LLC | 6/25/2014 |
| Refining Contribution Agreement | Sunoco, Inc. & Carlyle PES, LLC | 7/2/2012 |
| Amendment No. 1 to Refining Contribution Agreement | Philadelphia Energy Solutions Refining and Marketing, LLC, Sunoco, Inc. & Carlyle PES, LLC | 9/8/2012 |
| Registration Rights | Sunoco, Inc. & Carlyle PES, LLC | 9/8/2012 |
| Advisory Agreement | Carlyle Investment Management, LLC & Sunoco, Inc. | 9/8/2012 |

| Type of Agreement | Party | Execution Date |
|---|---|---|
| Amended & Restated Limited Liability Company Agreement (as amended) | | 9/8/2012 |
| Agreement | Psychemedics Corporation | 1/8/2013 |
| Pilot Agreement | City of Philadelphia, The School District of Philadelphia, PES Holdings, LLC, PESRM Holdings LLC, PESRM, LLC, PES Admin Services, LLC, North Yard GP, LLC & North Yard Logistics, LP | 6/13/2016 |
| Prospective Purchaser Agreement (Settlement Agreement and Covenant Not to Sue) | PESRM LLC & Sunoco, Inc. | 7/27/2012 |
| Buyer - Seller Consent Order Agreement | Sunoco, Inc. | 8/14/2012 |
| Separation Agreement | Philip Rinaldi | 3/31/2017 |
| Separation Agreement | David Ritter | 4/1/2015 |
| Guaranty | Valero and PESRM | 3/27/2017 |
| Guaranty | Sunoco Partners Marketing & Terminals L.P. and /or Sunoco Pipeline L.P. and PESRM | 6/28/2017 |
| Aon Contract for Insurance Policy MACAR1700076 | Aon UK Limited | 2/1/2017 |
| AFCO Ins Premium Finance Agreement (Aon) | PES LLC & PESRM LLC | |
| AFCO Ins Premium Finance Agreement (Aon Other) | PES LLC & PESRM LLC | |
| AFCO Ins Premium Finance Agreement (Lockton) | PES LLC | |

| Type of Agreement | Party | Execution Date |
|---|---|---|
| AFCO Ins Premium Finance Agreement (Lockton) Joint & Several | PES LLC & PESRM LLC | |
| Lockton Fee Arrangement | PES LLC | |
| Chubb Global Casualty Program Proposal 2-1-17 - 2-1-18 | PES LLC | |
| ACE (Chubb) Collateral & Payment Agreement | PES LLC | |
| BAML Signature Card, Banking Resolution, & Certificate of Incumbency | PES LLC | |
| BAML Authorization and Agreement for Treasury Services | PES LLC | |
| ACE (Chubb) Surety Agreement of Indemnity | PES LLC | |
| ACE (Chubb) Surety Agreement of Indemnity | Addendum per Oct 2014 SOA (adding PESIC LLC) | |
| ACE (Chubb) LC for Primary Insurance Program | PES LLC & PESRM LLC | |
| ACE (Chubb) LC for Primary Insurance Program - Admendment 1 | PES LLC & PESRM LLC | |
| ACE (Chubb) LC for Primary Insurance Program - Admendment 2 | PES LLC & PESRM LLC | |

| Type of Agreement | Party | Execution Date |
|---|---|---|
| ACE (Chubb) Workers Compensation Insurance Policy No. C49107912 | Ace American Insurance Company | 2/1/2017 |
| ACE (Chubb) Commercial Umbrella Liability Policy No. G27833056 002 | Ace Property and Casualty Insurance Company | 2/1/2017 |
| ACE Catastrophe Liability Plus Policy No. G24317092 005 | Ace American Insurance Company | 2/1/2017 |
| Commercial Liability Insurance Policy Nos. 001452904; 002583001 | Ironhorse Specialty Insurance Company | 2/1/2017 |
| Excess Liability Policy No. EAU76934 | Axis Surplus Insurance Company | 2/1/2017 |
| Excess Liability Policy No. 10F152461-2017-1; 1000030402171; US00073774LI17A; 1000030578171; B0713ENGLO1700260 | Lockton Companies, LLC | 2/1/2017 |
| AIG Marine Terminal Operators Liability Policy No. 045779282 | American International Group, Inc. | 2/1/2017 |
| AIG Marine Terminal Operators Liability Policy No. 045779283 | American International Group, Inc. | 2/1/2017 |
| Pollution Insurance Policy No. PEC004698301 | Lockton Companies, LLC | 2/1/2017 |
| Excess Environmental Insurance Policy No. AEC 0117876-01 | Zurich American Insurance Company | 2/1/2017 |
| ESIS Risk Mangement Services Agreement (Sep 2012 Original) | PES LLC | |

EXECUTION VERSION

| Type of Agreement | Party | Execution Date |
|---|---|---|
| ESIS Risk Mangement Services Agreement (Amendment through Jan 2018) | PES LLC | |
| Lockton Casualty Insurance Schedule | PES LLC & PESRM LLC | |
| Aon Property Insurance Schedule | PES LLC & PESRM LLC | |
| Databank | Philadelphia Energy Solutions | |
| Cisco | PES LLC | |
| Oracle | Philadelphia Energy Solutions | |
| Igen Fuels | Philadelphia Energy Solutions | |
| Merrill | Philadelphia Energy Solutions | |
| Thompson Reuters | Philadelphia Energy Solutions | |
| SABA | Philadelphia Energy Solutions | |
| SolarWinds | Philadelphia Energy Solutions | |
| Symantec | Philadelphia Energy Solutions | |
| Integration Point | Philadelphia Energy Solutions | |
| Citrix | Philadelphia Energy Solutions | |
| Iron Mountain | Philadelphia Energy Solutions | |
| Click Here Labs | Philadelphia Energy Solutions | |
| Sysaid | Philadelphia Energy Solutions | |
| SOTI Inc. | Philadelphia Energy Solutions | 7/27/2012 |
| Avalon | Philadelphia Energy Solutions | |
| R.M. Stoof & Associates, Inc. | Philadelphia Energy Solutions | 2/2/2016 |
| MessageOPS | PES | |

EXECUTION VERSION

| Type of Agreement | Party | Execution Date |
|---|---|---|
| Engagement Letter | KPMG LLP | 9/21/2015 |
| Engagement Letter | KPMG LLP | 10/16/2017 |
| Engagement Letter (Restructuring) | KPMG LLP | 8/17/2017 |
| Engagement Letter (Tax opinion) | KPMG LLP | 8/17/2017 |
| Purchase Order | CDW Direct | 10/31/2017 |

## LICENSES, PERMITS AND APPROVALS

1. **AMS Permit #17000061** issued February 10, 2017 to allow reactivation of Schuylkill River Tank Farm tank SR-64.

2. **Girard Point Wharf – DEP File No. CZ7;E51-128 Maintenance, including mechanical dredging (CENAP-OP-R-200002383-46) 082003.** Issued by the Pennsylvania Department of Environmental Protection – Office for River Basin Cooperation. Effective Date: August 20, 2003. No Termination Date. Additional Army Corps of Engineers approval under Nationwide Permit and E51-128 for bulkhead repairs dated December 20, 2016 and August 28, 2017. Similar PADEP acknowledgement and approval signed August 23, 2016 (3 areas) and April 24, 2017.

3. **Girard Point Wharf – mechanical maintenance dredging. CENAP-OP-R-2011-1083-46.** Issued by Army Corps of Engineers. Effective Date: January 15, 2014. Expires December 31, 2023. Army Corps approved revision on June 3, 2014.

4. **NJDEP Permit – maintenance dredging – NJDEP Permit # 0000-13-0014.1, CDT14001 -** approval for disposal at Weeks Marine Whites Basin, Logan Township, Gloucester County. Approval Date: January 14, 2014. Expiration date: January 13, 2019.

5. **Certificate of Boiler of Pressure Vessel Operation, Water Tube Power Boiler 45 #3 BLRHS**. Certificate issued by the Commonwealth of Pennsylvania Department of Labor and Industry. Inspection completed; awaiting certificate.

6. **Settlement Agreement and Covenant Not to Sue in Docket No. CERC/RCRA-03-2012-0224DC, by and among PES LLC, PESRM, the City of Philadelphia, the PADEP and the U.S.** Effective August 9, 2012.

## Applications Submitted For Review

1. **AMS Permit #16000225** application to allow ammonia injection for opacity control in the 868 FCCU Electrostatic Precipitator submitted October 13, 2016. Revised application submitted February 13, 2017. Draft permit went through public comment period that ended November 20, 2017. Clean Air Council submitted two comments that have delayed issuance of the permit.